COPY

1  Geoffrey M. Davis (CA Bar No. 214692)
   geoff.davis@klgates.com
2  K&L Gates LLP
   10100 Santa Monica Blvd., 8th Floor
3  Los Angeles, CA 90067
   Telephone: +1 310 552 5000
4  Facsimile: +1 310 552 5001

ORIGINAL
FILED

NOV 16 2016

5

6  Attorney for Plaintiff

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

LB

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10 ENIGMA SOFTWARE GROUP USA, LLC,      Case No.

CV 16  80  243 MISC

11              Plaintiff,           Underlying Litigation:
                                     Case No.: 1:16-cv-00057 (PAE)
12 v.                                United States District Court
                                     Southern District of New York
13 BLEEPING COMPUTER LLC and
   DOES 1-10,                        Hearing Date: TBD
14                                   Hearing Time: TBD
                Defendants.          Location: TBD
15
                                     **DECLARATION IN SUPPORT OF THE**
16                                   **MEMORANDUM OF POINTS AND LAW IN**
                                     **SUPPORT OF THE MOTION TO**
17                                   **TRANSFER OR COMPEL MALWAREBYTES**
                                     **INC.'S COMPLIANCE WITH FRCP 45**
18                                   **DOCUMENT SUBPOENA**

19

20                    **DECLARATION**

21      I, Geoffrey M. Davis, hereby declare:

22      1.    I am an attorney at K&L Gates LLP and am licensed to

23 practice law in California.  I am admitted to this Court.  I am

24 counsel for Plaintiff Enigma Software Group USA, LLC ("ESG") in the

25 above-captioned action.

26      2.    I make this declaration in support of the Memorandum of

27 Points and Law in Support of Plaintiff's Motion to Transfer or

28 Compel the Discovery Responses of Malwarebytes, Inc.

                              1

3.   I have been informed that on October 26, 2016, Christopher M. Verdini and Anna Shabalov, attorneys at K&L Gates LLP and counsel for ESG, met and conferred via telephone conference with Tyler Newby and Sapna Mehta, attorneys at Fenwick & West LLP and counsel for Malwarebytes Inc. ("Malwarebytes").  Counsel, however, were unable to resolve the disputed issues during that call.

4.   Attached hereto as Exhibit 1 is a true and correct copy of the Subpoena to Produce Documents, Information or Objects pursuant to Rule 45 of the Federal Rules of Civil Procedure that ESG served on Malwarebytes on September 7, 2016 (the "Subpoena").

5.   Attached hereto as Exhibit 2 is a true and correct copy of the Second Amended Complaint filed by ESG on March 18, 2016 in Case No. 1:16-cv-00057 (PAE), captioned *Enigma Software Group USA, LLC v. Bleeping Computer LLC and Does 1-10* ("Underlying Litigation").

6.   Attached hereto as Exhibit 3 is a true and correct copy of the Opinion & Order on Bleeping Computer LLC's Motion to Dismiss ESG's Second Amended Complaint issued by Judge Paul A. Engelmayer on July 8, 2016 in the Underlying Litigation.

7.   Attached hereto as Exhibit 4 is a true and correct copy of the Objections and Responses to the Subpoena that Malwarebytes served on ESG on October 11, 2016.

8.   Attached hereto as Exhibit 5 is a true and correct copy of the Responses and Objections to Plaintiff's First Request for Production of Documents served by Bleeping Computer LLC ("Bleeping") on ESG on October 26, 2016 in the Underlying Litigation.

2

1     9.    Attached hereto as Exhibit 6 is a true and correct copy

2  of the Complaint filed by ESG on October 7, 2016 in Case No. 1:16-

3  cv-7885 (PAE) (S.D.N.Y.), captioned *Enigma Software Group USA, LLC*

4  *v. Malwarebytes Inc.*

5     10.    Attached hereto as Exhibit 7 is a true and correct copy

6  of the Memorandum of Law in Support of Motion to Dismiss Second

7  Amended Complaint as to Defendant Bleeping Computer LLC, filed by

8  Bleeping on April 8, 2016 in the Underlying Litigation.

9     11.    Attached hereto as Exhibit 8 is a true and correct copy

10  dated November 12, 2016 of the profile of user "Quietman7" on

11  Malwarebytes' online forums, which is available at

12  https://forums.malwarebytes.org/profile/2934-quietman7/.

13     I declare under penalty of perjury that the foregoing is true

14  and correct.  Executed November 15, 2016, at Los Angeles,

15  California.

16                           Respectfully submitted by,

17

18                           Geoffrey M. Davis (CA Bar No. 214692)

19                           geoff.davis@klgates.com
K&L GATES LLP

20                           Attorney for Plaintiff

21

22

23

24

25

26

27

28

DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION TO TRANSFER OR COMPEL
DISCOVERY RESPONSES OF MALWAREBYTES INC.

# EXHIBIT 1

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| ENIGMA SOFTWARE GROUP USA, LLC | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 1:16-cv-00057 (PAE) |
| BLEEPING COMPUTER LLC and DOES 1-10 | ) |
| | ) |
| *Defendant* | ) |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To:                            Malwarebytes Corporation

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:    See Exhibit A.

| Place: K&L Gates LLP | Date and Time: |
|---|---|
| 4 Embarcadero Ctr Ste 1200, San Francisco, CA 94111 or electronically in a mutually agreeable format | 10/12/2016 9:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:       09/07/2016

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Enigma Software Group USA, LLC                                         , who issues or requests this subpoena, are:

Eric A. Prager, K&L GATES LLP, 599 Lexington Avenue New York, NY 10022
Email: eric.prager@klgates.com, Telephone: 212 536 3900

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:16-cv-00057 (PAE)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

<u>**EXHIBIT A**</u>

<u>**DEFINITIONS**</u>

1.      The term "communication" means any disclosure, transfer, transmission or exchange of information (in the form of facts, ideas, inquiries or otherwise) by whatever means including, but not limited to, oral, written, face-to-face, telephone, facsimile, network transfer, electronic mail, personal digital assistant messages, smart phone messages, voice-mail, text messages, postal mail, personal delivery, or otherwise.

2.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a) and all applicable case law, including, without limitation, electronically stored information and the definitions set forth in Rule 1001 of the Federal Rules of Evidence.  Any document bearing marks, including without limitation, initials, stamped initials, comments, or notations not a part of the original text or photographic reproduction thereof, is a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.  In addition, electronically stored information is any information that is stored electronically and includes, but is not limited to:

> Writings, drawings, graphs, charts, photographs, sound recordings, images, email from any type of e-mail system, e-mail attachments, facsimiles, and other data or data compilations, including metadata, stored in any medium from which information can be obtained, including personal computer drives, external hard drives, server/network drives, databases, CDs, diskettes, floppy disks, PDAs, Blackberries, laptops, voicemail, Zip-drives, flash/thumb/or any other type of external drives.

3.      The term "person" is defined as any natural person or any business, legal or governmental entity or association.

4.      The term "concerning" means relating to, referring to, describing, evidencing or constituting.

5.      The following rules of construction apply to all Requests:

1

(a)   The terms "all," "any," and "each" shall be construed as encompassing any and all.

(b)   The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

(c)   The use of the singular form of any word includes the plural and vice versa.

(d)   The present tense shall be construed to include the past tense and vice versa.

(e)   The term "including" shall be construed in its broadest sense and shall mean, without limitation, "including, but not limited to."

6.      The terms "Malwarebytes," "you," and "your" mean Malwarebytes Corporation and all subsidiaries, affiliates, segments or divisions, whether or not organized under the laws of the United States, any present or former members of the Board of Directors, any present or former officers, directors, agents, employees, attorneys, accountants, persons or entities acting or purporting to act on its behalf, or entities authorized to act on its behalf, including any predecessors in interest.

7.      The term "ESG" refers to Plaintiff Enigma Software Group USA, LLC.

8.      The term "Bleeping" means Defendant Bleeping Computer LLC and all subsidiaries, affiliates, segments or divisions, whether or not organized under the laws of the United States, any present or former officers, directors, agents, employees, attorneys, accountants, persons or entities acting or purporting to act on its behalf, or entities authorized to act on its behalf, including any predecessors in interest.

9.      The term "Litigation" means the above-captioned action.

10.     The term "Complaint" means the Second Amended Complaint filed by ESG in the above-captioned action and attached hereto.

11.     The term "SpyHunter" refers to an anti-malware software program developed by ESG and includes both current and former versions of the program.

12.     The terms "Global Moderator" and "Advisor" mean the levels of member groups on Bleeping's website, forums and/or message boards, as described by those names in Exhibit 2 of the Complaint attached hereto.

13.     The term "Staff" shall refer to the "Admin," "Site Admin," "Global Moderator," "Moderator," "Advisor," "Malware Response Instructor," "Malware Response Team Member," and "Malware Study Hall Admin" member groups on Bleeping's website, forums and/or message boards, as described in Exhibit 2 of the Complaint.

14.     The term "Affiliate" refers to entities from which Bleeping receives "affiliate commissions," as referred to in Exhibit 1 of the Complaint, and which sell antimalware products that compete with SpyHunter.

15.     The term "Quietman7" refers to the person who posts under that name on Bleeping's website, forums and/or message boards.

16.     Unless otherwise specified, the time frame for these Document Requests is for January 1, 2013 to the present.

**DOCUMENT REQUESTS**

1.     All communications or documents reflecting communications with Bleeping concerning ESG or SpyHunter.

2.     All communications or documents reflecting communications with Quietman7 concerning ESG or SpyHunter.

3.     All documents reflecting any oral or written agreement between Malwarebytes and Bleeping.

4.      All documents reflecting any oral or written agreement between Malwarebytes and Quietman7.

5.      All documents reflecting Malwarebytes' policies, procedures and practices to which Bleeping is subject as a Malwarebytes Affiliate.

6.      All communications or documents reflecting communications between Malwarebytes and Bleeping concerning Bleeping's advertising, promotion, or sale of Malwarebytes' products, including Bleeping's use or placement of Affiliate Links or its participation as an Affiliate of Malwarebytes.

7.      All communications or documents reflecting communications between Malwarebytes and Bleeping, Quietman7, and/or any other member of Bleeping's Staff concerning the content of postings by Bleeping, Quietman7 and/or any other member of Bleeping's Staff on Bleeping's website, forums and/or message boards.

8.      All documents concerning compensation in any form whatsoever, whether monetary or in-kind, that Malwarebytes provides to Bleeping, Quietman7, and/or any other member of Bleeping's Staff.

9.      Documents sufficient to show all payments made by Malwarebytes to Bleeping from January 1, 2013 to the present, itemized by date paid and purpose of the payment.

10.      All communications or documents reflecting communications between Marcin Kleczynski and Lawrence Abrams regarding Enigma, SpyHunter, Bleeping's advertising, promotion, or sale of Malwarebytes' products, and/or the Litigation.

11.      All communications or documents reflecting communications between Marcin Kleczynski and Quietman7 regarding Enigma, SpyHunter, Bleeping's advertising, promotion, or sale of Malwarebytes' products, and/or the Litigation.

4

12.     Documents sufficient to show each contribution from Malwarebytes, Marcin Kleczynski, or any other Malwarebytes executive to Bleeping's defense fund for this Litigation, including its amount.

13.     All communications or documents reflecting communications between Malwarebytes, Marcin Kleczynski, or any other Malwarebytes executive and Bleeping regarding this Litigation or contribution to Bleeping's defense fund.

14.     All documents concerning the Litigation, including communications with third parties regarding the Litigation.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                                        :
ENIGMA SOFTWARE GROUP USA, LLC,                         :
                                                        :
                            Plaintiff,                  :
                                                        :       Case No. 1:16-cv-00057 (PAE)
                                                        :
                  -against-                             :
                                                        :
BLEEPING COMPUTER LLC and                               :
DOES 1-10,                                              :
                                                        :       **SECOND AMENDED COMPLAINT**
                            Defendants.                 :
                                                        :
                                                        :
--------------------------------------------------------x

Plaintiff Enigma Software Group USA, LLC ("ESG"), by its attorneys, for its Second

Amended Complaint against Defendants Bleeping Computer LLC ("Bleeping") and Does 1-10,

respectfully alleges as follows:

## SUMMARY OF THE CASE

1.      This is an action for civil remedies, including injunctive relief and damages, under

the federal Lanham Act and under New York State law, arising out of the malicious publication

and use in commerce of false, misleading, disparaging, and defamatory statements by Bleeping

and Does 1-10 regarding ESG and its SpyHunter software product.

2.      Bleeping owns and operates a website at <http://www.bleepingcomputer.com>

(the "Bleeping Website") that Bleeping advertises to the public as a "premier" destination for

computer users to learn how to use and receive support for their computer and a place "for the

novice user to learn basic concepts about Computer Technology."

3.      Bleeping further touts its "staff" as providing "high quality and expert responses"

to questions and represents to consumers that its "staff" "can be trusted to give correct and

understandable answers" to computer system, technical and operational questions from the users.

4.      Bleeping targets all types of consumers -- individuals, employers, businesses, and clients, to name a few -- who often do not know the "basic concepts" that underlie computer system and operational issues and rely on Bleeping's representations and recommendations when purchasing, among other things, security protection software products that protect against viruses and hackers.  As a necessary consequence, these consumers often are not in a position to assess, measure or fully evaluate the accuracy and/or reliability of statements made by Bleeping, making it all the more necessary that Bleeping meets its self-proclaimed standards of giving truthful, accurate, non-biased information to its users.

5.      As noted, one of the most important areas in which Bleeping provides computer system installation and operational information to novice users concerns anti-malware software, which attempts to protect users from malicious computer programs that can, among other things, lead to data destruction, identity theft, and unauthorized access to sensitive individual and/or employer/business information.

6.      Based on Bleeping's own self-designed and self-proclaimed business model, consumers look to Bleeping to provide accurate, truthful, unbiased information about anti-malware products and rely upon Bleeping's computer science information to make critical decisions about purchasing anti-malware products that will protect them from the dangers of malicious computer programs — which is an area of particular heightened concern for consumers given the daily risks faced by computer users of their personal or business computer systems being hacked in today's environment of computer system breaches, both from domestic and international computer hacker threats.

7.      Bleeping, however, uses its Bleeping Website to generate profits for itself by

promoting and recommending anti-malware products for which it receives commissions. Under the guise of giving "correct and understandable answers," Bleeping purposely pushes users away from anti-malware products for which it does not receive commissions and toward specific anti-malware products for which it receives sales commissions.

8.     Bleeping furthers its business model by providing hyperlinks to the anti-malware products for which Bleeping receives commissions any time its "staff" mentions such a product. Through only a few clicks on the computer screen, Bleeping takes its user from the Bleeping Website directly to the third-party webpage where the user can buy the product that earns Bleeping a commission.

9.     On information and belief, Bleeping purposefully designed its website to bury the fact that it receives commissions from the products it promotes by placing the disclosure in one hard-to-find location on its website that consumers are unlikely to frequent.

10.    One of the products Bleeping promotes -- and a product it receives revenues based on direct commissions for selling -- is sold by Malwarebytes, a direct ESG competitor. On information and belief, these commissions are not insignificant to Bleeping's financial revenues and success.

11.    Bleeping does not receive and has never received commissions from ESG, whose products it has a pattern of smearing through false and misleading statements on its Website.

12.    Thus, Bleeping has a direct financial interest in driving traffic and sales to Malwarebytes and driving traffic and sales away from ESG.

13.    To further that interest, Bleeping as part of its business model has adopted and employed a pattern of making false, inaccurate, misleading and disparaging statements about ESG and ESG's products that protect computers and computer users from hackers, breaches and

security threats, for the purpose of steering consumers away from purchasing ESG's products while simultaneously recommending that its "novice" forum members use Malwarebytes programs for which Bleeping is paid commissions.

14.     Bleeping not only has unlawfully benefited in cash revenues from its dissemination of false, misleading and inaccurate information about ESG to the detriment of ESG and consumers, but it also has damaged the reputation of ESG by refusing to take down its false and misleading statements which, with Bleeping's encouragement and express permission, have been posted and reposted numerous times on other anti-malware related forums and websites.

15.     ESG brings this lawsuit to put an end to Bleeping's smear campaign and to stop the false and misleading information Bleeping has published, disseminated and promoted and continues to publish, disseminate and promote to the detriment of ESG and consumers.

## THE PARTIES

16.     Plaintiff ESG is a Florida limited liability company, having merged with a Connecticut limited liability company of the same name.  ESG does business in this District, but none of ESG's members is a resident or citizen of the State of New York.

17.     Upon information and belief, Defendant Bleeping is a New York limited liability company with a business address at P.O. Box 1025, Melville, New York 11747.

18.     Upon information and belief, Defendants Does 1-10 are entities and individuals that have acted on behalf of or in conjunction with Bleeping in carrying out the acts complained of herein.

## JURISDICTION AND VENUE

19.     This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and the laws of the State of New York.  This Court has subject matter jurisdiction, *inter alia*, pursuant to 28

U.S.C. §§ 1331, 1332, 1338, and 1367.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

### Background

21.     ESG develops and markets computer security products with a particular focus on protecting its millions of customers from computer hacks, system breaches, identity theft and system computing malware, as well as other computer security threats.

22.     As described by the Federal Trade Commission (<https://www.ftc.gov/news-events/media-resources/identity-theft-and-data-security/spyware-and-malware>): "[m]alware, short for 'malicious software,' includes viruses and spyware that can steal personal information, send spam, and commit fraud.  Criminals use appealing websites, desirable downloads, and compelling stories to lure consumers to links that will download malware – especially on computers that don't use adequate security software.  Spyware is one type of malware that can monitor or control your computer use.  It may be used to send consumers pop-up ads, redirect their computers to unwanted websites, monitor their Internet surfing, or record their keystrokes, which, in turn, could lead to identity theft."

23.     ESG protects its customers from this array of serious risks by providing software that detects and removes malware, enhances Internet privacy, and eliminates other security threats.

24.     ESG's flagship anti-malware product is a software program called SpyHunter, which presently is in version 4.

25.     ESG sells licenses to SpyHunter solely over the Internet, including at its website, <http://www.enigmasoftware.com>.  ESG enjoys worldwide sales of SpyHunter, including sales to citizens of the State of New York.

26.     SpyHunter is an adaptive malware detection and removal tool that provides rigorous protection against the latest malware threats including spyware, Trojans, rootkits, and other malicious software.

27.     Consumers can download a free scanning version of SpyHunter through a link entitled "Download Free Scanner."  The scanner detects whether a computer has malware or other threats.

28.     ESG informs consumers that they also have the choice to buy a license to the full version of SpyHunter and provides consumers with a "Buy Now" link.  The full version of SpyHunter includes the scanner, tools to remove malware and other security protection tools.

29.     ESG's SpyHunter product has received top industry certifications.

30.     SpyHunter has received the Checkmark Certification from West Coast Labs. Checkmark Certification is a highly regarded accreditation program, recognized globally by vendors, end users, and government agencies as providing reliable confirmation of a product's effectiveness in an ever-changing threat landscape.  Checkmark Certification validates the functionality and performance of both content and network security technologies in a range of threat scenarios and attack vectors from standard baseline benchmarking tests against accepted industry standards.

31.     ESG is a Better Business Bureau accredited business.  Better Business Bureau accreditation standards include a "commitment to make a good faith effort to resolve any consumer complaints."  ESG has received an "A+" rating from the Better Business Bureau.

### Bleeping Is A Commercial Enterprise That Earns Profits By Peddling The Products For Which It Receives Commissions and Financial Gain

32.     Defendant Bleeping holds itself and its designated staff members out as experts in computer security technical and operational matters that novice users can rely upon and trust to

provide correct, unbiased and truthful advice.

33.     Upon information and belief, Bleeping and its designated staff members do not provide such unbiased advice, but rather, under the guise of giving users "advice," seek to influence users to purchase certain software for which Bleeping receives commissions and from which it builds its revenues.

34.     Bleeping owns and controls the Bleeping Website, which is divided into several sections: (1) News; (2) Downloads; (3) Virus Removal Guides; (4) Tutorials; (5) Deals; (6) Forums; and (7) More.

35.     Bleeping generates profits through, among other things, the placement of "Affiliate Links" on its website.

36.     To create Affiliate Links, Bleeping uses a program called "SkimLinks" that automatically transforms posted links and certain keywords into affiliate links.

37.     By providing Affiliate Links, Bleeping earns a commission if a consumer simply clicks on the link and then purchases the product that Bleeping is peddling.

38.     Bleeping pushes consumers to products that earn them commissions through its "Virus Removal Guides," which "use programs and utilities that generate commissions for [Bleeping] when [a user] purchase[s] them." *See* Ex. 1.  Upon information and belief, Bleeping does not disclose its self-interest in the products used in its Virus Removal Guides within the Guides themselves.

39.     In its "Downloads" section, Bleeping provides "special offers and affiliate links that will generate a commission for [Bleeping] if [the user] purchase[s] the software." *See* Ex. 1. Upon information and belief, Bleeping does not disclose its self-interest in the products that Bleeping provides in the Download section of the Bleeping Website.

40.     Similarly, Bleeping provides Tutorials that "may discuss or require specific hardware or software that contain affiliate links that will generate a commission for [Bleeping] if [a user] purchase[s] them." *See* Ex. 1.  Upon information and belief, Bleeping does not disclose its self-interest in the products used in its Tutorials within the Tutorials themselves.

41.     Bleeping uses Affiliate Links not only in the Virus Removal Guides, Downloads, and Tutorials sections that it offers consumers, but also on its forums where users and Bleeping's "staff" comment on and post information about topics related to computer technology.

42.     In the "About BleepingComputer" portion of its website, which can be accessed only from a link at the very bottom of the Bleeping Website, Bleeping explains that it uses Affiliate Links that "generate a commission for [Bleeping] if [a user] use[s] them to purchase a product." *See* Ex. 1.  Bleeping further admits on that page that "the products that we [Bleeping] routinely use in our guides and that we receive affiliate commissions from are MalwareBytes, Emsisoft, and SuperAntiSpyware." *See* Ex. 1.  Upon information and belief, Bleeping generally does not include this disclosure elsewhere on the Bleeping Website, including on its security forums.

43.     The Bleeping Website is designed, operated, and intended as a commercial enterprise that generates revenues through advertising and commissions from affiliates whose products Bleeping promotes and sells through its website.

44.     Through Bleeping's chosen mode of operation, Bleeping functions as a sales arm of Malwarebytes.

**Bleeping And Its Handpicked, Specially Appointed Moderators Control, Directly And/Or Indirectly, The Content On Its Forums**

45.     To direct and control the functioning and content of the forums on the Bleeping Website, Bleeping has purposely designed, structured and implemented a special hierarchy of

"member groups."

46.     Bleeping provides its members with a "current list" of the individuals who are in each "member group" and informs users of its website about the "member group" status of such persons when they post information on Bleeping's forums, including whether they are a designee to act on behalf of Bleeping.  *See* Ex. 2.

47.     The highest level "member group" specifically designated and appointed by Bleeping is "Admin & Site Admins."  Lawrence Abrams, the owner of Bleeping, is the overall "Admin" of the Bleeping Website and forums and has the final say when appointing all other staff positions.

48.     The second-highest level "member group" specifically designated and appointed by Bleeping is "Global Moderator & Moderators."

49.     Bleeping holds Global Moderators out to its members as top computer system experts and describes them as follows:

> A Bleeping Computer Global Moderator or Moderator is someone granted special powers by the Admins to enforce the rules of Bleeping Computer Forums.  All moderators on all forums can move discussions to different sections of the forum, "close" discussions to prevent users from continuing to discuss them, as well as edit the content of individual posters.  Moderators of both levels answer questions (or help people with problems), and "pin" discussions so they remain visible in their forum section even if no new postings are made to them.  Global Moderators have a few additional powers above that of regular Moderators, the most important of which is the ability to suspend forum posting privileges of members who violate forum rules.

*See* Ex. 2.

50.     The third-highest "member group" specifically designated and appointed by Bleeping is "Advisors."

51.     Bleeping holds Advisors out to its users as follows:

> Bleeping Computer Advisors are regular forum contributors who have been nominated by other current Advisors or other members of the staff as a result of their consistently high quality and expert responses to people's questions in the forums; Advisors can be trusted to give correct and understandable answers to our member's questions.

*See* Ex. 2.

52.     As noted, Bleeping, on its own and through its own decision making, actively selects which members are appointed as Global Moderators, the top echelon experts, as well as Moderators and Advisors, and assigns them each specific duties.

53.     Upon information and belief, Bleeping's Global Moderators, Moderators, and Advisors are authorized to and expected to post in Bleeping's forums.  When they make a posting, Bleeping clearly identifies that the post has been made by a Global Moderator, Moderator, or Advisor.  *See, e.g.*, *infra* at ¶ 69.

54.     In addition to designating Advisors, Moderators, and Global Moderators to generate and control content on its forums, Bleeping has also designed, structured and implemented a malware removal training program, which it calls the "Bleeping Computer Malware Study Hall."  *See* Ex. 2.

55.     The program is taught by "Malware Response Instructors" and overseen by "Malware Study Hall Admins," each of whom is ultimately specifically selected and appointed by Bleeping itself as part of its business model.

56.     Bleeping requires individuals to apply for the position and then determines whether to accept the applicant to the program as a "Malware Trainee."  In the third stage of the training, when the individual is a "Malware Study Hall Senior," Bleeping requires the trainee to assist forum users with technical and operational computer problems "under the assistance and supervision of [Bleeping] instructors."

57.     Bleeping represents that the purpose of the training program is for Malware Trainees to "gain[] the knowledge and study[] the theory behind the analysis of Malware removal logs, with the aim of eventually joining the Malware Response Team."

58.     In addition to the Malware Response Team's moderator duties, Bleeping instructs its Malware Response Team to assist forum users with specific malware removal processes.

59.     Upon information and belief, Bleeping instructs its Malware Trainees to use specific Bleeping-approved methods, tools, and programs for malware removal.  Once Malware Trainees are elevated to members of the Malware Response Team, they are expected when posting in Bleeping's forums to continue using and recommending the methods, tools, and programs they were taught in Bleeping's training program.

60.     Bleeping promotes and/or effectively represents to its users that its Global Moderators, Moderators, Advisors, Malware Response Team Members, Malware Response Instructors, and Malware Study Hall Admins are "staff members."

61.     On information and belief, Bleeping does not require its "staff members" to disclose their business affiliations, even when the Bleeping "staff member" also holds a position with one of Bleeping's Affiliates to whom Bleeping directs sales to achieve commission revenues.  *See, e.g.*, Ex. 3.

62.     Upon information and belief, Bleeping maintains a policy of directing its staff members to recommend and promote certain products for which it receives commissions from which it builds its revenues and to discourage use of other products from which it does not receive commission.

63.     In fact, Bleeping has a policy that "[p]osting referral links to non-Bleeping Computer malware removal guides is generally NOT permitted in this or any other forum with the exception of well known security vendors like Kaspersky, ESET, Symantec, etc which sometimes release specialized fix tools with instructional documentation."

64.     On Bleeping's forums, Bleeping "staff" members routinely recommend and promote products offered by Bleeping's affiliates, including Malwarebytes.

65.     One of Bleeping's "staff" members is known as "Quietman7."  He serves as one of the top echelon computer system experts specially appointed by Bleeping, a Global Moderator.  Upon information and belief, at all relevant times there have been only three Global Moderators.

66.     In March 2006, Bleeping announced to its users that it had specially appointed Quietman7 as an Advisor.  *See* Ex. 4.

67.     Bleeping made the announcement with a post entitled "New Advisor--quietman7" in which Bleeping stated: "***Quietman7 has quietly been added to the staff*** here at BC [Bleeping Computer] as an advisor.  Now we can shout a warm welcome!!!!  Congratulations, welcome, and thanks for becoming an even larger asset for BC [Bleeping Computer]!"  *See* Ex. 4 (emphasis added).

68.     Mr. Abrams, the owner of Bleeping and sole administrator for the entire Bleeping Website, responded to the March 2006 post by congratulating Quietman7 and thanking him "***for accepting the position***" to which Quietman7 responded "***it is a pleasure to be part of the BC [Bleeping Computer] staff*** . . . ."  *See* Ex. 4 (emphasis added).

69.     In September 2007, Mr. Abrams himself created a post entitled "Big Thank You To Our Newest Global, Quietman7" in which he announced to Bleeping's forum users that

Quietman7 had accepted the "position, of Global Moderator here at BC [Bleeping Computer]."

*See* Ex. 5.

70.    Quietman7 responded to the announcement as follows:

> Thanks everyone and thanks Grinler [Abrams' username] for
> offering the sentence … grrr … I mean position.  There are not
> many [web]sites who will give an ex-cop, now a "Bleepin' Janitor"
> the keys to the kingdom.  Usually I only get the keys to the broom
> closet and back door so I can take out the trash.

*See* Ex. 5.

71.    Since he became a Global Moderator, Quietman7's posts have prominently

identified him as a Global Moderator.  Recently, he has also begun to sign posts as "***The BC***

***Staff***" (emphasis added).

72.    As the picture below from Bleeping's website shows, Bleeping and Quietman7

further promote Quietman7 as a special staff spokesman for Bleeping by using Bleeping's own

proprietary business name in identifying Quietman7 to users on the Bleeping Website as the

"Bleepin' Janitor" and using a well known image of "Dick Tracy" as Quietman7's avatar -- a

not-so-subtle and deliberate use of the iconic police detective who was universally viewed as an

idealized police figure committed to chasing rogues.



73.    Upon information and belief, in addition to serving as a Global Moderator,

Quietman7 is active in Bleeping's malware removal training program, providing instruction

and/or administrative support for other Bleeping "staff" members.

74.     In his role as one of only three Global Moderators and as a "staff member" of Bleeping, Quietman7 is and acts as an agent of Bleeping.

75.     Quietman7 and Bleeping's other "staff" members routinely promote Malwarebytes in their forum postings to advocate consumers purchasing Malwarebytes' products for which Bleeping receives commission revenues.

76.     Quietman7 and other Bleeping "staff" also routinely engage in a pattern of disparaging ESG and misleading consumers through false and misleading information about ESG and its products.  Upon information and belief, Bleeping's conduct is not a mere coincidence.

77.     Indeed, upon information and belief, Malwarebytes has provided thousands of dollars of funding to Bleeping's defense of this action.  This direct financial support from Malwarebytes to Bleeping is further evidence of the common interest between them -- both profit from Bleeping's dissemination of inaccurate, false and misleading information to consumers about ESG for the express business motive of driving consumers away from ESG's products and to purchasing Malwarebytes' products, from which Bleeping can build its revenues based on commissions from Malwarebytes.

### Bleeping Makes False, Misleading, And Defamatory Statements Both Directly And Indirectly About ESG And Its SpyHunter Product

78.     In the forums that Bleeping maintains on its website, Bleeping purports to convey factual information about ESG and its products including, but not limited to, in posts by Bleeping's agent and appointed Global Moderator, Quietman7, but instead assert inaccurate information, outright falsehoods and misleading statements that are repeated in multiple topics on the forum and over multiple years -- damaging both ESG and consumers.  *See* Exs. 6-8.

14

79.     By virtue of Bleeping's promotion and representation regarding of its "staff" (*see, e.g.*, *supra* ¶¶ 2-3), consumers and users of Bleeping's forums understand those posts to be factual and believe that they convey true information.

80.     In these posts and reports of these posts, Bleeping makes the following assertions falsely and without any reasonable basis to believe that the statements were true when made:

- That ESG engages in "deceptive advertising which violates several consumer protection laws in many states";

- That ESG has a "history of employing aggressive and deceptive advertising";

- That SpyHunter 4 is and/or should be considered a "rogue product," which is a term used to identify products supposedly of unknown, questionable, or dubious value as anti-spyware protection;

- That ESG has not cooperated in submitting Spyhunter for testing "most likely due to the program's ineffectiveness and high rate of false positives";

- That ESG engages in deceptive pricing;

- That SpyHunter 4 is a "dubious and ineffective program" and is part of a "scam";

- That ESG deceives consumers of SpyHunter 4 because the consumers "are not aware that when purchasing SpyHunter, they have agreed to a subscription service with an automatic renewal policy"; and

- That SpyHunter 4 is and/or should be considered "malware" or "rogue security software" despite not being classified as such by security vendors.

*See* Exs. 6-8.

81.     Each of those statements, which go directly to the nature, characteristics and qualities of ESG's business and its SpyHunter product, is false and misleading and was false and misleading when made, either directly on their face or as innuendo, indirect intimation, and ambiguous suggestion that results in a sophisticated deception of the consumer.

82.     Upon information and belief, Bleeping, through its agent Quietman7 or otherwise, has never properly or fully tested SpyHunter4 to determine the effectiveness of the program or

its supposed rate of false positives, despite knowing that testing is the only reasonable way to reliably determine a program's effectiveness and rate of false positives.

83.     Bleeping knew, recklessly disregarded, or should have known, that its statements about ESG and SpyHunter were false and misleading when made.  Indeed, where Bleeping identifies a supposed external source for its statements, the citations are to third-hand information that is between 7-10 years old and that was generated by a group of individuals who previously were engaged in an anticompetitive campaign against ESG.

84.     Bleeping knew, recklessly disregarded, or should have known that ESG engaged these individuals in discourse, provided full and accurate information to them, which the individuals admitted they did not have, and ultimately proved each claim to be false.

85.     Upon information and belief, Bleeping and Quietman7, as prominent members of the anti-malware community in which this discourse played out, knew, recklessly disregarded, or should have known that ESG had already previously proved these claims to be false years before Quietman7 made them and used them as part of Bleeping's smear campaign against ESG for the purpose of building Bleeping's revenues.

86.     Bleeping, through its agents Quietman7 and other "staff" members, including other Global Moderators, has engaged repeatedly in the pattern and practice of referring to Bleeping's false, misleading and disparaging statements about ESG and SpyHunter4 each time a forum member mentions ESG or SpyHunter including, but not limited to, in response to user questions on March 18, 2015, March 27, 2015, April 24, 2015, July 19, 2015, October 28, 2015, October 29, 2015 and February 27, 2016.

87.     On January 26, 2015, in response to a question from a forum member about SpyHunter, Quietman7 directed the forum member to "please read this topic (http://www.bleepingcomputer.com/forums/t/550005/spyhunter-vs-malwarebytes-vs-iobit/#entry3491488) *for important information about SpyHunter and how to remove it.*" Ex. 9 (emphasis added).  The cited topic contains false, misleading and disparaging statements about ESG and SpyHunter 4.

88.     In other posts on May 7, 2015, June 1, 2015, and October 31, 2015, Quietman 7 directed forum members to the same topic, adding that SpyHunter was "a dubious and ineffective program" that had "a history of employing aggressive and deceptive advertising" and/or that, if a user has used Spyhunter, "any detection results should be viewed with suspicion."  Ex. 10.

89.     After Bleeping spreads the false, misleading and disparaging statements about ESG and SpyHunter4, Bleeping instructs its users to "*remove*" SpyHunter and "*replace it*" with its affiliates' software, including Malwarebytes' software (emphasis added).

90.     Bleeping's instructions to its users are heeded -- in fact, Bleeping openly touts its influence on the purchasing decisions of its users.  After disparaging ESG and SpyHunter4, Quietman7 trumpeted that "[s]ince we [Bleeping] do not recommend this program [SpyHunter], I doubt that any of our members use it."

91.     To make it easy for users to replace SpyHunter4 with Malwarebytes' software and to earn its "Affiliate Commission" from Malwarebytes, Bleeping provides a single hyperlink for Malwarebytes' website that, when clicked, takes a user directly to the page where the user can click to purchase Malwarebytes' competing product.  Once purchased, Bleeping earns its "Affiliate Commission."

92.     To further influence its users to purchase Malwarebytes' products and not ESG products, Bleeping has removed links posted by users that suggest using an ESG product. *See* Ex. 11.

93.     Upon information and belief, the Bleeping website hosts additional false, misleading and defamatory statements about ESG and SpyHunter made by Bleeping and its "staff" and third-party comments solicited by the false, misleading and defamatory statements made by Bleeping.

94.     Upon information and belief, Defendants Does 1-10 have carried out the aforesaid acts at the direction of, on behalf of, and with full knowledge of Bleeping.

95.     These postings by Defendants are all the more egregious as they represent a clear pattern and practice of making false and misleading claims, including unfounded, sensationalized claims of violations of consumer protection laws which can carry criminal penalties, over multiple topics, by multiple Bleeping staff members, in multiple areas of the forum.

96.     ESG has specifically requested Bleeping to cease and desist its unlawful conduct, but it has repeatedly refused to do so and continues to refuse to date.

97.     Bleeping not only has refused to take down the offending posts, but Bleeping, through at least Quietman7, has given permission to others to post and repost the false, misleading and disparaging information on other forums, including at least in February 2015, causing further harm to ESG.

98.     Defendants' conduct is willful and malicious.

99.     Defendants' unlawful conduct is causing and will continue to cause harm to ESG and its products.

100.    ESG has no adequate remedy at law for certain of the relief requested below.

## FIRST CAUSE OF ACTION

### (Violations of Lanham Act § 43(a))

101.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

102.    Defendants' use in commerce of false and misleading statements about ESG and SpyHunter constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

103.    Defendants' use in commerce of false and misleading statements about ESG and SpyHunter is likely to deceive consumers as to the nature, quality, and efficacy of ESG and SpyHunter, including causing consumers to believe that SpyHunter itself is a form of malware.

104.    Such deception is material as it is likely to influence consumers not to purchase SpyHunter and/or do business with ESG and instead to purchase products for which Bleeping gets a commission.

105.    Defendants' false and misleading statements have actually deceived or have the capacity to deceive a substantial portion of their intended audience, *i.e.*, users of the Bleeping Website who are potential customers of ESG and Malwarebytes.

106.    Defendants' false and misleading statements, which Bleeping deliberately repeatedly reposts and/or links to any time a new forum topic mentions or inquires about ESG, are part of an organized campaign by Bleeping to penetrate the market for anti-malware products to drive consumers away from ESG and to Malwarebytes, in order for Bleeping to earn commission on sales of Malwarebytes that it generated.

107.    As a direct and proximate result of Defendants' unlawful acts, ESG has suffered and will continue to suffer significant monetary and reputational injury, including direct diversion of sales and a lessening of goodwill associated with its products, in amounts that will be proven at trial but that are believed to exceed $75,000, exclusive of interest and costs.

## SECOND CAUSE OF ACTION

### (Trade Libel/Commercial Disparagement)

108.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

109.    Defendants have maliciously published and disseminated false statements that disparage ESG and its SpyHunter product.

110.    These statements constitute injurious falsehoods and trade libel, which, *inter alia*, impugn the integrity of ESG and the quality and efficacy of SpyHunter.  These statements were expressly directed at ESG.

111.    Defendants have published and disseminated their false statements to the public by means of the Internet and specifically the Bleeping Website.

112.    There can be no question that the readers of Defendants' statements understand Defendants' defamatory meaning and understand that Defendants' statements are directed at ESG and its products.

113.    ESG has been specifically harmed by Defendants' defamatory statements.

114.    Defendants have no privilege or authorization to make their false and harmful statements.

115.    As a direct and proximate result of Defendants' unlawful acts, ESG has suffered and will continue to suffer significant monetary and reputational injury in amounts that will be proven at trial but that are believed to exceed $75,000, exclusive of interest and costs.

## THIRD CAUSE OF ACTION

### (Libel)

116.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

117.    Defendants' published and disseminated statements concerning ESG and SpyHunter are false and bring ESG into disrepute or contempt and impeach its integrity and reputation.  Specifically, Defendants assert, directly or by implication, *inter alia*, that ESG engages in "deceptive advertising which violates several consumer protection laws"; that ESG "has a history of employing aggressive and deceptive advertising"; and that SpyHunter 4 is a "rogue product."

118.    Defendants have published and disseminated their false statements to the public by means of the Internet and specifically, at least the Bleeping Website.

119.    Defendants are at fault because they intentionally, recklessly, or negligently made such statements.

120.    Defendants have no privilege or authorization to make such statements.

121.    ESG has been and continues to be damaged by these statements.

122.    ESG is a for-profit corporation, and Defendants' statements prejudice ESG in the conduct of its business and/or to deter others from dealing with it by discouraging potential customers from purchasing ESG products and encouraging them to purchase a competitor's products instead.

123.    As a direct and proximate result of Defendants' unlawful acts, ESG has suffered and will continue to suffer significant monetary and reputational injury, including lost sales and/or refunds, in amounts that will be proven at trial but that are believed to exceed $75,000, exclusive of interest and costs.

## FOURTH CAUSE OF ACTION

(Libel *per se*)

124.    ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

125.    Defendants' published and disseminated statements tend to cause injury to ESG's profession and business because they reflect on ESG's performance and are incompatible with the proper conduct of ESG's business.

126.    Injury to ESG is a natural and proximate consequence of Defendants' *per se* libelous statements.

127.    As a result of this libel *per se*, ESG has suffered and will continue to suffer damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, ESG respectfully requests that the Court enter judgment in its favor as follows:

        a.    Declaring that Defendants' conduct violates 15 U.S.C. § 1125(a);

        b.    Declaring that Defendants' conduct constitutes trade libel and/or commercial disparagement under the laws of the State of New York;

        c.    Declaring that Defendants' conduct constitutes libel and libel *per se* of a corporation under the laws of the State of New York;

        d.    Permanently enjoining Defendants from publishing and disseminating the false advertising statements identified above in relation to ESG;

        e.    Permanently enjoining Defendants from publishing and disseminating the statements constituting trade libel and/or commercial disparagement identified above in relation to ESG;

        f.    Permanently enjoining Defendants from publishing and disseminating the statements constituting defamation of a corporation identified above in relation to ESG;

        g.    Directing Defendants on the main page of the Bleeping Website to publish a retraction of the statements constituting false advertising, trade libel, commercial

disparagement and/or defamation of a corporation in relation to ESG;

    h.  Awarding ESG damages in an amount proven at trial and believed to be in

excess of $75,000, plus interest;

    i.  Awarding ESG its attorneys' fees and costs incurred in bringing this

action; and

    j.  Awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMANDED

  ESG demands a trial by jury of all issues so triable in this action.

Dated: New York, New York      Respectfully submitted,
    March 18, 2016

              By: /s/ Eric R.I. Cottle
                  Eric A. Prager (EP-0964)
                  Eric R. I. Cottle (EC-3234)
                  K&L GATES LLP
                  599 Lexington Avenue
                  New York, NY 10022
                  Telephone: 212.536.3900
                  Facsimile: 212.536.3901
                  eric.prager@klgates.com
                  eric.cottle@klgates.com

                  &

                  Terry Budd
                  Christopher M. Verdini
                  (*pro hac vice*)
                  K&L GATES LLP
                  210 Sixth Avenue
                  Pittsburgh, PA 15222
                  Telephone: 412.355.6500
                  Facsimile: 412.355.6501
                  terry.budd@klgates.com
                  christopher.verdini@klgates.com

                  *Attorneys for Plaintiffs*

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                        :

ENIGMA SOFTWARE GROUP USA, LLC,     :

                        Plaintiff,       :

               -v-                 :

BLEEPING COMPUTER LLC,          :

                       Defendant.     :

------------------------------------------------------------------X

16 Civ. 57 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   7 | 8 | 16

PAUL A. ENGELMAYER, District Judge:

This lawsuit by a computer software company seeks redress for critical statements about it and its flagship product that were posted on a computer support website. Plaintiff Enigma Software Group USA, LLC ("ESG") develops and markets computer security products, including SpyHunter, its leading anti-malware program. Defendant Bleeping Computer LLC ("Bleeping") owns and operates http://www.bleepingcomputer.com, a computer support website. ESG alleges that Bleeping has perpetrated a "smear campaign" against ESG, which has entailed publishing false, defamatory statements about ESG and SpyHunter in order to divert sales from ESG to its competitors, from whom Bleeping receives commissions. ESG brings claims against Bleeping for defamation and trade libel, in violation of New York law, and false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

Bleeping now moves to dismiss the Second Amended Complaint ("SAC") under Federal Rule of Civil Procedure 12(b)(6) on various grounds. For the reasons that follow, that motion is granted in part and denied in part.

## I.    Background

### A.    Factual Background[1]

ESG is a Florida limited liability company that develops and markets computer security products.  SAC ¶¶ 16, 21.  It specializes in anti-malware products, *i.e.*, those that protect against "malicious software," such as "viruses and spyware that can steal personal information, send spam, and commit fraud."  *Id.* ¶¶ 21–23.[2]  SpyHunter, an "adaptive malware detection and removal tool," is ESG's flagship anti-malware product.  *Id.* ¶¶ 24–26.  Consumers can download a free scanning version of SpyHunter through a link on ESG's website.  *Id.* ¶ 27.  The scanner detects whether a computer has malware or other security threats.  *Id.*  Through ESG's website, consumers can also buy a license to the full version of SpyHunter.  *Id.* ¶ 28.  That version includes the scanner, as well as tools to remove malware and other security protection tools.  *Id.*

Bleeping operates a website, http://www.bleepingcomputer.com, which offers information, advice, and resources about computer technology and security.  *See id.* ¶¶ 2–3, 32–34.  Anti-malware software is a focus of Bleeping's coverage.  *Id.* ¶ 5.  Bleeping generates profits through its "Affiliate" program, under which it receives commissions from designated "Affiliate" software companies for promoting their products on its website.  *Id.* ¶¶ 7–8, 43.

---

[1] The facts related herein are drawn primarily from the SAC, Dkt. 25 ("SAC"), and the attached exhibits.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  The Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in ESG's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  For context, the Court also cites here representations made by counsel at argument on June 6, 2016.  Dkt. 43 ("Tr.").

[2] Spyware is a "type of malware that can monitor or control your computer use.  It may be used to send consumers pop-up ads, redirect their computers to unwanted websites, monitor their Internet surfing, or record their keystrokes, which, in turn, could lead to identity theft."  SAC ¶ 22.

Under that program, Bleeping posts "Affiliate Links" throughout its website which redirect users to third-party webpages where they can buy Affiliate products. *Id.* ¶¶ 8, 35–36. Bleeping earns a commission whenever a user clicks on an Affiliate link and buys an Affiliate product. *Id.* ¶ 37.

The Bleeping website includes a "Forums" section where Bleeping offers advice and answers users' questions about topics related to computer security and technology. *Id.* ¶¶ 34, 41. Bleeping manages the Forums through a hierarchy of "member groups," comprised of "staff members" who are appointed to "generate and control [the] content" posted therein. *Id.* ¶¶ 45, 54, 60. The third-highest "member group" is made up of "Advisors," whom Bleeping holds out as experts who "can be trusted to give correct and understandable answers to [users'] questions." *Id.* ¶¶ 50–51. Above Advisors are "Global Moderators," who enjoy "special powers" to enforce rules governing the Forums, *e.g.*, by "closing" discussions, editing the content of users' posts, and suspending the posting privileges of users who violate the rules. *Id.* ¶¶ 48–49. Finally, Lawrence Abrams, Bleeping's owner, occupies the highest member group as the overall "Admin" of the Forums. *Id.* ¶ 47. Abrams has the "final say when appointing all other staff positions." *Id.*

Whenever an Advisor, Global Moderator, or Admin posts in Bleeping's Forums, "Bleeping clearly identifies that the post has been made by [a Bleeping staff member]." *Id.* ¶ 53.[3] Because Bleeping touts its staff as experts who can be "trust[ed] to provide correct, unbiased and truthful advice," *id.* ¶¶ 3, 32, the SAC alleges, users rely on their advice when making purchasing decisions regarding anti-malware products, *id.* ¶¶ 4, 6, 79. However, the

---

[3] Bleeping also "provides its members with a 'current list' of the individuals who are in each 'member group' and informs users of its website about the 'member group' status of such persons when they post information on Bleeping's [F]orums, including whether they are a designee to act on behalf of Bleeping." SAC ¶ 46.

SAC alleges, Bleeping's staff members "do not[, in fact,] provide such unbiased advice." *Id.*

¶ 33. Rather, "[u]nder the guise of giving 'correct and understandable answers,' [they] purposely

push[] users away from anti-malware products for which [Bleeping] does not receive

commissions and toward specific anti-malware products for which it receives sales

commissions." *Id.* ¶ 7; *see also id.* ¶ 33.

Bleeping does not receive commissions from ESG on sales of SpyHunter or any of its

other products. *Id.* ¶ 11. But, it does have an Affiliate arrangement with Malwarebytes, a direct

competitor of ESG. *Id.* ¶ 10; *see also id.* ¶ 44 ("Bleeping functions as a sales arm of

Malwarebytes."). On that basis, the SAC alleges, "Bleeping has a direct financial interest in

driving traffic and sales to Malwarebytes and . . . away from ESG." *Id.* ¶ 12. "To further that

interest," it alleges, Bleeping "has adopted and employed a pattern of making[, in its Forums

posts,] false, inaccurate, misleading and disparaging statements about ESG and [SpyHunter] . . .

while simultaneously recommending . . . Malwarebytes[' anti-spyware product, Malwarebytes

Anti-Malware]." *Id.* ¶ 13; *see also id.* ¶¶ 75–78. "To make it easy for users to replace

SpyHunter[] with [Malwarebytes Anti-Malware] and to earn its [commission]," the SAC alleges,

Bleeping includes in such posts Affiliate Links through which users can purchase Malwarebytes

Anti-Malware. *Id.* ¶ 91. Additionally, the SAC alleges, Bleeping routinely removes links posted

by users that endorse ESG's products. *Id.* ¶ 92.

The SAC alleges that Quietman7, a Bleeping Advisor and one of only three Global

Moderators, is a chief spokesperson for Bleeping's "smear campaign" against ESG. *See id.*

¶¶ 65–76. In that role, the SAC alleges, whenever a forum member mentions or inquires about

ESG or SpyHunter, Quietman7 responds by making false, disparaging statements about ESG and

SpyHunter and/or directing users to past posts containing such statements. *See id.* ¶¶ 86–88.

4

The SAC identifies 13 such posts published on various dates between December 10, 2013 and October 31, 2015. *See id.* ¶¶ 80, 86–88; *id.*, Exs. 6–11. In them, the SAC alleges, Quietman7 made false and misleading statements that "impugn the integrity of ESG and the quality and efficacy of SpyHunter." *Id.* ¶ 110. Concretely, the SAC alleges, Quietman7 stated, directly or by implication, that: (1) ESG engages in aggressive and deceptive advertising; (2) SpyHunter is a "dubious" and "ineffective" program that generates false positives; and (3) SpyHunter is a "rogue" product that is properly classified as malware, rather than the *anti*-malware product it purports to be. *See id.* ¶¶ 103, 117; *id.*, Ex. 7, at 2, 4; *id.*, Ex. 8, at 3; *id.*, Ex. 10, at 3, 10, 13–14; *id.*, Ex. 11, at 5. In the same posts, the SAC alleges, Quietman7 advised users to remove SpyHunter and replace it with a more "trustworthy" alternative—invariably an Affiliate product, such as Malwarebytes Anti-Malware, for which he supplied an Affiliate Link. *Id.* ¶ 89.[4]

The SAC alleges that Bleeping has considerable influence over its users, who heed its advice when making purchasing decisions. *Id.* ¶ 90; *see also, e.g.*, *id.*, Ex. 10, at 11 (user response to Quietman7's 6/1/2015 post: "K, thanks . . . . I'm convinced. Will buy a more trustworthy product when [SpyHunter] expires."). Accordingly, the SAC alleges, as a result of Bleeping's conduct, ESG has suffered significant monetary and reputational injury, including direct diversion of sales and a lessening of goodwill associated with its products. *Id.* ¶¶ 107, 115, 123, 127.

---

[4] *See, e.g.*, SAC, Ex. 6, at 4 (9/28/14 post in "spyhunter vs Malwarebytes vs iobit" forum topic: "If you have downloaded and scanned with SpyHunter, detection results should be analyzed carefully before you remove anything. Based on this information, it is in my opinion that you remove this program and replace it with highly regarded alternatives such as Malwarebytes Anti-Malware or Emsisoft Anti-Malware."). The SAC alleges that Emsisoft is another Affiliate that pays Bleeping commissions. *Id.* ¶ 42.

## B. Procedural History

On January 5, 2016, ESG filed the original Complaint. Dkt. 1. On January 8, 2016, ESG filed the First Amended Complaint ("FAC"). Dkt. 6. On February 26, 2016, Bleeping filed a motion to dismiss the FAC. Dkt. 16.

On March 18, 2016, ESG filed the SAC. Dkt. 25. It brings claims for (1) libel; (2) libel *per se*; (3) trade libel/commercial disparagement; and (4) false advertising, in violation of § 43(a) of the Lanham Act. SAC ¶¶ 101–27. It seeks (1) declaratory relief; (2) an injunction barring Bleeping from publishing actionable statements about ESG and directing it to publicly retract the offending statements; (3) damages; and (4) attorneys' fees and costs. *Id.* at 22–23.

On April 8, 2016, Bleeping filed a motion to dismiss the SAC, Dkt. 28, along with a memorandum of law, Dkt. 32 ("Def. Br."), and an affidavit by its counsel, Dkt. 29, in support. On April 22, 2016, ESG filed a brief in opposition, Dkt. 32 ("Pl. Br."), along with a declaration by ESG's counsel, Dkt. 31 ("Prager Decl."), and attached exhibits. On April 29, 2016, Bleeping replied. Dkt. 35 ("Def. Reply Br."). On June 6, 2016, the Court heard argument. *See* Tr.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

6

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)).  However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).  A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## III.  Discussion

ESG brings claims against Bleeping for libel, libel *per se*, and trade libel, under New York law ("state-law claims"), and for false advertising, under § 43(a) of the Lanham Act. Bleeping moves to dismiss on the grounds that (1) the Communications Decency Act, 47 U.S.C. § 230 ("CDA" or "Section 230"), shields it from liability; (2) ESG's claims are time-barred; and (3) the SAC fails to state a claim.

The ensuing analysis proceeds as follows:  The Court first addresses, and rejects, Bleeping's threshold arguments that ESG's claims are barred by the CDA and the applicable statutes of limitations.  The Court then considers Bleeping's substantive challenges to each claim.

A.    **Threshold Questions: Immunity and Timeliness**

1.    **Does the Communications Decency Act Bar ESG's Claims?**

Section 230(c) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Section 230(e) states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).  Accordingly, a defendant is immune from liability if: "(1) it is a 'provider or user of an interactive computer service';[5] (2) the complaint seeks to hold the defendant liable as a 'publisher or speaker'; and (3) the action is based on 'information provided by another information content provider.'"[6]  *Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281, 286 (2011) (quoting 47 U.S.C. § 230(c)(1)) (collecting cases); *accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 548 (E.D. Va. 2008), *aff'd*, 591 F.3d 250 (4th Cir. 2009).

ESG does not dispute that Bleeping is an ICS under the statute, and websites clearly so qualify.[7]  Nor does it dispute that its state-law claims—defamation and trade libel—"clearly seek

---

[5] The statute defines "interactive computer service" ("ICS") as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."  47 U.S.C. § 230(f)(2).

[6] The statute defines "information content provider" ("ICP") as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).

[7] *See, e.g.*, *Nemet Chevrolet*, 591 F.3d at 255 (www.consumeraffairs.com was ICS); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) ("Today, the most common interactive computer services are websites."); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011) (consumer review website www.pissedconsumer.com was ICS).

to hold [Bleeping] liable as [a] publisher[] and speaker[]." *Shiamili*, 17 N.Y.3d at 290. Rather, it argues that § 230 does not shield Bleeping from liability because: (1) the CDA does not apply to claims brought under the Lanham Act; and (2) in any event, it was Bleeping—not a third-party ICP—that "provided" the allegedly offending content.

As to ESG's first argument, § 230(e)(2) states that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." 47 U.S.C. § 230(e)(2). A court in this District has held that this language precludes immunity for claims brought under § 43(a) of the Lanham Act. *See Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 413 (S.D.N.Y. 2001); *see also Ford Motor Co. v. GreatDomains.com, Inc.*, No. 00 Civ, 71544 (DT), 2001 WL 1176319, at *1 (E.D. Mich. Sept. 25, 2001) (same). Bleeping neither disputes this construction nor identifies contrary case law. *See* Def. Reply Br. 1–2. On the basis of the statutory text, the Court, therefore, holds that the CDA does not bar ESG's Lanham Act claim.

As to ESG's second argument, it is well established that, for an ICS to enjoy immunity under CDA § 230, a *different* ICP must have provided the complained-of information—the statute does "not immunize [defendants] with respect to any information [they] developed or created entirely by [themselves]." *Doe v. City of New York*, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008); *accord Carafano v. Metrosplash.com., Inc*., 339 F.3d 1119, 1123 (9th Cir. 2003); *Ascentive*, 842 F. Supp. 2d at 474; *Shiamili*, 17 N.Y.3d at 289. Here, ESG argues that Bleeping was the ICP of the allegedly offending statements because, on the facts pled, Quietman7 was acting as Bleeping's agent when he posted them.[8]

---

[8] This case is thus distinguishable from the cases cited by Bleeping, where, on the facts pled, the defendant website operator had performed only "traditional editorial functions" with respect to content that was created by third-party ICPs. *See, e.g.*, *Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 541 (2015) (defendant immune under CDA notwithstanding allegations that it filtered users' reviews, because "[s]uch activities

The Court agrees that the factual allegations, which must be credited on a motion to dismiss, are sufficient, under principles of agency, to make Bleeping the provider of the challenged statements about ESG and SpyHunter.  Under New York law, an express agency is created through (1) "the principal's manifestation of intent to grant authority to the agent," (2) "agreement by the agent," and (3) the principal's "control over key aspects of the undertaking." *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (collecting cases).  Even where there is no "actual" authority, an implied agency is created where the principal's conduct, "reasonably interpreted, causes [ ] third [parties] to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir. 1990); *accord Dinaco, Inc. v. Time Warner Inc.*, 98 Civ. 6422 (JSM), 2002 WL 31387265, at *3 (S.D.N.Y. Oct. 22, 2002), *aff'd*, 346 F.3d 64 (2d Cir. 2003) (implied agency exists where principal is "responsible for [the agent's] appearance of authority and . . . [the third party's] reliance on the appearance of authority was reasonable").

Here, the SAC alleges that Bleeping publicly designated Quietman7 as a "Global Moderator" and "Advisor"—the second and third highest "staff member" positions within the

---

constitute traditional editorial functions that do not render Yelp an [ICP]"); *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (defendant not ICP where he "did no more than select and make minor alterations" to content posted by third parties); *Ascentive*, 842 F. Supp. 2d at 476 (consumer review website's acts of inviting consumers to post complaints on website, and prominently displaying such complaints, did not render it an ICP); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006), *aff'd*, 242 F. App'x 833 (3d Cir. 2007) (Google held immune under CDA because "[i]n each instance raised by Plaintiff's tort claims, Google either archived, cached, or simply provided access to content that was created by a third party"); *Shiamili*, 17 N.Y.3d at 286 (section 230 barred plaintiff's claim "because the complaint [did] not allege that defendants authored the defamatory content, but only that they published and edited it").

Bleeping member group hierarchy.  SAC ¶¶ 48–51, 60, 65–67, 69.[9]  It alleges that Quietman7 publicly accepted these appointments, and has since signed his posts as "Bleepin' Janitor" and "The BC Staff."  *Id.* ¶¶ 70–72.  Further, as alleged in the SAC, Bleeping staff members are "authorized [ ] and expected to post in Bleeping's forums," and "direct[ed] . . . to recommend and promote certain products for which [Bleeping] receives commissions . . . and to discourage use of other products from which it does not receive commission."  *Id.* ¶¶ 53, 62.  Bleeping's Advisors are touted as experts who "can be trusted to give correct and understandable answers to [Bleeping's] member's [sic] questions."  *Id.* ¶ 51 (quoting Bleeping website).  And Global Moderators are alleged to enjoy even greater authority:  They are authorized "to enforce the rules of the Bleeping Computer Forums," to "answer questions (or help people with problems)," and to suspend forum posting privileges of members who violate forum rules.  *Id.* ¶ 49 (quoting Bleeping website).

These allegations plausibly support the conclusion that Quietman7 was acting, at a minimum, as Bleeping's implied agent when he posted the allegedly offending content.  *See Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344–45 (S.D.N.Y. 2010) ("[T]o survive a motion to dismiss . . . , a plaintiff need only raise[] a sufficient inference that some sort of agency relationship existed between the purported principal and agent. . . .  [W]here the circumstances alleged in the pleading raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency are issues for the jury." (internal quotation marks and citations omitted)).  By holding Quietman7 out

---

[9] The SAC alleges that Quietman7 was appointed as an Advisor in March 2006, SAC ¶¶ 66–68, and as a Global Moderator in September 2007, *id.* ¶¶ 69–70.

as a staff member who enjoyed the "special powers" of an Advisor and Global Moderator,[10] and

who could be "trusted to give correct . . . answers" to users' questions, *see* SAC ¶¶ 3, 49, 51,

Bleeping represented to its users that Quietman7 was authorized to post on its behalf.[11] Users

could have reasonably relied on this representation. *See Capitol Records, LLC v. Vimeo, LLC*,

972 F. Supp. 2d 500, 518–19 (S.D.N.Y. 2013) (triable issue of fact existed as to whether

employee-uploaders were acting as website's agents, where uploaders served as "editorial voice"

---

[10] Based on Quietman7's later appointment to the higher position of Global Moderator, Bleeping argues that he was no longer an Advisor at the time he published the posts recited in the SAC. Def. Br. 6 n.4; Def. Reply Br. 1–2. However, nothing in the SAC or its cognizable attachments suggests that Quietman7 was ever stripped of his "Advisor" authority or his designation as an "expert." Therefore, drawing all reasonable inferences in ESG's favor, the Court concludes that Quietman7 was acting in his capacity as both an Advisor and a Global Moderator when he posted the challenged statements.

[11] Bleeping cites several cases for the proposition that a person's "moderator" status, without more, does not render a website operator liable for his conduct. *See* Def. Br. 7 (citing *Internet Brands, Inc. v. Jape*, 328 Ga. App. 272 (2014); *Stevo Design, Inc. v. SBR Mktg., Ltd.*, 919 F. Supp. 2d 1112 (D. Nev. 2013); *Higher Balance, LLC v. Quantum Future Group, Inc.*, No. 08 Civ. 233 (HA), 2008 WL 5281487 (D. Or. Dec. 18, 2008); *Shiamili*, 17 N.Y.3d 281). But ESG's claim of agency is not predicated on Quietman7's designation as a generic "moderator." Rather, it is based on his designation as a "staff member," the special authority he enjoys as an Advisor and Global Moderator, and the representations Bleeping has made regarding staff members who hold those titles. *See* Pl. Br. 8. This case is thus afar from those on which Bleeping relies, where the moderators either enjoyed limited powers or did not themselves author the offending posts. *See Internet Brands*, 328 Ga. App. at 274 (author of offending post authorized only to "delete spam posts"); *Stevo Design*, 919 F. Supp. 2d at 1126 (website had "passive message boards" on which users posted content, "with only occasional curation by message board moderators") (internal quotation marks omitted); *Higher Balance*, 2008 WL 5281487, at *7 (plaintiff failed to show moderators were "staff members" or otherwise agents); *Shiamili*, 17 N.Y.3d at 286 ("complaint . . . [did] not allege that [moderators] authored the defamatory content, but only that they published and edited it").

Moreover, the fact that Quietman7 may have been a "volunteer" does not, as Bleeping argues, negate his status as Bleeping's agent. *See* Def. Br. 6 (citing statement on Bleeping website that "the staff are all volunteers"). New York courts have repeatedly held volunteers to be agents where the common law requirements for agency were met. *See, e.g.*, *Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (2d Dep't 2007); *Robinson v. Downs*, 834 N.Y.S.2d 770, 771 (4th Dep't 2007).

for website and website posted "staff badge" next to uploaders' names on their posts); *Columbia Pictures Indus., Inc. v. Fung*, No. 06 Civ. 5578 (SVW), 2009 WL 6355911, at *13 n.21 (C.D. Cal. Dec. 21, 2009) (websites liable for moderators' infringements, despite lack of evidence of actual authority, where "websites' act of designating them as 'moderators' and providing them with specific forum-related powers [could] lead[] a 'third party reasonably [to] believe[ ] the [moderators] ha[d] authority to act on behalf of the [website]") (internal quotation marks and citation omitted), *aff'd in part and modified on other grounds*, 710 F.3d 1020 (9th Cir. 2013).

Because the SAC adequately pleads that Quietman7 acted as Bleeping's agent, he does not qualify as a third-party ICP under the CDA so as to entitle Bleeping to immunity. Section 230, therefore, does not bar ESG's claims. *See Alvi Armani Medical, Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306 (S.D. Fla. 2008) (dismissal on § 230 grounds inappropriate where plaintiffs alleged that defendant "itself created tortious content . . . through its agents"); *Higher Balance*, 2008 WL 5281487, at *7 (§ 230 immunity would not apply if plaintiffs showed that forum moderators were agents or employees of defendants); *Anthony v. Yahoo Inc.*, 421 F. Supp. 2d 1257, 1262–63 (N.D. Cal. 2006) (Yahoo! not immune under § 230 from claims that company itself created false profiles).

### 2.      Are ESG's Claims Time-Barred?

Bleeping argues that ESG's claims are time-barred because (1) they are subject to a one-year limitations period, and (2) "[n]early all" the statements that underlie them were published more than one year before the initial Complaint was filed. Def. Br. 9. The Court assesses the timeliness of ESG's state-law and Lanham Act claims in turn.

### a.      State-Law Claims

New York law sets a one-year statute of limitations for defamation and trade libel claims. N.Y. C.P.L.R. § 215(3). Under the "single publication rule," the publication of a defamatory

statement—however widespread its distribution—is "in legal effect, one publication which gives rise to one cause of action," with the limitations period running from the date of publication. *Gregoire v. Putnam's Sons*, 298 N.Y. 119, 123 (1948).  The New York Court of Appeals has extended this rule to online publications.  *See Firth v. State*, 98 N.Y.2d 365, 370 (2002); *Martin v. Daily News L.P. (Martin II)*, 990 N.Y.S.2d 473, 483 (1st Dep't 2014) ("This rule applies to publications on the Internet . . . so continuous access to an article posted via hyperlinks . . . is not a republication.") (citation omitted).  However, if a defamatory comment is "republished" in a new format, the statute of limitations begins to run anew from the date of republication.  *Firth*, 98 N.Y.2d at 371.  The New York Court of Appeals has explained that republication "occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition," and which is intended to reach a "new audience."  *Id.* (internal quotation marks and citation omitted).

Here, the 13 posts that supply the basis for ESG's claims were published on various dates between December 10, 2013 and October 31, 2015.  *See* SAC ¶¶ 80, 86–88; *id.*, Ex. 6, at 3–4, 7, 9; *id.*, Ex. 7, at 2–3, 4, 5; *id.*, Ex. 8, at 3; *id.*, Ex. 9, at 3–4; *id.*, Ex. 10, at 3, 10, 13–14; *id.*, Ex. 11, at 5.  Of those, eight were posted within one year of the initiation of this action—*i.e.*, on or after January 5, 2015.  *See id.*, Ex. 6, at 7, 9; *id.*, Ex. 7, at 5; *id.*, Ex. 9, at 3–4; *id.*, Ex. 10, at 3, 10, 13–14; *id.*, Ex. 11, at 5.  Each of those includes a hyperlink to a previous post published by Quietman7 on September 28, 2014, in a forum topic entitled "spyhunter vs Malwarebytes vs iobit" (the "2014 Post").  *Id.*, Ex. 6, at 3–4.

Bleeping argues that merely hyperlinking to the 2014 Post does not create a republication that retriggers the limitations period, and, therefore, that any claims predicated on posts in which Quietman7 refers readers to the 2014 Post via hyperlink are time-barred.  Def. Br. 9.

14

Bleeping's argument fails because four post-January 5, 2015 posts go beyond merely hyperlinking to the 2014 Post: They contain additional statements which ESG alleges are themselves defamatory. For instance, Quietman7's October 31, 2015 post in the "HTML/RCE.Gen3 Virus" forum topic reads, in pertinent part, as follows:

> SpyHunter by Enigma Software Group USA, LLC is a dubious program and detection results should be analyzed carefully before you remove anything. When searching for malware removal assistance (and removal guides) on the Internet, it is not unusual to find numerous hits from untrustworthy and scam sites which mis-classify detections or provide misleading information. This is deliberately done more as a scam to entice folks into buying an advertised fix or using a questionable removal tool. SpyHunter . . . , a dubious and ineffective program with a history of employing aggressive and deceptive advertising is one of the most common "so-called" removal tools pushed by these sites. Please read this topic [the 2014 Post] for important information about SpyHunter.

SAC, Ex. 10, at 13–14; *see also id.*, Ex. 10, at 3, 10; *id.*, Ex. 11, at 5.

Because at least some of the allegedly defamatory statements fall within the limitations period, ESG's state-law claims cannot be dismissed as untimely. *See Ullah v. NYC Dep't of Educ.*, No. 11 Civ. 3868 (GBD), 2012 WL 4471533, at *4 (S.D.N.Y. Sept. 27, 2012) (denying motion to dismiss on statute-of-limitations grounds where "[p]laintiff . . . alleged at least some discriminatory conduct which falls within the statute of limitations"); *Benhur v. Madavaram*, No. 15 Civ. 6826, 2015 WL 6739109, at *3 (D.N.J. Nov. 2, 2015) ("As at least some of Plaintiff's [defamation] claims are not barred by the statute of limitations, the count will not be dismissed on this basis."); *Doolittle v. Ruffo*, No. 88 Civ. 1175 (NPM), 1996 WL 159850, at *15 (N.D.N.Y. Mar. 27, 1996) ("[I]n order to withstand a given defendant's motion, each plaintiff must demonstrate that *at least some of that given defendant's conduct* occurred within the . . . statute of limitations period." (emphasis added)).

In light of this holding, the Court has no occasion to determine, at this stage, whether any of Quietman7's post-January 5, 2015 posts amount to a republication of the 2014 Post (thus

making the material first published in the 2014 Post potentially actionable).  However, because

this issue, which presents a question requiring close textual and contextual analysis, is apt to

resurface later in this litigation, the Court offers the following observations on arguments the

parties have made.

Bleeping cites a number of cases for the proposition that hyperlinking to an earlier-

published article does not amount to a republication of that article.  But those cases arise in a

context different from that here.  There, the hyperlinks were either posted without commentary

or accompanied by a reference that did not restate the allegedly defamatory content.  *See, e.g.*, *In*

*re Philadelphia Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) (mere reference to an

article, "*as long as it does not restate the defamatory material*, does not republish the material")

(emphasis added); *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009)

("[A] reference, without more, is not properly a republication[, because . . . w]hile it may call the

*existence* of the article to the attention of a new audience, it does not present the *defamatory*

*contents* of the article to that audience.") (emphasis in original).  By contrast, here, as alleged, at

least two of Quietman7's timely posts themselves restate, almost verbatim, allegedly defamatory

statements from the 2014 Post, and only then do they direct users to read the 2014 Post for

additional, similar information.  *See* SAC, Ex. 10, at 3, 10.[12]  The cases on which Bleeping relies

---

[12] The May 7, 2015 post in the "New PClock CryptoLocker Ransomeware discovered" forum
topic, and the June 1, 2015 post in the "Rogue partition driving me insane!!!" topic, each states,
in pertinent part:

> When searching for malware removal assistance (and removal guides) on the
> Internet, it is not unusual to find numerous hits from untrustworthy sources and
> scam sites which mis-classify detections or provide misleading information.  This
> is deliberately done more as a scam to entice folks into buying an advertised fix or
> using a questionable removal tool.  SpyHunter (SpyHunter-Installer.exe), a
> dubious and ineffective program from Enigma Software Group (ESG) with a
> history of employing aggressive and deceptive advertising is one of the most
> common 'so-called' removal tools pushed by these sites.

are therefore inapposite, as they do not address whether, under these circumstances, Quietman7's

hyperlinking to the 2014 Post amounts to a republication.  *See Martin v. Daily News, L.P.*

*(Martin I)*, 951 N.Y.S.2d 87 (Sup. Ct. N.Y. Cty. 2012) (table decision) ("Whether a particular

event constitutes a republication giving rise to a new cause of action with a refreshed limitations

period must be analyzed on a case-by-case basis."), *aff'd*, *Martin II*, 990 N.Y.S.2d 473.

In contrast, ESG cites to cases "where substantive material [was] added to a website, and

that material [was] related to defamatory material that [was] already posted."  *In re Davis*, 347

B.R. 607, 612 (W.D. Ky. 2006).  For instance, in *Larue v. Brown*, 333 P.3d 767, 773 (Ariz. Ct.

App. 2014), the court held that there was republication when the author of an online article

responded to reader comments by re-urging the truth of the article and posting additional

substantive information.  Similarly, in *In re Davis*, 347 B.R. at 611–612, the court held that

---

> Please read this <u>topic</u> [the 2014 Post] for more important information about
> SpyHunter.

SAC, Ex. 10, at 3, 10.

By way of comparison, the 2014 Post states, in pertinent part:

> SpyHunter by Engima Software Group USA, LLC is a program that was
> previously listed as a rogue product on the Rogue/Suspect Anti-Spware Products
> List because of the company's history of employing aggressive and deceptive
> advertising.  It has since been delisted but some users have reported they still
> engage in deceptive advertising. . . .
>
> * * *
>
> Further, when searching for new malware or malware removal assistance (and
> removal guides) on the Internet, it is not unusual to find numerous hits from
> untrustworthy sites that provide inadequate removal instructions and then offer a
> tool that a visitor must purchase before it removes anything.  These sites
> recommend a pay-to-clean program, rather than a free-to-clean program, because
> the site owner will make a commission on the sale of the program.  SpyHunter
> (SpyHunter-Installer.exe) is one of the most common removal tools pushed by
> these sites.

*Id.*, Ex. 6, at 3–4.

defendants had republished a website containing allegedly defamatory material when they

updated it to add "Breaking News!" and "Update!" sections which "list[ed] additional nefarious

activities in which [the plaintiffs were] . . . alleged to have participated."  "To hold otherwise,"

the court explained, "would give a publisher *carte blanche* to continue to publish defamatory

material on the Internet after the statute of limitations has run in the first instance."  *Id.* at 612.

These cases appear factually closer to the fact pattern alleged in the SAC and its attachments.  To

the extent the issue of whether a hyperlink to a prior post constitutes republication is the subject

of future briefing, counsel, in citing case law, should be mindful of the specific factual context in

which the hyperlinking is shown to have occurred.[13]

---

[13] ESG makes a separate argument: that the 2014 Post was republished by virtue of Bleeping's later (post-January 5, 2015) alterations of that post.  *See* Pl. Br. 24–25.  That argument, however, is not persuasive.  Where an author or publisher makes substantive, not technical, modifications to an online post, it may constitute a republication.  *See Biro v. Conde Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013); *In re Davis*, 347 B.R. at 612.  But, here, the cognizable materials reveal that the only modification to the 2014 Post within the limitations period was the addition of a single link to its reference section.  *See* SAC, Ex. 6, at 5; Pl. Br., Ex. 2.  ESG does not explain why such an alteration is a "material[] change[]" to the original post.  *Pearce v. Manhattan Ensemble Theater, Inc.*, No. 06 Civ. 1535 (KMW), 2009 WL 3152127, at *8 n.7 (S.D.N.Y. Sept. 30, 2009); *see Martin I*, 951 N.Y.S.2d 87 (addition of "share buttons" to online article did not constitute republication); *Churchill v. State of New Jersey*, 378 N.J. Super. 471, 477 (App. Div. 2005) (technical changes to website, such as addition of button on menu bar linking to report, did not constitute republication).

The Court is similarly unpersuaded that Quietman7's act of hyperlinking to the 2014 Post in separate forum topics on the Bleeping website was akin to posting it on an entirely separate website, thereby republishing it to "new audience."  *Compare Firth v. State of New York*, 761 N.Y.S.2d 361, 362 (3d Dep't 2003) ("[C]laimant's allegations that the report was moved to a different Internet address are sufficient to state a cause of action for republication to a new audience akin to the repackaging of a book from hard cover to paperback."), *with Martin II*, 990 N.Y.S.2d 473, 484 (restoration of article to website on which it was originally published was "not geared toward reaching a new audience" and was "akin to a delayed circulation of the original"), *and Salyer*, 701 F. Supp. 2d at 917 (although reposting article on same website made it easier for website visitors to access, it did not amount to republication before a new audience).

b.    *Lanham Act Claim*

Because the Lanham Act does not have its own statute of limitations, the Court "must look to the analogous State law to determine the limitations period which does best to further the policies behind the Act." *Mario Valente Collezioni, Ltd. v. AAK Ltd.*, 280 F. Supp. 2d 244, 257 (S.D.N.Y. 2003) (internal quotation marks and citation omitted).  As the Second Circuit has observed, "virtually every district court in this Circuit that has addressed the question [has held] that a six year fraud statute" applies to false advertising claims brought under § 43(a) of the Lanham Act.  *Conopco*, *Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996); *accord Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1529 (S.D.N.Y. 1994) (collecting cases).  The rationale of these decisions is that § 43(a) "applies . . . to those deceptive business practices which, like trademark infringement, attempt to induce consumers to purchase an advertiser's goods by falsely passing them off as the same as, or better than[,] those of a competitor.  Such claims can best be analogized to causes of action sounding in fraud."  *PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F. Supp. 196, 199 (S.D.N.Y. 1984).

In the face of this precedent, Bleeping argues that a one-year limitations period should apply here because ESG's Lanham Act claim—that Bleeping damaged ESG's reputation by making disparaging comments about its business practices and product—is akin to a defamation claim.  Def. Br. 9–10.  That argument is not persuasive.

Bleeping fails to identify any case applying a defamation statute of limitations to a Lanham Act claim.  *See* Tr. 16–17 (Bleeping's counsel: "I don't even have an obscure case for you.").  And its statement that "[t]his is a defamation claim poorly disguised as a Lanham Act claim" oversimplifies ESG's claim.  Def. Br. 10; *see also* Tr. 19 ("We are [ ] only here because they are complaining about damage to their reputation. . . .  [S]o that's why I [ ] think it's a defamation claim dressed up as a Lanham Act claim.").  ESG does not merely allege that

Bleeping made false and disparaging statements about it and SpyHunter.  It claims that Bleeping mounted an organized "smear campaign" against ESG, designed to mislead consumers as to the relative merits of SpyHunter and Malwarebytes Anti-Malware, in order to divert sales from ESG to Malwarebytes, from whom it receives commissions.  *See* SAC ¶¶ 85, 106.  In this light, ESG's Lanham Act claim has significant echoes of a fraud claim.  *See PepsiCo*, 578 F. Supp. at 199.

Based on the pleadings, therefore, the Court declines to stray from "the body of cases holding that the [six-year] statute of limitations [for] New York state fraud claims" applies to claims brought under the Lanham Act.  *Mario Valente Collezioni, Ltd.*, 280 F. Supp. 2d at 258. Because each of Quietman7's allegedly unlawful statements was made well within this period, ESG's Lanham Act claim is, also, timely.[14]

### B.      Whether the SAC States a Claim

Having held that ESG's claims are barred neither by the CDA nor the governing statutes of limitations, the Court turns to Bleeping's challenges to ESG's pleadings as to the elements of those claims.

### 1.      Has ESG Stated a Claim for Defamation?

The SAC brings claims for libel and libel *per se* (collectively, the "defamation claims"), alleging that Bleeping published statements about ESG and SpyHunter that are false, bring ESG into disrepute or contempt, impeach its reputation, and cause injury to its business and profession.  *See* SAC ¶¶ 117–27.  The gravamen of these claims is that Bleeping, through Quietman7, falsely represented that: (1) ESG engages in unlawful, deceptive pricing and advertising; and (2) SpyHunter is an ineffective, "rogue" product, more akin to malware than the *anti*-malware product it purports to be.

---

[14] Even if the Court applied a one-year limitations period, the result would not change—as with ESG's state-law claims, some underlying statements were made within a year of this lawsuit.

To state a claim for defamation under New York law, a plaintiff must allege that the defendant made a statement that was: (1) false, defamatory, and of and concerning the plaintiff; (2) published to a third party; (3) made with the applicable level of fault; and (4) defamatory *per se* or caused the plaintiff special harm. *See Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011); *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 76 (S.D.N.Y. 2012); *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666 (S.D.N.Y. 1991).

Bleeping does not dispute that the allegedly defamatory statements were published to a third party or "of and concerning" ESG. But, it argues, the SAC does not adequately plead the other elements of the defamation claims. The Court addresses these elements in turn.

### a. Falsity

Bleeping argues that none of the statements at issue are actionable because each either (1) asserts true fact(s), or (2) is a protected statement of opinion. That is not correct.

"It is axiomatic that truth is an absolute, unqualified defense to a civil defamation action . . . and that substantial truth is all that is required." *Nyitray v. Johnson*, No. 96 Civ. 6150 (MBM), 1998 WL 67651, at *10 (S.D.N.Y. Feb. 19, 1998) (quoting *Smith v. United Church Ministry, Inc.*, 623 N.Y.S.2d 46, 46 (4th Dep't 1995)) (internal quotation marks omitted), *aff'd*, 166 F.3d 1201 (2d Cir. 1998). And, "New York law absolutely protects statements of pure opinion, such that they can never be defamatory." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) (internal quotation marks and citation omitted). "Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it follows that only statements alleging facts can properly be the subject of a defamation action.'"

*Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152–53 (1993) (quoting *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 139 (1992)).

To qualify as a protected opinion, a "statement must be accompanied by a recitation of the accurate facts on which it is based. When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable 'mixed opinion.'" *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 503 (S.D.N.Y. 2012) (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986)) (citation omitted). Further, if the predicate facts are disclosed but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity, the opinion may be an actionable "defamatory opinion[]." *Silsdorf v. Levine*, 59 N.Y.2d 8, 15–16 (1983) (reinstating defamation claim based on letter accusing former mayor of corruption because facts stated to demonstrate such corruption were allegedly false); *see also Como v. Riley*, 731 N.Y.S.2d 731, 731 (1st Dep't 2001). "What differentiates an actionable mixed opinion from a privileged, pure opinion is the implication that the speaker knows certain facts, unknown to [the] audience, which support [the speaker's] opinion and are detrimental to the person being discussed." *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014) (internal quotation marks and citation omitted).

Whether a challenged statement is fact or opinion is a question of law to be decided by the Court. *See Steinhilber*, 68 N.Y.2d at 290. The core inquiry is "whether a reasonable listener . . . could have concluded that [the defendant] was conveying facts about the plaintiff." *Von Gutfeld*, 80 N.Y.2d at 139; *accord Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 148 (2d Cir. 2000) ("[T]he dispositive inquiry . . . [is] whether the challenged statement can reasonably be construed to be stating or implying facts about the defamation plaintiff." (citations omitted)); *Davis*, 24 N.Y.3d at 269–70. In making this determination, courts consider:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Davis*, 24 N.Y.3d at 270 (internal quotation marks, citations, and alterations omitted).  The third factor "is often the key consideration in categorizing a statement as fact or opinion."  *Id.* at 272 (internal quotation marks and citations omitted).  As a result, the New York Court of Appeals has "adopted a holistic approach to this inquiry":

> Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff.

*Id.* at 270 (internal quotation marks and citations omitted); *see also Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) ("[A]n analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions . . . .  [S]tatements must be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts."  (citations omitted) (emphasis in original)).

Applying these principles and utilizing this holistic approach, the Court holds that the SAC adequately pleads that Bleeping, through Quietman7, made false, defamatory statements of fact about ESG and SpyHunter.  The allegedly defamatory statements cited in the SAC include Quietman7's statements that:

- "SpyHunter by [ESG] is a program that was previously listed as a rogue product on the Rogue/Suspect Anti-Spyware Products List because of the company's history of employing aggressive and deceptive advertising.  It has since been delisted but some users have reported they still engage in deceptive

advertising." SAC, Ex. 6, at 3.[15]

- "SpyHunter is not classified as malware or rogue security software and other antivirus and antimalware vendors do not target it for removal. Those security vendors which have tried in the past received threats of legal action for attempting to do so or agreed to legal settlements as a result of litigation brought forth by [ESG]." *Id.*, Ex. 6, at 4.

- "In my opinion SpyHunter is a dubious program with a high rate of false positives." *Id.*, Ex. 6, at 4.

- "SpyHunter by [ESG] is a dubious program and detection results should be analyzed carefully before you remove anything. When searching for malware removal assistance (and removal guides) on the Internet, it is not unusual to find numerous hits from untrustworthy and scam sites which mis-classify detections or provide misleading information. This is deliberately done more as a scam to entice folks into buying an advertised fix or using a questionable removal tool. SpyHunter . . . , a dubious and ineffective program with a history of employing aggressive and deceptive advertising is one of the most common 'so-called' removal tools pushed by these sites." *Id.*, Ex. 10, at 13–14.

The SAC alleges that these statements were "false and misleading when made." *Id.* ¶ 81. In assessing the parties' arguments as to whether these statements are reasonably susceptible to defamatory connotation, the Court finds that the Second Circuit's decision in *Flamm*, 201 F.3d 144, and the New York Court of Appeals' decision in *Gross*, 82 N.Y.2d 146, offer valuable guidance.

In *Flamm*, Flamm sued non-profit organizations for libel, alleging that they had made defamatory statements about him in their attorney referral directory. 201 F.3d at 146–47. Flamm took issue with defendants' statements that at least one client had described him as an "ambulance chaser" who was interested only in "slam dunk cases." *Id.* at 147. The district court

---

[15] Even if the Court were to conclude that the 2014 Post was not republished within the limitations period, *see supra* pp. 16–18, it would still be proper to consider the statements contained therein to give context to Quietman7's timely posts, which hyperlinked to the 2014 Post.

granted the motion to dismiss, holding that such statements could not reasonably be construed as statements of objective facts. *Id.* The Second Circuit reversed. Considering the "fact-laden context" in which the statements were made—a "straightforward directory" which was, "in all other respects, purely factual," *id.* at 152, 154—it held that the statements "reasonably implie[d] that [Flamm] ha[d] engaged in unethical solicitation," a fact capable of being proven true or false, *id.* at 151.

In *Gross*, the *New York Times* had published a series of investigative reports alleging that Gross, New York's chief medical examiner, had altered autopsy reports in cases in which people had died in police custody. 82 N.Y.2d at 150. The articles included statements from sources within the medical examiner's office that Gross had "ben[t] over backwards to help the police" and was "looking for a way out for the police." *Id.* (internal quotation marks omitted). The "over-all thrust of the series was that [Gross] had issued false or misleading reports . . . to protect the police and that his conduct ranged from 'highly suspicious' to 'possibly illegal.'" *Id.* (quoting articles). The trial court dismissed the complaint, and the First Department affirmed, holding that the average reader would recognize the allegations as expressions of opinion. *Id.* at 151. The Court of Appeals reversed. It held that, viewed in context, the allegation that Gross had engaged in "corrupt" conduct could reasonably be understood as a factual assertion. *Id.* at 154–57. It emphasized that the circumstances surrounding the investigative reports, including their placement in the news section and their apparent basis in "thorough investigation" and "deliberation," would have "encourag[ed] the reasonable reader to be less skeptical and more willing to conclude that [they] stat[ed] or impl[ied] facts." *Id.* at 156 (quoting *Von Gutfeld*, 80 N.Y.2d at 142).

The analyses in *Flamm* and *Gross* point to the same result here. Viewed holistically, the "overall thrust" of Quietman7's thematically similar and mutually reinforcing statements is that ESG is engaged in a deliberate and fraudulent scam in which it is peddling a product which is the precise opposite of what it purports to be: The challenged statements "reasonably imply" that ESG has intentionally designed SpyHunter, in its "free scanner" mode, to generate false positives so as to induce customers to buy a license for the full version to eliminate ostensible malware. In other words, rather than being a means to enable a user to detect and remove unwanted spyware, SpyHunter is itself a rogue product designed to loot customers. Such allegations—like the claims that Flamm was an "ambulance chaser" who only took "slam dunk cases," and that Gross engaged in "corrupt" conduct and "ben[t] over backwards to help the police"—could reasonably be understood as assertions of objectively verifiable facts.

To be sure, viewed in isolation, words used in Quietman7's posts like "scam," "rogue,"[16] "dubious," and "ineffective" would likely be too imprecise to be capable of being proven true or

---

[16] Bleeping emphasizes that Quietman7 did not state that SpyHunter is a rogue product, but rather that: (1) it "was *previously* listed as a rogue product on the Rogue/Suspect Anti-Spyware Products List"; (2) it "is not [currently] classified as malware or rogue security software"; and (3) "other antivirus and antimalware vendors do not target it for removal." Def. Br. 13–14. These statements, Bleeping argues, are non-defamatory and "undeniably true." *Id*. But the context of Quietman7's use of the word "rogue" makes his implication clear that the underlying practices that gave rise to that earlier classification persist. For instance, Quietman7's statement that SpyHunter was previously listed as a rogue product is immediately followed by an assertion that "some users have reported [Engima] *still engage[s]* in deceptive advertising." SAC, Ex. 6, at 3 (emphasis added). And his statement that SpyHunter is not currently targeted for removal is followed by an allegation that "security vendors which have tried [to target it] in the past have received threats of legal action for attempting to do so or agreed to legal settlements as a result of litigation brought forth by Enigma Software." *Id.*, Ex. 6, at 4. Viewed in context, the challenged statements convey that, although SpyHunter has been "delisted," it remains a rogue product, and, but for ESG's wrongful threats and litigation tactics, would still be so classified. *See Church of Scientology Int'l*, 778 F. Supp. at 666 (a court considering whether statements are "reasonably susceptible of a defamatory connotation" "must consider the publication as a whole and not pick out and isolate particular phrases"; the "accused words" should be read "against the background of their issuance with respect to the circumstances of their publication and the scope and

26

false.  *See McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision [in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false.").  But, in the context supplied by Quietman7, these words did not appear in isolation.  His surrounding commentary made more concrete and reasonably precise the conduct of which he was accusing ESG:  He denounced ESG for operating a business model whereby it "mis-classif[ies] detections" and generates "false positives," *i.e.*, bogus reports of finding spyware on customer computers, "to entice folks into buying" its "questionable removal tool."  SAC, Ex. 10, at 13–14; *id.*, Ex. 6, at 4.  He characterized that practice as a "deliberate[] . . . scam," and located ESG within a widespread and well-defined universe of con artists, identifying SpyHunter as one of the "most common" products peddled by the many "untrustworthy and scam sites" in the anti-malware software market.  *Id.*, Ex. 10, at 13–14.  These "scam sites," Quietman7 stated, hawk "pay-to-clean program[s, like SpyHunter], rather than [ ] free-to-clean program[s], because the site owner will make a commission on the sale of the program."  *Id.*, Ex. 6, at 3–4.  SpyHunter, he stated, is "one of the most common '*so-called*' removal tools pushed by these sites," and "should [therefore] be viewed with suspicion."  *Id.*, Ex. 10, at 14 (emphasis added).

In this context, the words "rogue" and "dubious" accuse ESG of a defined course of conduct, and this claim, through discovery, can be proven or disproven.[17]  *Id.*, Ex. 6, at 3–4; *see*

apparent object of the writer") (quoting *Lasky v. Am. Broad. Cos.*, 606 F. Supp. 934, 938 (S.D.N.Y. 1985)); *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963) (discrete "utterances [in article] are not so closely parsed by their readers or by the courts and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent").

[17] At argument, ESG's counsel interpreted Quietman7's claim that "we are rogue" as conveying "that we hold ourselves out . . . as a pretense of being an anti-malware trustworthy software that people should subscribe to when, in fact, we're not.  We're coming up with false positives or . . . ways to deceive the consumer into thinking we're the product they should buy."  *See* Tr. 50–51.  Bleeping's counsel countered that Quietman7's statements could be construed, more benignly, to mean only that SpyHunter has a high error rate—not that it deliberately generates false results so

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1506 (D.S.C.

1989) (holding that terms "scam," "rip-off," and "bait and switch," considered in context, "ha[d]

ascertainable meaning and c[ould] be identified as either true or false," because they "relay[ed]

to the average viewer that the defendants ha[d] access to knowledge confirming that the plaintiffs

ha[d] engaged in some course of wrong doing").

Other features of the Forums page, at least as described in the pleadings, lend heft to

Quietman7's critical assessments as anchored in fact. Bleeping holds out the Forums page as

tightly regulated by its member groups.[18]  SAC ¶ 45.  And it assures users that its "expert" staff

members "can be trusted to give correct and understandable answers to [Bleeping's] member's

---

as to induce sales. *See* Tr. 13 ("[P]erhaps reasonable minds can disagree about how you read
it."). But even if Quietman7's statements could be so construed, a motion to dismiss must be
denied where, as here, "the communication at issue, taking the words in their ordinary meaning
and in context, is also susceptible to a defamatory connotation." *Davis*, 24 N.Y.3d at 272
(internal quotation marks and citations omitted).

Bleeping separately argues that the phrase "high rate of false positives" used by Quietman7 is
too imprecise to be verifiable. *See* Tr. 9. The Court rejects that argument, as this allegation is no
less exact than the allegations held potentially defamatory in *Flamm* and *Gross*. The claim of a
"high rate of positives" could be tested, for example, by comparing SpyHunter's rate with those
of competing products. That an accusation is "somewhat . . . vague and difficult to prove" does
not mean that it is not objectively verifiable. *See Church of Scientology Int'l*, 778 F. Supp. at
667 (statement that plaintiffs were pursuing "hostile critique" of Prozac held factual because "the
public nature of [plaintiffs'] activities and the public profile of the Prozac controversy indicate[d]
that this [was] also a factual dispute with a determinable answer").

[18] This case is thus distinct from those, cited by Bleeping, holding statements in an online forum
to be non-actionable opinion. *See* Def. Br. 15 (citing *Sandals Resorts Int'l v. Google, Inc.*, 925
N.Y.S.2d 407, 415 (1st Dep't 2011) (calling "bulletin boards and chat rooms" a "repository of a
wide range of casual, emotive, and imprecise speech"); *Brahms v. Carver*, 33 F. Supp. 3d 192,
195 (E.D.N.Y. 2014) (noting that statement was made in online forum "where people typically
solicit and express opinions" and where the parties were then engaged in a "heated argument—
replete with name-calling"); *Versaci v. Richie*, 815 N.Y.S.2d 350, 351–52 (N.Y. App. Div. 2006)
("rambling commentary" at issue was made "on an Internet public message board, which, as
[alleged], is a forum where people air concerns about any matter")).

[sic] questions." *Id.* ¶¶ 3, 32, 51. This promise was, allegedly, reiterated by Quietman7 himself, whose posts "prominently identif[y]" him as a Global Moderator and "BC Staff." *Id.* ¶ 71; *see id.*, Ex. 10, at 10 (6/1/15 post in "Rogue partition driving me insane!!!" forum topic: "Folks come to Bleeping Computer for advice, recommendations and other assistance. We provide that based on our experience and expertise so they can make an informed decision."); *compare Davis*, 24 N.Y.3d at 273 ("context further suggest[ed] to the reader that [defendant] spoke with authority, and that his statements were based on facts" where defendant "was a well respected, exalted member of the University . . . [and] well placed to have information about the [allegations he made]"), *with Egiazaryan*, 880 F. Supp. 2d at 509 (fact that author "[was] not a news writer for the periodical and [did] not purport to have undertaken a 'thorough investigation' or to have 'deliberat[ed] over the statements' supported conclusion that statements were non-actionable opinion) (quoting *Gross*, 82 N.Y.2d at 156). The manner of Quietman7's written presentation—one using footnotes and citations—conveyed further that his advice was based on an "investigation" of verifiable facts. *Gross*, 82 N.Y.2d at 156.

To be sure, Quietman7's Forums-page posts sporadically used qualifying statements, such as "[m]y personal recommendation" and "[i]n my opinion." SAC, Ex. 7, at 2; *id.*, Ex. 6, at 4. But these caveats do not "transform his [posts] into nonactionable pure opinion, because in context, a reasonable reader could view his statements as supported by undisclosed facts despite these denials." *Davis*, 24 N.Y.3d at 273 (citation omitted); *see Flamm*, 201 F.3d at 152 ("The mere recitation of prefatory phrases such as 'in my opinion' or 'I think' will not render innocent an otherwise defamatory statement." (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990)). For the reasons reviewed above, notwithstanding these qualifier phrases, "[t]he impression created by [Quitman7's] words in the mind of a reasonable person could be that they

were purporting to state the truth of the matter, not merely [his] opinion." *Church of Scientology Int'l*, 778 F. Supp. at 668.

In a final argument, Bleeping urges that, to the extent Quietman7's statements purport to report and recap consumer complaints or are otherwise truthful, they are "accurate and thus incapable of supporting a defamation claim."  Def. Br. 13; *see id.* at 14 (citing, as example of truthful statement, Quietman7's statement that "SpyHunter is not classified as malware or rogue security software and other antivirus and antimalware vendors do not target it for removal").  But even if some discrete statements by Quietman7 were accurate, that would not shelter his statements as a whole from a defamation claim, because the SAC adequately alleges that Quietman7's overall derogatory depiction of ESG and SpyHunter was substantially false.  *See* SAC ¶¶ 81–85.[19]  And as to the cited consumer complaints specifically, ESG alleges that these largely contained *false* claims about it and SpyHunter, and were "generated by a group of individuals . . . engaged in an anticompetitive campaign against ESG."  *Id.* ¶ 83.  A speaker who repeats another's defamatory statement is not made immune from liability for defamation merely because another person previously made the same demeaning claim.  *See Flamm*, 201 F.3d at 152 ("[T]he fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character." (quoting *Brian v. Richardson*, 87 N.Y.2d 46, 54 (1995)); *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60–61 (2d Cir. 1980) (noting "widely recognized" "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally,

---

[19] As the Court of Appeals stated in *Gross*, it is unnecessary that "every word and assertion in [a] disputed [publication] is false or defamatory."  82 N.Y.2d at 154.  As long as a publication contains at least some "assertions of objective fact that, if proven false, could form the predication for a maintainable libel action," dismissal of a complaint on the pleadings is improper.  *Id.*

even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement") (internal quotation marks and citation omitted); *Condit v. Dunne*, 317 F. Supp. 2d 344, 364 (S.D.N.Y. 2004) (although statements were "literally true because defendant clarifie[d] that he [was] merely retelling stories told to him[,]" defendant was not "immune from a slander suit" because "the stories themselves [were] false and defamatory"). And while statements are generally protected where the speaker indicates that they represent only "his own interpretation of [disclosed] facts[,] . . . leaving the reader free to draw his own conclusions," *Condit*, 317 F. Supp. 2d at 364 (internal quotation marks and citation omitted), this principle does not apply where the disclosed facts are themselves false. *See Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998) ("[W]here the plaintiff alleges that both the opinions and the facts are false, a motion to dismiss should not be granted, and the plaintiff may proceed against both the statements of fact and opinion.").

The Court, therefore, holds that the SAC adequately pleads the first element of ESG's defamation claims—false, defamatory statements about ESG.

*b.*      *Fault*

Bleeping next challenges the defamation claims by arguing that ESG is a limited-purpose public figure, and that the SAC does not plead that Bleeping acted with the heightened level of fault corresponding to that status. This argument also fails.

The level of fault that a defamation plaintiff must plead depends on the plaintiff's status. There are three recognized classes of plaintiffs: (1) "general public figures," *i.e.*, public officials or persons whose conduct is generally a matter of interest to the public; (2) "limited public figures," *i.e.*, persons whose conduct is of interest to certain portions of the public as to a limited range of issues; and (3) "private figures." *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323,

31

351 (1974); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154–55 (1967); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Public-figure plaintiffs must plead "'actual malice'—that is, [ ] knowledge that [the statement at issue] was false or [ ] reckless disregard of whether it was false or not." *N.Y. Times Co.*, 376 U.S. at 280. By contrast, under New York law, private-figure plaintiffs must plead only negligence or, "where the content . . . is arguably within the sphere of legitimate public concern," that "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Ratajack v. Brewster Fire Dep't, Inc.*, No. 14 Civ. 7 (KMK), 2016 WL 1274581, at *27 (S.D.N.Y. Mar. 31, 2016) (quoting *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199 (1975)). Whether a plaintiff is a public figure is a question of law for the Court to decide. *See Church of Scientology Int'l*, 778 F. Supp. at 666 n.3.

Here, Bleeping argues that ESG is a limited-purpose public figure and, therefore, to state a claim, must allege that Bleeping acted with actual malice. Def. Br. 11–13; Def. Reply Br. 8–9. The SAC's key allegations that would bear on actual malice are that Bleeping: (1) never properly or fully tested SpyHunter, despite knowing that such testing is the only reasonable way to gauge its efficacy; (2) relied on discredited and outdated sources assailing SpyHunter, despite knowing or recklessly disregarding that ESG had publicly disproved them; (3) has a financial incentive to disparage ESG because it profits from sales of competing products; and (4) refused to correct or retract its defamatory statements when ESG confronted it. SAC ¶¶ 7, 12–13, 82–85, 96. These allegations, Bleeping argues, do not plausibly support the conclusion that Bleeping acted with actual malice. Def. Reply Br. 8–9.

This argument fails at the threshold: Although the facts adduced in discovery may yet show that ESG is a limited-purpose public figure, the Court cannot, on the pleadings, conclude

that ESG must be so.  *See Kapetanovic v. Cannell*, No. 97 Civ. 2224, 1998 WL 474141, at *2

(N.D. Ill. Aug. 6, 1998) (denying motion to dismiss based on failure to plead actual malice

because it was not clear from complaint's face that plaintiff was a public figure).  And ESG's

pleadings comfortably satisfy the lesser fault showing required for a private figure.

      The Second Circuit has adopted a four-part test to determine whether a plaintiff is a

limited-purpose public figure.  To qualify, a plaintiff must have: "(1) successfully invited public

attention to [its] views in an effort to influence others prior to the incident that is the subject of

litigation; (2) voluntarily injected [itself] into a public controversy related to the subject of the

litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained

regular and continuing access to the media."  *Lerman v. Flynt Distrib. Co*., 745 F.2d 123, 136–37

(2d Cir. 1984); *accord Biro*, 963 F. Supp. 2d at 270.  Bleeping argues that the SAC satisfies

these elements by alleging that ESG (1) has "millions of customers" and "enjoys worldwide sales

of Spyhunter"; (2) "has received top industry certifications" from "highly regarded accreditation

program[s]"; and (3) has a "reputation in the software community for being highly litigious in

response to claims about its products."  Def. Br. 12 (citing SAC ¶¶ 21, 25, 29–30). [20]   However,

---

[20] As to the final point, the SAC contains no allegations bearing on ESG's reputation for
litigiousness.  Instead, on this point, Bleeping relies on a document it attached as an exhibit to its
initial motion to dismiss.  *See* Dkt. 17, Ex. 4.  But this document—a screenshot of a third-party's
website—is neither attached to nor incorporated by reference in the SAC.  Accordingly, it is not
cognizable here.  *See Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106,
123–24 (S.D.N.Y. 2010) (declining to consider extrinsic documents that were neither referenced
in nor attached to the complaint); *Adams v. Crystal City Marriott Hotel*, No. 02 Civ. 10258
(PKL), 2004 WL 744489, at *3 (S.D.N.Y. Apr. 6, 2004) (declining to consider "Certification"
attached to plaintiff's opposition brief because it was neither attached to nor incorporated by
reference in complaint); *Thomas v. Westchester Cty. Health Care Corp*., 232 F. Supp. 2d 273,
276 (S.D.N.Y. 2002) (extraneous document not incorporated by complaint's brief reference to
it).  In any event, as discussed below, evidence of ESG's reputation for litigiousness has no
bearing on its status as a limited-purpose public figure here.

the cognizable allegations, viewed together, do not "justify application of the demanding burden of *New York Times*." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 168 (1979).

As an initial matter, Bleeping has not clearly identified a "public controversy related to the subject of [this] litigation." *Biro*, 963 F. Supp. 2d at 270 (quoting *Lerman*, 745 F.2d at 136–37). It asserts that "[t]he public controversy at issue here is Plaintiff's deceptive business practices, the danger its software poses, and Plaintiff's harassment of those who criticize it." Def. Reply Br. 8. But this "controversy" melds three disparate issues. And it is not obvious, from the cognizable material, that any of these matters, significant as they may be in discrete quarters, qualifies as a "topic upon which sizeable segments of society have different, strongly held views." *Lerman*, 745 F.2d at 138.

Moreover, even assuming an identifiable public controversy, the Court cannot, based on the pleadings, conclude confidently that ESG "voluntarily injected" itself into that controversy. Bleeping argues that ESG's sales and recognition alone satisfy this requirement. Def. Br. 12. But New York courts have held that "the mere fact that a business enterprise is successful is an insufficient reason to deem it a public figure." *Behr v. Weber*, No. 16047/89, 1990 WL 270993, at *2 (Sup. Ct. N.Y. Cty. Jan. 5, 1990), *aff'd*, 568 N.Y.S.2d 948 (1st Dep't 1991) (citation omitted); *see, e.g.*, *Lee v. City of Rochester*, 663 N.Y.S.2d 738, 742–45 (Sup. Ct. Monroe Cty. 1997), *aff'd*, 677 N.Y.S.2d 848 (4th Dep't 1998) (evidence of plaintiff's "high profile effort to promote his business" did not make him a public figure where there was "no public controversy attend[ing] plaintiff's self-promotion efforts"); *see also Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 536 (E.D. Pa. 1999) (despite being "one of the largest and most influential corporations in the world," Hewlett-Packard was not a limited-purpose public figure

34

because it did not voluntarily thrust itself into a public controversy).[21]  Rather, the plaintiff must

"tak[e] an affirmative step to attract public attention *with respect to the subject of the allegedly*

*defamatory commentary.*"  *Lee*, 663 N.Y.S.2d at 744 (collecting cases) (internal quotation marks

and citations omitted) (emphasis added).

The SAC does not allege any facts suggesting that ESG has taken a public position on the

integrity of its business practices or the quality of its products.  Nor would the extrinsic evidence

that Bleeping has offered as to ESG's purported litigiousness cure this problem.  Even if ESG

has brought multiple lawsuits challenging allegedly defamatory claims about its products, such

conduct does not mark ESG's "voluntary injection" into a public controversy on this matter.  To

the contrary, "[i]t [may] be more accurate to say that [ESG] was dragged unwillingly into the

controversy."  *Wolston*, 443 U.S. at 166; *see Calvin Klein Trademark Trust v. Wachner*, 129 F.

Supp. 2d 248, 252 (S.D.N.Y. 2001) (defendants' public denials of allegedly defamatory claims

"do not constitute their 'injecting' themselves into a public controversy"); *Lee*, 663 N.Y.S.2d at

745 ("Litigation . . . even if accompanied by press coverage . . . does not alone render the dispute

a 'public controversy.'" (additional internal quotation marks and citation omitted)); *Time, Inc. v.*

---

[21] The two cases on which Bleeping relies in arguing the contrary are inapposite.  *See* Def. Reply Br. 8–9.  In *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977), the court found that the defendant—a large public company with more than $1 billion in assets—had attained sufficient prominence to qualify as "a public figure in the general sense, [as well as] in the specific context" of the claims at issue.  Here, by contrast, the SAC affords no basis on which to infer that "[ESG's] role in society is such that it is a figure generally in the public eye."  *Id.*  In *Steaks Unlimited v. Deaner*, 623 F.2d 264, 273–74 (3d Cir. 1980), the court held that the plaintiff, through its intensive "advertising blitz," had "created a controversy for the purpose of influencing the consuming public," and thus "voluntarily injected itself into a matter of public interest."  Here, by contrast, the SAC pleads no facts regarding ESG's marketing campaign for SpyHunter, and there is no basis to infer that it has similarly "invited public attention, comment, and criticism."  *Id.* at 274; *see Computer Aid, Inc.*, 56 F. Supp. 2d at 537 (distinguishing *Steaks Unlimited* where there was no evidence that Hewlett-Packard had "gone on an extensive media or advertising campaign to . . . to entice investors and customers, respectively, to purchase [its] securities or products").

35

*Firestone*, 424 U.S. 448, 454 (1976) (where respondent was forced to go to court in order to obtain a divorce, her "[r]esort to the judicial process . . . [was] no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court") (internal quotation marks and citation omitted).

Absent a fuller factual record, the Court therefore cannot conclude that ESG is a limited-purpose public figure with regard to the subject of the statements at issue. It is thus premature to hold ESG to a heightened standard of actual malice. And the SAC—by alleging, *inter alia*, that Bleeping knowingly or recklessly relied on discredited and outdated sources, *see* SAC ¶¶ 83–85—adequately pleads that Bleeping "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau*, 38 N.Y.2d at 199. (Bleeping has not disputed this point.) The SAC therefore has adequately pled the third element of its defamation claims.

> c.      *Harm*

Finally, Bleeping argues, for the first time in a footnote in its reply, that ESG has failed to plead harm—*i.e.*, either special damages or libel *per se*. Def. Reply Br. 9 n.10. This argument is baseless.

Under New York law, a written statement constitutes libel *per se* where it "tend[s] to injure another in his or her trade, business, or profession." *Zherka v. Amicone*, 634 F.3d 642, 645 n.6 (2d Cir. 2011); *accord Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 0442 (DLC), 2016 WL 815205, at *9 (S.D.N.Y. Feb. 29, 2016). "Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties." *Van-Go Transp. Co., Inc. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997).

36

Here, the SAC alleges that Bleeping made statements to the effect that ESG engages in fraudulent business practices, peddling an ineffective product which is the exact opposite of what it purports to be.  *See, e.g.*, SAC ¶ 80; *id.*, Ex. 6, at 4 ("SpyHunter is a dubious program with a high rate of false positives."); *id.*, Ex. 10, at 14 ("[ESG has] a history of employing aggressive and deceptive advertising.").  Such statements, which "go directly to the nature, characteristics and qualities of ESG's business and its SpyHunter product," *id.* ¶ 81, "impugn[] the basic integrity or creditworthiness of [ESG's] business," *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (quoting *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (1981)).  Injury, therefore, is "conclusively presumed." *Id.*[22]

\* \* \*

The Court, therefore, holds that ESG has adequately pled each element of its defamation claims.  Accordingly, Bleeping's motion to dismiss these claims is denied.

### 2.     Has ESG Stated a Claim for Trade Libel/Commercial Disparagement?

The SAC brings a claim for trade libel/commercial disparagement, alleging that Bleeping published false statements that "impugn the integrity of ESG and the quality and efficacy of SpyHunter."  SAC ¶ 110; *see id.* ¶¶ 108–15.

Under New York law, "[t]rade libel or product disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property."  *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989).  Like defamation, trade libel is based on an injurious falsehood published to a

---

[22] Given this holding, the Court need not determine whether ESG has adequately pled special damages.  *See Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) ("[S]tatements [found] to be libelous *per se* [ ] do not require pleading and proof of special damages.").

third party.  *Ruder*, 52 N.Y.2d at 670.  However, whereas defamation (in the commercial

context) entails a statement that "impugns the basic integrity or creditworthiness of a business,"

trade libel is based on statements "confined to denigrating the quality of a business' *services* [*or*

*products*]."  *Ehrenkranz v. 58 MHR, LLC*, 18 N.Y.S.3d 578 (Sup. Ct. Suffolk Cty. 2015) (table

decision) (emphasis added).  To state a claim for trade libel, a plaintiff must adequately plead

"(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied),

and (4) [ ] special damages."  *Angio-Med. Corp.*, 720 F. Supp. at 274 (citation omitted); *accord*

*Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628 (RWS), 2002 WL

31398933, at *5 (S.D.N.Y. Oct. 24, 2002).

Bleeping argues that, insofar as the SAC relies on the same statements and alleged harm

that form the basis for ESG's defamation claims, ESG's trade libel claim must be dismissed as

duplicative of those claims.  Def. Br. 19–20; Def. Reply Br. 5.  On this, it is correct.  *See*

*Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary order)

(holding "district court correctly dismissed [plaintiff's] other tort claims as duplicative of his

defamation claim" where "the factual allegations underlying [those] . . . claims [were] virtually

identical to the facts underlying his defamation claim" and "the harms that [plaintiff] contend[ed]

he suffered as a result of the[] other torts . . . all flow[ed] from the effect on his reputation caused

by defendants' allegedly defamatory statements") (internal quotation marks and citations

omitted); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 726 (S.D.N.Y.

2014) (dismissing tortious interference claim as duplicative of defamation claim where all

alleged injuries arose out of the allegedly defamatory statements); *O'Brien v. Alexander*, 898 F.

Supp. 162, 172 (S.D.N.Y. 1995) (injurious falsehood claim was duplicative of defamation claim

where it "relie[d] on the same statements [and alleged damages] that form[ed] the basis of the defamation claim").[23]

ESG argues that its trade libel claim is not duplicative because it is "directed to different statements on different topics within a given post, rather than the 'same statements.'" Pl. Br. 5 n.2. Both sets of claims should be permitted to go forward, ESG argues, because the former "targets statements that go to the quality and efficacy of ESG's services and products," whereas the latter "goes to statements that impugn the character and business ethics of ESG" itself. *Id.*

This argument fails to avert dismissal because, to the extent the SAC's trade libel claim is *not* duplicative of its defamation *per se* claim, it suffers from another fatal deficiency: The SAC does not adequately plead special damages. *See Ruder*, 52 N.Y.2d at 671; *Drug Research Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 440 (1960).

"Language which merely disparages a product is not actionable unless special damages are pleaded and it appears that such damage is a natural and immediate consequence of the disparaging statements." *Angio-Med. Corp.*, 720 F. Supp. at 274 (citation omitted); *accord Penn Warranty Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 813 (Sup. Ct. N.Y. Cty. 2005) ("Trade libel requires proof of special damages; while libel *per se*, even if based on disparagement in business, requires no such proof of special damages."). Special damages are "limited to losses having pecuniary or economic value, and must be fully and accurately stated, with sufficient particularity to identify actual losses." *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y.

---

[23] *See also Angio-Med. Corp.*, 720 F. Supp. at 274 ("[Where] the disparaging statements impeach the business methods or integrity of the plaintiff himself, . . . [t]he action . . . qualif[ies] as [defamation] *per se* instead of trade libel."); *Van-Go Transp.*, 971 F. Supp. at 98 (claims sounded in defamation *per se*, not trade libel, where "gist of . . . complaint [was] that the statements falsely impugned the basic trustworthiness and integrity of [plaintiffs'] business") (internal quotation marks and citation omitted).

1992) (internal quotation marks and citations omitted). "The requirement of pleading and ultimately proving special damages goes to the cause of an action itself and not merely to the recovery. . . . Courts considering product disparagement claims have therefore applied this requirement strictly, granting motions to dismiss . . . for failure to allege special damages with the requisite specificity." *Computech Int'l*, 2002 WL 31398933, at *6 (internal quotation marks and citation omitted). "If the special damage was a loss of customers . . . the persons who ceased to be customers, or who refused to purchase, must be named . . . . [I]f they are not named, no cause of action is stated." *Drug Research Corp.*, 7 N.Y.2d at 441 (internal quotation marks and citations omitted).

Here, as to damages, the SAC alleges only that as a result of Bleeping's unlawful acts in general, "ESG has and will continue to suffer significant monetary and reputational injury in amounts that will be proven at trial but that are believed to exceed $75,000." SAC ¶ 115. Given the pleading requirement of special damages, that allegation is far "too generalized to survive dismissal." *Kirby*, 784 F. Supp. at 1116, 1118 (where plaintiff claimed defendant made false and disparaging statements about painting that prevented its sale, "vague allegation[]" that plaintiff sustained $250,000 in damages, without specifying losses underlying that figure or identifying any person who did not bid on the painting because of the alleged disparagement, was "clearly inadequate" to plead special damages); *see also, e.g.*, *Drug Research Corp.*, 7 N.Y.2d at 441 (plaintiff failed to plead special damages where it alleged damages of $5 million because "[s]uch round figures, with no attempt at itemization, must be deemed to be a representation of general damages").

The SAC, therefore, has not pled a *prima facie* claim for trade libel. This claim must be dismissed.

### 3. Has ESG Stated a Lanham Act Claim for False Advertising?

Finally, the SAC brings a claim for false advertising under Section 43(a) of the Lanham Act. It alleges that Bleeping made false and misleading statements about ESG and SpyHunter which were intended to deceive consumers as to the nature, quality, and efficacy of SpyHunter, in order to divert sales from ESG to Malewarebytes, from whom Bleeping receives commissions. *See* SAC ¶¶ 101–07.

Section 43(a) prohibits making "false or misleading description[s] . . . or . . . representation[s] of fact," in "commercial advertising or promotion," about the "nature, characteristics, [or] qualities . . . of [one's own] or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1). To be actionable under the Lanham Act, statements must constitute "commercial advertising or promotion." *Romeo & Juliette Laser Hair Removal*, 2016 WL 815205, at *7. A false advertising claim under § 43(a) must also allege that: (1) "the statement in the challenged advertisement is false . . . or . . . likely to deceive or confuse consumers"; (2) the defendant "misrepresented an inherent quality or characteristic of the product"; (3) the defendant "placed the false or misleading statement in interstate commerce"; and (4) "the plaintiff has been . . . injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (internal quotation marks and citations omitted).

Bleeping moves to dismiss ESG's Lanham Act claim on the grounds that: (1) the statements challenged in the SAC are not "commercial advertising or promotion"; and (2) ESG has not adequately pled the other elements of a § 43(a) claim. The Court first addresses whether

41

Quietman7's posts constitute "commercial advertising or promotion," and then considers the remaining elements.

### a.    Commercial Advertising or Promotion

The "touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). In this Circuit, "to constitute 'commercial advertising or promotion' . . . a statement must be: (1) commercial speech, (2) made for the purpose of influencing consumers to buy defendant's goods or services, and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (collecting cases) (additional internal quotation marks and citations omitted); *accord Boule v. Hutton*, 328 F.3d 84, 90 (2003). Many district courts have also adopted a fourth requirement, articulated by Judge Sand in *Gordon & Breach*, 859 F. Supp. at 1536: that the statement be made "by a defendant who is in commercial competition with plaintiff." *See, e.g.*, *Multivideo Labs, Inc. v. Intel Corp.*, No. 99 Civ. 3908 (DLC), 2000 WL 12122, at *15 (S.D.N.Y. Jan. 7, 2000); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1019 (S.D.N.Y. 1994).

Bleeping argues that the SAC does not adequately plead "commercial advertising or promotion" because: (1) the statements it challenges are not commercial speech; (2) it does not allege sufficient dissemination to the relevant consumer market; and (3) it does not allege that Bleeping itself is ESG's competitor. Def. Br. 21–24; Def. Reply Br. 9–10. The Court considers these arguments in turn.

i.      *Commercial Speech Made for the Purpose of Influencing
        Consumers*

Pure commercial speech "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp*., 463 U.S. 60, 66 (1983) (internal quotation marks omitted).  But a "hybrid" communication, *i.e.*, one that combines commercial and non-commercial elements, may nonetheless be "commercial" where (1) it is an advertisement; (2) it refers to a specific product or service; and (3) the speaker has an economic motivation for the speech.  *Id.* at 66–67 (pamphlets containing information about sexually transmitted disease were "properly characterized as commercial speech," notwithstanding their discussion of important social issues, because they were advertisements that referenced the publisher's products, and publisher had an economic motivation for disseminating them); *Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002); *see also Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1235–36 (S.D.N.Y. 1991) (speech "may properly be classified as 'commercial', notwithstanding its social aspects" where it was made "at least primarily[] for business purposes").

Applying these standards, the Court holds that Quietman7's posts are commercial speech. In nearly all of them, Quietman7, after lambasting ESG's SpyHunter, recommends that the reader "remove [that] program and *replace it with a trustworthy alternative*," such as Malwarebytes Anti-Malware and other Affiliate products.  SAC, Ex. 7, at 2–3 (emphasis added); *id.*, Ex. 8, at 3; *see also id.*, Ex. 10, at 10, 13–14; *see also* Tr. 21 (acknowledgement by Bleeping's counsel that, in various posts, Quietman7 both disparages ESG's product *and* encourages the purchase of Malwarebytes' product "as an alternative").  By promoting Bleeping's Affiliate products as superior to SpyHunter, these posts unmistakably constitute advertisements for the Affiliate products.  (Indeed, Quietman7 goes one step further, providing links through which users can purchase the products.  *See* SAC ¶ 91; *id.*, Ex. 7, at 2–3; *id.*, Ex. 8,

43

at 3; *id.*, Ex. 10, at 13–14.)  And, by alleging that Bleeping earns a commission on directed sales of those products, the SAC adequately pleads that Bleeping has an economic incentive to engage in such promotion.[24]  *See Handsome Brook Farm, LLC v. Human Farm Animal Care, Inc.*, No. 115 Civ. 592 (JCC), 2016 WL 3348431, at *6 (E.D. Va. June 15, 2016) ("economic incentive" prong satisfied where defendant promoted products sold by suppliers from whom it received licensing fees based on percentage of products sold).

Therefore, Quietman7's posts are fairly pled to be "commercial speech" "made for the purpose of influencing consumers to buy [products in which Bleeping has a financial stake]." *Gmurzynska*, 355 F.3d at 210 (internal quotation marks and citation omitted); *see Romeo & Juliette Laser Hair Removal*, 2016 WL 815205, at *7 (defendants' comments constituted commercial speech because, "[b]y [ ] disparaging the plaintiff's business and simultaneously promoting [defendants' business], the defendants acted in pursuit of their economic interests"); *Mobius*, 880 F. Supp. at 1020 (commercial speech test satisfied where defendant's letter "was an explicit invitation to purchase [its] product over that of [plaintiff]"); *Handsome Brook Farm*, 2016 WL 3348431, at *7 ("The Court has little difficulty concluding that speech is commercial when it comes from a speaker whose organizational goal is to direct demand toward certain consumer goods, the speaker receives revenue based on the amount of those goods sold, that revenue is the speaker's largest source of income, and the speech in question directly promotes

---

[24] *See* SAC ¶¶ 10–12 (because Bleeping receives commissions from Malwarebytes but not ESG, it has "a direct financial interest in driving traffic and sales to Malwarebytes and driving traffic and sales away from ESG"), 37 ("By providing Affiliate Links, Bleeping earns a commission if a consumer simply clicks on the link and then purchases the product that Bleeping is peddling."), 42–43 (noting that Bleeping "generates revenues through advertising and commissions from affiliates," such as Malwarebytes, Emsisoft, and SuperAntiSpyware), 44 ("Bleeping functions as a sales arm of Malwarebytes.").

those same goods while disparaging the goods of a competitor."). The SAC has thus adequately pled the first two elements of "commercial advertising or promotion."

> ii.      *Dissemination to the Relevant Consumer Market*

To constitute commercial advertising or promotion, commercial speech "must be disseminated sufficiently to the relevant purchasing public." *Gmurzynska*, 355 F.3d at 210 (internal quotation marks and citation omitted). "[T]he level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case." *Gordon & Breach*, 859 F. Supp. at 1535 (internal quotation marks and citation omitted); *see, e.g.*, *Mobius*, 880 F. Supp. at 1020–21 (single letter addressed to potential purchaser of plaintiff's software product was sufficient to satisfy "dissemination" requirement because relevant purchasing market was small).

Here, the SAC alleges that Quietman7's posts were part of "an organized campaign by Bleeping to penetrate the market for anti-malware products" by repeating or linking to negative reviews of SpyHunter "any time a new forum topic mention[ed] or inquir[ed] about ESG." SAC ¶ 106.[25] The Second Circuit has "le[ft] open the possibility" that such a scheme might support the "dissemination" requirement if the defendant's "policy of reactive disparagement successfully reaches a substantial number of the competitor's potential consumers." *Fendi*, 314 F.3d at 58.

---

[25] Notably, the SAC alleges that Bleeping goes beyond ridiculing ESG: "To further influence its users to purchase Malwarebytes' products and not ESG products, [it also] remove[s] links posted by users that suggest using an ESG product." SAC ¶ 92; *see also id.*, Ex. 11 at 4 (8/5/15 post by Quietman7) (stating that, "per Bleeping Computer policy," Quietman7 had removed user's post referencing SpyHunter; post then criticizes ESG and SpyHunter).

Here, the "relevant purchasing public" consists of potential consumers of anti-malware software. Quietman7's posts were aimed at such consumers: Bleeping advertises itself as a "premier destination" for computer users seeking information about computer technology and recommendations regarding malware removal. *See* SAC ¶¶ 2, 4, 6, 59.[26] And the cognizable materials support an inference that the posts reached a sizable swath of this constituency. The statements challenged in the SAC were posted on a public Internet forum, where they could be viewed by the "[more than] 3.5 million unique visitors [that visit Bleeping's website each] month," copied, and re-disseminated. Prager Decl., Ex. 1, at 1;[27] *see also* SAC ¶ 14 (alleging that Bleeping's statements about ESG have been, "with Bleeping's encouragement and express permission, . . . reposted numerous times on other anti-malware related forums and websites"). They are thus far from the "isolated disparaging statements" that have been held "not [to] have redress under the Lanham Act." *Fendi*, 314 F.3d at 57 (evidence that defendant made 27 *oral* statements in marketplace of thousands of customers was insufficient to satisfy dissemination

---

[26] Bleeping's counsel acknowledged at argument that the Bleeping Forums page is a site which "consumers of [anti-malware] products are apt to be on." Tr. 21.

[27] These figures are drawn from a screenshot of the "Advertise on BleepingComputer.com" page of Bleeping's website, submitted as an attachment to ESG's counsel's declaration. Prager Decl., Ex. 1. "For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006); *accord Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (taking judicial notice of printouts of defendant's website because defendant did "not actually dispute the factual material reflected in [them]," but rather "simply . . . prefer[red] that the Court not consider [them]"); *Sarl Louis Feraud Int'l v. Viewfinder Inc*., 406 F. Supp. 2d 274, 277 (S.D.N.Y. 2005) ("[A]ll of the facts relevant to the resolution of the matter are contained either in the complaint, or in materials (such as the records of the French proceedings or the defendant's websites) that are either referred to in the complaint or of which the Court may take judicial notice."), *vacated and remanded on other grounds*, 489 F.3d 474 (2d Cir. 2007). Bleeping has not disputed any of the factual material represented on its website.

requirement) (citing *Sports Unlimited., Inc. v. Lankford Enters., Inc*., 275 F.3d 996, 1004–05

(10th Cir. 2002) (dissemination of information to two customers, where plaintiff made up to 150

bids per year, was insufficient)).

The SAC therefore adequately pleads that the challenged statements were "disseminated

sufficiently" to the relevant consumer market.  *Gmurzynska*, 355 F.3d at 210 (quoting *Fendi*, 314

F.3d at 56).  It thus satisfies the third element of "commercial advertising or promotion."

*iii.*　　　*Competitive Relationship with the Plaintiff*

In *Gordon & Breach*, Judge Sand held that, to constitute "commercial advertising or

promotion" under § 43(a), the allegedly false representation must be made by someone who is

"in commercial competition with [the] plaintiff."  859 F. Supp. at 1536.  The Second Circuit has

"express[ed] no view on [the] soundness" of this requirement, *Fendi*, 314 F.3d at 58, or "whether

[it] is necessary to find commercial advertising and promotion," *Boule*, 328 F.3d at 91.

However, a number of courts have held that any door left open by the Second Circuit as to the

"competitors" requirement was "firmly closed by the Supreme Court's decision in *Lexmark*

*International, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014)."  *Healthnow N.Y. Inc.*

*v. Catholic Health Sys., Inc*., No. 14 Civ. 986S (WMS), 2015 WL 5673123, at *4 (W.D.N.Y.

Sept. 25, 2015) (citation modified); *see also, e.g.*, *Handsome Brook Farm*, 2016 WL 3348431, at

*6; *Tobinick v. Novella*, No. 14 Civ. 80781, 2015 WL 1191267, at *5 n.10 (S.D. Fla. 2015)

("After the Supreme Court's decision in *Lexmark*[,] . . . it does not appear that the second prong

of the *Gordon & Breach* test, which requires that the defendant be in commercial competition

with the plaintiff, remains good law.") (citation omitted); *Educ. Impact, Inc. v. Danielson*, No. 14

Civ. 937 (FLW), 2015 WL 381332, at *13 (D.N.J. Jan. 28, 2015).

47

In *Lexmark*, the Supreme Court held that, to have standing to sue under § 43(a), a plaintiff need not allege that the parties are direct competitors. 134 S. Ct. at 1393–95. Rather, "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 1395. Although the Supreme Court "express[ed] no view" on whether the plaintiff there had adequately alleged "commercial advertising or promotion," *id.* at 1385 n.1, "[m]any post-*Lexmark* cases have seized on [that decision] . . . to conclude that such a relationship is [also] not necessary to show commercial advertising or promotion," *Handsome Brook Farm*, 2016 WL 3348431, at *6 ("[I]t would be a perplexing decision by the Supreme Court to conclude that indirect competitors had standing to bring a Lanham Act claim, but those same plaintiffs' claims would necessarily fail on the merits due to lack of direct competition."). The reasoning of those decisions is persuasive, and there is, post-*Lexmark*, no contrary authority. The Court accordingly holds that ESG need not plead that Bleeping was its competitor,[28] and therefore, that the SAC has adequately pled "commercial advertising or promotion" within the scope of the Lanham Act.

### b.    *False Advertising*

The SAC adequately pleads the other elements of ESG's § 43(a) claim: (1) a false or misleading statement that (2) misrepresents an inherent quality or characteristic of the product, (3) is placed in interstate commerce, and (4) injures the plaintiff by diverting sales or lessening the goodwill associated with its products. *See Merck Eprova*, 760 F.3d at 255.

First, for the reasons reviewed in connection with the defamation claims, the SAC pleads that Bleeping made false statements about ESG and SpyHunter. Its allegations, therefore,

---

[28] In any event, even if a competitive relationship were required, the SAC's allegations that Bleeping, by virtue of its Affiliate program, "functions as a sales arm of Malwarebytes," SAC ¶¶ 42–44, which is a "direct ESG competitor," *id.* ¶ 10, would satisfy this requirement.

necessarily satisfy the Lanham Act's more lenient requirement that the challenged statements be "false *or misleading*." 15 U.S.C. § 1125(a)(1) (emphasis added); *see Merck Eprova*, 760 F.3d at 255 ("Falsity may be established by proving that (1) the advertising is literally false as a factual matter, *or* (2) although the advertisement is literally true, it is likely to deceive or confuse customers." (internal quotation marks and citation omitted) (emphasis added)); *Time Warner Cable, Inc. v. DIRECTV, Inc*., 497 F.3d 144, 153 (2d Cir. 2007) ("[P]laintiffs alleging an implied falsehood [under the Lanham Act] are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality." (internal quotation marks and citation omitted)).

Second, Bleeping's statements about SpyHunter's ineffectiveness implicate inherent qualities and characteristics of that product.  Accordingly, they are likely to "influence the purchasing decisions of consumers," and are thus "material" for purposes of § 43(a).  *Mylan Pharm., Inc. v. Procter & Gamble Co*., 443 F. Supp. 2d 453, 462 (S.D.N.Y. 2006); *accord Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 423 (S.D.N.Y. 2013).

Third, "[t]here is no dispute that posting to internet fora placed the statements in interstate commerce."  *Romeo & Juliette Laser Hair Removal*, 2016 WL 815205, at *7.

Fourth, the SAC alleges that, "[a]s a direct and proximate result of [Bleeping's] unlawful acts, ESG has suffered . . . significant monetary and reputational injury, including direct diversion of sales and a lessening of goodwill associated with its products."  SAC ¶ 107; *see also id.* ¶ 99.  According to the SAC, Bleeping's members—many of whom "do not know the 'basic concepts' that underlie computer . . . issues"—"rely on Bleeping's representations and recommendations when purchasing . . . [anti-malware products]."  *Id.* ¶ 4.  Indeed, the SAC alleges, Bleeping itself acknowledges its ability to influence consumers.  *See id.* ¶ 90

49

("Bleeping's instructions to its users are heeded—in fact, Bleeping openly touts its influence on the purchasing decisions of its users. After disparaging ESG and SpyHunter4, Quietman7 trumpeted that '[s]ince we [Bleeping] do not recommend this program [SpyHunter], I doubt that any of our members use it.'"). And, the cognizable materials show that at least one consumer has heeded Bleeping's advice, to ESG's detriment. *See id.*, Ex. 10, at 11 (user response to Quietman7's 6/1/15 post in the "Rogue partition driving me insane!!!" forum topic: "I'm convinced. Will buy a more trustworthy product when [SpyHunter] expires."). These allegations adequately plead that ESG's business has been injured as a result of Bleeping's misrepresentations.

\* \* \*

In sum, the SAC adequately pleads each element of ESG's Lanham Act claim. Bleeping's motion to dismiss this claim is, therefore, denied.

## CONCLUSION

For the foregoing reasons, Bleeping's motion to dismiss is granted in part and denied in part. ESG's trade libel/commercial disparagement claim is dismissed. Bleeping's motion is in all other respects denied. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 16 and 28.

The parties are directed to confer with each other and submit to the Court, by Monday, July 18, 2016, a proposed Civil Case Management Plan and Scheduling Order in accordance with the Court's Individual Rules. *See* http://www.nysd.uscourts.gov/judge/Engelmayer.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: July 8, 2016
        New York, New York

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ENIGMA SOFTWARE GROUP USA, LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>BLEEPING COMPUTER LLC and DOES 1-10,<br><br>     Defendants. | Case No. 1:16-cv-00057 (PAE)<br><br>**NON-PARTY MALWAREBYTES'**<br>**OBJECTIONS AND RESPONSES TO**<br>**ENIGMA SOFTWARE GROUP USA,**<br>**LLC'S SUBPOENA** |

    Pursuant to Rule 45 of the Federal Rules of Civil Procedure, non-party Malwarebytes

Corporation ("Malwarebytes") hereby objects and responds to Plaintiff Enigma Software Group

USA, LLC's ("Plaintiff" or "Enigma") Subpoena to Produce Documents, Information, or Objects

or to Permit Inspection of Premises in a Civil Action, dated September 7, 2016 ("Subpoena") as

follows:

## GENERAL OBJECTIONS

    1.  Malwarebytes objects to Plaintiff's Definitions and Document Requests to the

extent that they seek to impose obligations beyond those required by the Federal Rules of Civil

Procedure.  Malwarebytes' responses will be made only in accordance with the applicable rules.

    2.  Malwarebytes objects to Plaintiff's definition of "document" to the extent it seeks

discovery of electronically stored information from sources that are not reasonably accessible

and thus not proportional to the needs of the case.

    3.  Malwarebytes objects to Plaintiff's definition of "Malwarebytes," "you," and

"your" to the extent that it seeks documents that are not in Malwarebytes' possession, custody, or

control.

4.      Based on the allegations in the Second Amended Complaint, Malwarebytes objects to Plaintiff's time frame for Document Requests as it seeks documents that are not relevant to any claim or defense in this matter and are not proportional to the needs of the case.

5.      Malwarebytes objects to each Document Request to the extent it seeks the disclosure of documents and information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or protection as provided by law. Malwarebytes does not intend to produce such privileged or protected documents or information. Any inadvertent disclosure of any privileged or protected document or information shall not be deemed a waiver of any privilege.

6.      Malwarebytes' investigation into whether it possesses documents sought by the Subpoena is ongoing.  A representation that Malwarebytes will produce particular categories or types of documents in response to a Document Request is not a representation that such documents necessarily exist.

**RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS**

**REQUEST NO. 1:**

All communications or documents reflecting communications with Bleeping concerning ESG or SpyHunter.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present.  Malwarebytes further objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation,  a "more convenient," "less burdensome," or "less

expensive" source.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 2:**

All communications or documents reflecting communications with Quietman7 concerning ESG or SpyHunter.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present.  Malwarebytes further objects that the term "Quiteman7" is vague and ambiguous.  Plaintiff did not provide any identifiers for the individual referred to as "Quiteman7," in Exhibit A to the Subpoena.  Accordingly, Malwarebytes is not able to conduct a reasonable search that is not unduly burdensome and that is proportional to the needs of the case.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation or other non-parties.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 3:**

All documents reflecting any oral or written agreement between Malwarebytes and Bleeping.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present.  Malwarebytes further objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation,  a "more convenient," "less burdensome," or "less expensive" source.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation.

Subject to the foregoing objections, Malwarebytes will produce non-privileged, responsive documents in its possession, custody, or control sufficient to show an affiliate agreement, if any, between Malwarebytes and Defendant Bleeping Computer LLC.

**REQUEST NO. 4:**

All documents reflecting any oral or written agreement between Malwarebytes and Quietman7.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present.  Malwarebytes further objects that the term "Quiteman7" is vague and ambiguous.  Plaintiff did not provide any identifiers for the person referred to as "Quietman7," in Exhibit A to the Subpoena.  Accordingly, Malwarebytes is not able to conduct a reasonable search that is not unduly burdensome and that is proportional to the needs of the case.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation or other non-parties.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 5:**

All documents reflecting Malwarebytes' policies, procedures and practices to which Bleeping is subject as a Malwarebytes Affiliate.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present.  Malwarebytes further objects that the term "Malwarebytes Affiliate" is vague and ambiguous.  Malwarebytes will interpret the term to mean a domain owner that is authorized by Malwarebytes to link to Malwarebytes' products on its website.

Subject to the foregoing objections, Malwarebytes will produce non-privileged, responsive documents in its possession, custody, or control sufficient to show Malwarebytes' policies, procedures and practices to which Bleeping is subject as a Malwarebytes Affiliate, as interpreted above.

**REQUEST NO. 6:**

All communications or documents reflecting communications between Malwarebytes and Bleeping concerning Bleeping's advertising, promotion, or sale of Malwarebytes' products, including Bleeping's use or placement of Affiliate Links or its participation as an Affiliate of Malwarebytes.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present, without limitation to documents and communications concerning Enigma or SpyHunter.   Malwarebytes further objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation,  a "more convenient," "less burdensome," or "less expensive" source.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 7:**

All communications or documents reflecting communications between Malwarebytes and Bleeping, Quietman7, and/or any other member of Bleeping's Staff concerning the content of postings by Bleeping, Quietman7 and/or any other member of Bleeping's Staff on Bleeping's website, forums and/or message boards.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present, without limitation to documents and communications concerning Enigma or SpyHunter.   Malwarebytes further objects that the terms "Quiteman7" and "member of Bleeping's Staff" are vague and ambiguous.  Plaintiff did not provide any identifiers for the person referred to as "Quiteman7" or the persons referred to as

"Staff" in Exhibit A to the Subpoena.  Accordingly, Malwarebytes is not able to conduct a reasonable search that is not unduly burdensome and that is proportional to the needs of the case.

Moreover, Malwarebytes objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation,  a "more convenient," "less burdensome," or "less expensive" source.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation or other non-parties.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 8:**

All documents concerning compensation in any form whatsoever, whether monetary or in-kind, that Malwarebytes provides to Bleeping, Quietman7, and/or any other member of Bleeping's Staff.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present.  Malwarebytes further objects that the terms "Quiteman7" and "member of Bleeping's Staff" are vague and ambiguous.  More specifically, Plaintiff did not provide any identifiers for the person referred to as "Quiteman7" or the persons referred to as "Staff" in Exhibit A to the Subpoena.  Accordingly, Malwarebytes is not able to conduct a reasonable search that is not unduly burdensome and that is proportional to the needs of the case.

Moreover, Malwarebytes objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation, a "more convenient," "less burdensome," or "less expensive" source. Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation or other non-parties.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 9:**

Documents sufficient to show all payments made by Malwarebytes to Bleeping from January 1, 2013 to the present, itemized by date paid and purpose of the payment.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks such documents that pre-date the conduct alleged in the Second Amended Complaint. Malwarebytes further objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation, a "more convenient," "less burdensome," or "less expensive" source. Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 10:**

All communications or documents reflecting communications between Marcin Kleczynski and Lawrence Abrams regarding Enigma, SpyHunter, Bleeping's advertising, promotion, or sale of Malwarebytes' products, and/or the Litigation.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad and unduly burdensome.  More specifically, Malwarebytes' communications concerning "Bleeping's advertising, promotion, or sale of Malwarebytes' products," without limitation to those concerning Enigma or SpyHunter, are not relevant to a party's claim or defense in this matter, and are not proportional to the needs of the case.  Moreover, Malwarebytes is not a party to this case and its communications, if any, regarding this litigation are not relevant to a party's claim or defense in this matter, and are not proportional to the needs of the case.

Malwarebytes further objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation,  a "more convenient," "less burdensome," or "less expensive" source.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 11:**

All communications or documents reflecting communications between Marcin Kleczynski and Quietman7 regarding Enigma, SpyHunter, Bleeping's advertising, promotion, or sale of Malwarebytes' products, and/or the Litigation.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad and unduly burdensome.  More specifically, Malwarebytes' communications concerning "Bleeping's advertising, promotion, or sale of Malwarebytes' products," without limitation to those concerning Enigma or SpyHunter, are not relevant to a party's claim or defense in this matter, and are not proportional to the needs of the case.  Similarly, Malwarebytes is not a party to this case and its communications, if any, regarding this litigation are not relevant to a party's claim or defense in this matter, and are not proportional to the needs of the case.

Malwarebytes further objects that the term "Quiteman7" is vague and ambiguous.  Plaintiff did not provide any identifiers for the person referred to as "Quiteman7," in Exhibit A to the Subpoena.  Accordingly, Malwarebytes is not able to conduct a reasonable search that is not unduly burdensome and that is proportional to the needs of the case.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation or other non-parties.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 12:**

Documents sufficient to show each contribution from Malwarebytes, Marcin Kleczynski, or any other Malwarebytes executive to Bleeping's defense fund for this Litigation, including its amount.

**RESPONSE:**

Malwarebytes objects that the term "Malwarebytes executive" is vague and ambiguous, as Plaintiff did not define or provide any identifiers for the persons referred to generally as

"Malwarebytes executive" in Exhibit A to the Subpoena.  Malwarebytes interprets the term to mean an individual currently employed by Malwarebytes in a C-level position.

Malwarebytes further objects to this Request as unduly burdensome, as it is a non-party to this action and the requested documents are equally available from a party to the litigation,  a "more convenient," "less burdensome," or "less expensive" source.  Malwarebytes also objects to this Request to the extent it is duplicative of documents requested, or received, from parties to the litigation or other non-parties.  Malwarebytes further objects to this Request as unduly burdensome on the grounds that it seeks to require Malwarebytes to conduct a search for documents that are not relevant to any claim or defense in this matter and are not proportional to the needs of the case.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

**REQUEST NO. 13:**

All communications or documents reflecting communications between Malwarebytes, Marcin Kleczynski, or any other Malwarebytes executive and Bleeping regarding this Litigation or contribution to Bleeping's defense fund.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad, not relevant to a party's claim or defense, and not proportional to the needs of the case to the extent it seeks "[a]ll" such documents from January 1, 2013 to the present.  Malwarebytes also objects that the term "Malwarebytes executive" is vague and ambiguous, as Plaintiff did not define or provide any identifiers for the persons referred to generally as "Malwarebytes executive" in Exhibit A to the

Subpoena.  Malwarebytes interprets the term to mean an individual currently employed by

Malwarebytes in a C-level position.

Malwarebytes further objects to this Request as unduly burdensome, as it is a non-party

to this action and the requested documents are equally available from a party to the litigation,  a

"more convenient," "less burdensome," or "less expensive" source.  Malwarebytes also objects

to this Request to the extent it is duplicative of documents requested, or received, from parties to

the litigation or other non-parties.  Malwarebytes further objects to this Request as unduly

burdensome on the grounds that it seeks to require Malwarebytes to conduct a search for

documents that are not relevant to any claim or defense in this matter and are not proportional to

the needs of the case.

Based on the foregoing objections, Malwarebytes will not produce documents in response

to this request.

**REQUEST NO. 14:**

All documents concerning the Litigation, including communications with third parties

regarding the Litigation.

**RESPONSE:**

Malwarebytes objects to this Request as overly broad and unduly burdensome.  More

specifically, Malwarebytes is not a party to this case and its documents and communications, if

any, regarding this litigation are not relevant to a party's claim or defense in this matter, and are

not proportional to the needs of the case.  Malwarebytes further objects to this Request as unduly

burdensome on the grounds that it seeks to require Malwarebytes to conduct a search for

documents that are not relevant to any claim or defense in this matter and are not proportional to

the needs of the case.

Based on the foregoing objections, Malwarebytes will not produce documents in response to this request.

Respectfully submitted,

FENWICK & WEST LLP

Dated:   October 11, 2016                    By: _____
                                             Tyler G. Newby
                                             tnewby@fenwick.com
                                             Sapna Mehta
                                             smehta@fenwick.com
                                             555 California Street, 12th Floor
                                             San Francisco, CA  94104
                                             Telephone:        415.875.2300
                                             Facsimile:415.281.1350


                                             Attorneys for Non-Party
                                             Malwarebytes Corporation

### PROOF OF SERVICE

The undersigned declares as follows:

I am a citizen of the United States and employed in San Francisco County, State of California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is Fenwick & West LLP, 555 California Street, San Francisco, CA  94104.  On the date set forth below, I served a copy of the following documents:  NON-PARTY MALWAREBYTES' OBJECTIONS AND RESPONSES TO ENIGMA SOFTWARE GROUP USA, LLC'S SUBPOENA on the interested parties in the subject action as follows:

>     Eric A. Prager
>     K&L Gates LLP
>     559 Lexington Avenue
>     New York, NY  10022
>     email:  eric.prager@klgates.com

☐    **BY U.S. MAIL:**  by placing the document listed above in a sealed envelope for collection and mailing following our ordinary business practices.  I am readily familiar with our ordinary business practices for collecting and processing mail for the United States Postal Service, and mail that I place for collection and processing is regularly deposited with the United States Postal Service that same day with postage prepaid.

☑    **BY OVERNIGHT COURIER:**  by placing the document listed above in a sealed envelope with a prepaid shipping label for express delivery and causing such envelope to be transmitted to an overnight delivery service for delivery by the next business day in the ordinary course of business.

☑    **BY E-MAIL:**  by causing to be transmitted via e-mail the document listed above to the addressee at the e-mail address listed above.

☐    **BY PERSONAL DELIVERY:**  by causing to be personally delivered the document listed above to the addressee at the address set forth above.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.


Date:  October 11, 2016              *Marti Guidoux*
                                      Marti Guidoux

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ENIGMA SOFTWARE GROUP USA, LLC,   :
                                        :
                 Plaintiff,      :
                                          :  Case No. 1:16-cv-00057-PAE
       -against-            :
                                        :
BLEEPING COMPUTER LLC, and     :  **DEFENDANT'S   RESPONSES   AND**
DOES 1-10,                        :  **OBJECTIONS TO PLAINTIFF'S FIRST**
                                        :  **REQUEST  FOR  PRODUCTION  OF**
                 Defendants.      :  **DOCUMENTS**
--------------------------------------------------------x

       Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Bleeping Computer, LLC hereby responds to Plaintiff's First Request for Production of Documents as follows:

**GENERAL OBJECTIONS:**

       These responses are made solely for the purpose of, and in relation to, this action. Each response is given subject to all appropriate objections (including but not limited to objections concerning competency, relevancy, materiality, propriety, and admissibility), which would require the exclusion of any statement contained herein if the request was asked of, or any statement contained herein was made by, a witness present and testifying in court. All such objections and grounds therefore are reserved and may be interposed at the time of trial.

       Defendant has not yet completed its investigation of the facts relating to this action, has not yet completed discovery in this action, and has not yet completed preparation for trial. Consequently, the following responses are given without prejudice to Defendant's rights to produce at the time of trial subsequently discovered material.

       Except for facts explicitly admitted herein, no admission of any nature whatsoever is to be implied or inferred. The fact that any request herein has been responded upon should not be taken as an admission, or a concession, of the existence of any facts set forth or assumed by such

1

request, or that such response constitutes evidence of any fact thus set forth or assumed.   All responses must be construed as given on the basis of present recollection.

Defendant objects to each and every Request for Production to the extent that they do not seek relevant information and have not been reasonably calculated to lead to the discovery of admissible evidence.   Defendant objects to each and every request that seeks privileged and/or confidential information.   Defendant objects to each request that is overbroad and unduly burdensome.   Defendant objects to each request that is vague and ambiguous, such that responding completely and accurately to it is impossible.   Defendant specifically objects to any request as unduly burdensome to the extent it requires Defendant to differentiate between Plaintiff and any entity that might otherwise use the name "Enigma" or the abbreviation "ESG". Defendant specifically objects to any request as unduly burdensome and lacking foundation to the extent it requires Defendant to affirm that "SpyHunter" was developed by ESG, is an anti-malware software program, and/or determine what versions of the program exist.   Defendant objects to each interrogatory to the extent it seeks confidential, proprietary, or sensitive business information.

Defendant objects to the Instructions to the extent they exceed the requirements imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, and/or Standing Orders applicable in the instant matter.   Specifically, Defendant objects to any obligation to produce information in the possession, custody, and/or control of third parties to the extent Defendant is unable to obtain such information.   Defendant objects to any obligation to make partial production of an unduly burdensome request unless otherwise required and to provide explanation beyond what may be required.   Defendant objects to any obligation to create a privilege log beyond that required.   Defendant objects to producing non-final documents unless such are relevant to the instant dispute.   Defendant objects to any requirement to produce documents in their entirety to the extent Defendant is entitle to withhold a portion thereof. Defendant objects to any obligation to create any documents describing destroyed, lost, discarded, transferred, or disposed of documents or communications unless otherwise required.

Defendant objects to utilizing a page identifier or confidentiality legend, though it may choose to do so without waiver of this objection. Defendant objects to any requirement to agree upon a particular production format, though it may choose to do so without waiver of this objection. Defendant objects to the specified time frame to the extent it seeks irrelevant material or is overbroad.

Defendant objects to the Definitions to the extent they exceed the requirements imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, and/or Standing Orders applicable in the instant matter. Defendant specifically objects to the definition of "Affiliate" as unduly burdensome and lacking foundation to the extent it requires Defendant to determine whether such entities sell products, whether such are antimalware, and whether such compete with SpyHunter. Defendant objects to the definitions as unduly burdensome and lacking foundation to the extent it requires Defendant to affirm that "SpyHunter" was developed by ESG, is an anti-malware software program, and/or determine what versions of the program exist.

Discovery in this matter is continuing, and Defendant reserves the right to supplement these responses if it locates additional documents responsive to Defendant's requests pursuant to Federal Rule of Civil Procedure 26(e).

## METHODOLOGY

Production of posts to Defendant's website are produced as exported from the SQL database to Comma Separated Value (.csv) files. Where a search resulted in a relevant post, the "topic_id" of the post was retrieved and all posts containing that same "topic_id" value were exported to the .csv file, with the file name generated from the "title" field in the "Topic" table of the database associated with that same "topic_id". The .csv files reproduce the table headers of the "Posts" table in the database, which are:

| Header Name | Purpose |
|-------------|---------|
| pid | post id |
| append_edit | unknown |

| edit_time | when edited |
|---|---|
| author_id | member id of author |
| author_name | display name of author |
| use_sig | whether signatures should be used |
| use_emo | whether emoticons should be used |
| ip_address | IP Address of author at the time of post. As it is PII of third parties, such is withheld. |
| post_date | date of post |
| icon_id | unknown |
| post | content of post |
| queued | unknown |
| topic_id | topic id post is associated with |
| post_title | unknown. does not seem to be used |
| new_topic | unknown |
| edit_name | who last edited |
| post_key | unknown |
| post_htmlstate | whether html is allowed |
| post_edit_reason | if a reason was given for the edit |
| post_bwoptions | unknown |
| pdelete_time | unknown. Not sure if its used. |
| post_field_int | unknown |
| post_field_t1 | unknown |
| post_field_t2 | unknown |

**DEFENDANT'S RESPONSE TO REQUEST FOR PRODUCTION**

**Request No. 1:**

All documents concerning ESG or SpyHunter, including all posts made on Bleeping's website, forums and/or message boards concerning ESG or SpyHunter.

**Response to Request No. 1:**

Defendant objects to this request to the extent it seeks communications protected by the attorney-client privilege, marital communications privilege, or attorney work-product rule, and Defendant is withholding all emails and text messages between himself and counsel, as well as all emails and text messages between Larry Abrams, the single member of Defendant, and his wife.  Defendant is further withholding all messages sent through PayPal identifying donors to Defendant's legal defense fund.  Defendant will provide a privilege log.

4

Without waiving these objections, documents responsive to this request are in the folder "1" and in the folder "1 – Attorneys Eyes Only", the contents of latter of which is designated as ATTORNEYS EYES ONLY, and in the folders "Disc 1" and "Disc 1 – Attorney's Eyes Only", the contents of the latter of which is designated ATTORNEYS EYES ONLY, within the file "discovery2.pst".

Pursuant to a Nondisclosure Agreement with Malwarebytes, a copy of which appears in response to Request for Production 18, Defendant is withholding the following documents:

Bob-g-skype.csv

Ade-gill-skype.csv

Pieter-arntz-skype.csv

Thisisu-skype.csv

Nathan-scott-skype.csv

Such documents are exports to .csv from Skype chats between Larry Abrams and the Skype users named in the file name.

Due to the burden of manually searching through the entire database, Defendant  searched for the following keywords "enigma, spyhunter, spy hunter, lawsuit, law suit, help defend, legal defense fund, and gofundme" in the forum database Topics, forum Private Messages, documents, and emails from 2013 on.


**Request No. 2:**

All communications with any Affiliate, including Malwarebytes, Emsisoft Ltd. or SurfRight B.V., concerning ESG or SpyHunter.

**Response to Request No. 2:**

Defendant objects to this request as overly broad and unduly burdensome to the extent it requires Defendant to identify documents "concerning" ESG or SpyHunter that do not mention such by name.

Without waiving these objections, documents responsive to this request are in the folder "2" and in the folder "2 – Attorney's Eyes Only", the contents of latter of which is designated as ATTORNEYS EYES ONLY, and in the folder "Disc 2" within the file "discovery2.pst". Defendant further refers to documents produced in response to Request for Production 1.  Due to the undue burden of a manual search, Defendant searched all emails and documents from 2013 on for the following keywords:

"@malwarebytes.org, @malwarebytes.com, @emsisoft.com, @zemana.com, @surfright.com, @iobit.com, @reimageplus.com, @heimdalsecurity.com, @skimlinks.com, @viglink.com, @foolishit.com, @stackcommerce.com, @revresponse.com, @reasoncoresecurity.com, @iolo.com, @avangate.com, @cleverbridge.com, @onenetworkdirect.com, @commissionjunction.com, @comfort-software.com, @revenuewire.com, Amazon.com Associates Program, affiliatesupport@gamestop.com, element5.com, @affiliategroove.com, @bluesnap.com"

**Request No. 3:**

All communications with Quietman7 concerning ESG, SpyHunter, or any Affiliate, including Malwarebytes, Emsisoft Ltd. or SurfRight B.V.

**Response to Request No. 3:**

Defendant objects to this request as overly broad and unduly burdensome to the extent it requires Defendant to identify documents "concerning" ESG or SpyHunter or an affiliate that do not mention such by name.

Without waiving these objections, documents responsive to this request are in the folder "3-14" and in the folder "3-14 – Attorney's Eyes Only", the contents of latter of which is designated as ATTORNEYS EYES ONLY, and in the folder "Disc 3-14" within the file "discovery2.pst".

**Request No. 4:**

All documents concerning BSC's appointment of and relationship with members of Staff in 2006, including documents reflecting any oral or written agreements between Bleeping and members of Staff and any documents reflecting how and why Bleeping appoints an individual as a member of Staff.

**Response to Request No. 4:**

Defendant objects to this request as overbroad and unduly burdensome to the extent "relationship with" might encompass each and every communication with members of Staff. Defendant further objects to this request as lacking foundation to the extent the terms "appointment" or "appoints" imply an employment or agency relationship.

Without waiving these objections, documents responsive to this request are in folder "4". Due to the undue burden of a manual search, Defendant searched the forum topics, private messages, and emails for the year 2006 for the following keywords: "nominate, nominating, nomination, thank, welcome, congrats, position, congratulations, congrat, coach, instructor, Moderator, advisor, graduate, Malware Response Team, MRT, global, admin".

**Request No. 5:**

All documents reflecting any change to BSC's appointment of and relationship with members of Staff from 2007 to date.

**Response to Request No. 5:**

Defendant objects to this request as overbroad and unduly burdensome to the extent "relationship with" might encompass each and every communication with members of Staff. Defendant further objects to this request as lacking foundation to the extent the term "appointment" implies an employment or agency relationship.

Without waiving these objections, documents responsive to this request are in folder "5" and in the folder "5 – Confidential", the contents of latter of which is designated as CONFIDENTIAL.  Due to the undue burden of a manual search, Defendant searched the forum

topics, private messages, and emails for the years 2007 on for the following keywords: "nominate, nominating, nomination, thank, welcome, congrats, position, congratulations, congrat, coach, instructor, Moderator, advisor, graduate, Malware Response Team, MRT, global, admin".

**Request No. 6:**

All documents concerning the decision to appoint Quietman7 an Advisor or a Global Moderator.

**Response to Request No. 6:**

Defendant objects to this request as lacking foundation to the extent the term "appoint" implies an employment or agency relationship.

Without waiving these objections, documents responsive to this request are in folder "6" and were produced in response to Requests for Production 4 and 5.

**Request No. 7:**

All documents reflecting any oral or written agreement between Bleeping and Quietman7.

**Response to Request No. 7:**

Defendant objects to this request under the doctrines of attorney-client privilege and work product, to the extent the request implicates an existing or future common interest agreement in this matter.

Without waiving these objections, documents responsive to this request are in folder "7".

**Request No. 8:**

All documents reflecting the rights and powers Bleeping provided to each level of Staff in 2006, including all documents reflecting any statements Bleeping has made on its website, forums and/or message boards concerning the rights and powers of each level of Staff.

**Response to Request No. 8:**

Defendant objects to this request as overbroad and irrelevant as any rights and powers in 2006 are unrelated to actions taken within the relevant statutes of limitations for the claims in the Complaint.

Without waiving these objections, documents responsive to this request are in folder "8". Defendant also refers to the 7624-Global Moderator Abilities.csv file in folder "7".


**Request No. 9:**

All documents reflecting any changes to the rights and powers Bleeping provided to each level of Staff from 2007 to date.

**Response to Request No. 9:**

Defendant objects to this request as overbroad and irrelevant as any rights and powers outside the relevant statutes of limitations are unrelated to actions taken within the relevant statutes of limitations for the claims in the Complaint.

Without waiving these objections, documents responsive to this request are in folder "9".


**Request No. 10:**

All documents concerning any training Bleeping provides to members of Staff.

**Response to Request No. 10:**

Defendant objects to this request as the term "training" is vague.

Without waiving these objections, documents responsive to this request are in folder "10". Defendant also refers to the 485214-Using your new Global Moderation Powers.csv in folder "7".

**Request No. 11:**

All communications between Bleeping and members of its Staff concerning the content of postings by Staff on Bleeping's website, forums and/or message boards.

**Response to Request No. 11:**

Defendant objects to this request as overbroad and unduly burdensome to the extent it requires Defendant to review the entire universe of uncategorized communications on the forums.

Without waiving these objections, documents responsive to this request are in folder "11".

**Request No. 12:**

Documents sufficient to identify all Admins, Global Moderators, and Moderators from 2006 to date, including his or her username, Staff position and the time period he or she served in that position.

**Response to Request No. 12:**

Defendant objects to this request as lacking foundation to the extent the term "position" implies an employment or agency relationship. Defendant objects to this request to the extent it requires Defendant to create a document not presently in existence; no documents specifically exist recording those previously in such positions with the information requested.

Without waiving these objections, documents responsive to this request are in folder "12".  To the extent otherwise responsive, Defendant refers to the document produced in response to Requests for Production 4 & 5.

**Request No. 13:**

All documents concerning compensation in any form whatsoever, whether monetary or in-kind, that Bleeping provides to Quietman7 or other members of Staff.

**Response to Request No. 13:**

Defendant objects to the term "compensation" as it relates to "in-kind" as vague.

Without waiving these objections, to the extent it encompasses the fact of being named a Staff member, Defendant incorporates by reference "holiday-gift.xls" produced in response to

Request No. 12.  Such production is not to be construed as an admission that Staff are employees or agents of Defendant or that Staff are compensated for services performed; rather, the term "compensation", being vague, is being broadly construed to include voluntary, discretionary gifts to Staff, who had no reasonable expectation of receiving any gifts or entitlement to same.

**Request No. 14:**

All communications between Lawrence Abrams and Quietman7, including by private messaging on Bleeping's website, forums and/or message boards.

**Response to Request No. 14:**

Defendant objects to this request under the doctrines of attorney-client privilege and work product, to the extent the request implicates an existing or future common interest agreement in this matter.  Defendant further objects to this request as overbroad and irrelevant to the extent it seeks communications unrelated to the allegations in the Complaint.

Without waiving these objections, documents responsive to this request are produced in response to Request for Production 3.

**Request No. 15:**

Documents sufficient to show the annual income of Bleeping, itemized by source, including documents sufficient to show all monies received by Bleeping as a result of purchases made through its Affiliate Links, itemized by Affiliate or Affiliate Link.

**Response to Request No. 15:**

Defendant objects to this request to the extent it requires Defendant to create a document not presently in existence.  Defendant objects to this request as overbroad and irrelevant to the extent it seeks documents outside the applicable statute of limitations governing Plaintiff's claims.

Without waiving these objections, documents responsive to this request, designated ATTORNEYS EYES ONLY, are in folder "15 – Attorney's Eyes Only", and in the folder "Disc

15 – Attorney's Eyes Only", the contents of which is designated ATTORNEYS EYES ONLY, within the file "discovery2.pst".  Defendant is withholding confidential material setting forth revenue earned from Malwarebytes pursuant to a nondisclosure agreement, a copy of which appears in response to Request for Production 18.

**Request No. 16:**

Documents sufficient to show all monies received by Bleeping from Malwarebytes, itemized by date received, and the purpose of the payments.

**Response to Request No. 16:**

Defendant objects to this request to the extent it requires Defendant to create a document not presently in existence.

Without waiving these objections, documents responsive to this request are in folder "16".  Defendant otherwise refers to documents produced in response to Request for Production 15.  Defendant is withholding confidential material, being emails setting forth revenue earned from Malwarebytes pursuant to a nondisclosure agreement, a copy of which appears in response to Request for Production 18.

**Request No. 17:**

Documents sufficient to show all monies received by Bleeping from ESG, itemized by date received, and the purpose of the payments.

**Response to Request No. 17:**

Defendant objects to this request to the extent it requires Defendant to create a document not presently in existence.

Without waiving these objections, documents responsive to this request are in folder "17".

**Request No. 18:**

All documents concerning Bleeping's relationship with its Affiliates, including documents reflecting any oral or written agreements that govern the relationship between Bleeping and its Affiliates.

**Response to Request No. 18:**

Defendant objects to this request as overbroad and irrelevant to the extent it seeks documents outside the applicable statute of limitations governing Plaintiff's claims.

Without waiving these objections, documents responsive to this request are in folder "18" and in the folder "Disc 18" within the file "discovery2.pst".

**Request No. 19:**

All documents concerning how Bleeping determines which products to recommend in its product reviews, in Virus Removal Guides, or in the Downloads, Tutorials or Forums sections of its website.

**Response to Request No. 19:**

Defendant objects to this request as overbroad and irrelevant to the extent it seeks documents outside the applicable statute of limitations governing Plaintiff's claims.

Without waiving these objections, documents responsive to this request are in folder "19" and in the folder "Disc 19" within the file "discovery2.pst".

**Request No. 20:**

All communications between Bleeping and its Affiliates concerning Bleeping's advertising or promotion of the Affiliate's products, including Bleeping's use or placement of Affiliate Links.

**Response to Request No. 20:**

Defendant objects to this request as overbroad and irrelevant to the extent it seeks documents outside the applicable statute of limitations governing Plaintiff's claims.  Without

waiving these objections, documents responsive to this request are in folder "20" and in the folder "20 – Attorney's Eyes Only", the contents of latter of which is designated as ATTORNEYS EYES ONLY, and in the folder "Disc 20" within the file "discovery2.pst". Defendant is withholding confidential material, namely emails to and from the Malwarebytes.org and Malwarebytes.com domains, which discuss the promotion of Malwarebytes products, pursuant to a nondisclosure agreement, a copy of which appears in response to Request for Production 18.  Due to the undue burden of a manual search, Defendant performed a search for all emails since 2013 and on that had the following keywords:

"@malwarebytes.org, @malwarebytes.com, @emsisoft.com, @zemana.com,@surfright.com, @iobit.com, @reimageplus.com, @heimdalsecurity.com, @skimlinks.com, @viglink.com, @foolishit.com, @stackcommerce.com, @revresponse.com, @reasoncoresecurity.com, @iolo.com, @avangate.com, @cleverbridge.com, @onenetworkdirect.com, @commissionjunction.com, @comfort-software.com, @revenuewire.com, Amazon.com Associates Program, affiliatesupport@gamestop.com, element5.com, @affiliategroove.com, @bluesnap.com, revenuwire, affiliatewire, @commissionjunction, @avangate.com, @onenetworkdirect"


**Request No. 21:**

Documents sufficient to show any editing or alteration made to the posts by Quietman7 in Exhibits 6-8 of the Complaint, including the date of such editing or alteration and the identity of the editor.

**Response to Request No. 21:**

Defendant objects to this request as vague and ambiguous.

Without waiving these objections, documents responsive to this request are in folder "21".

**Request No. 22:**

Documents sufficient to show, for any postings on Bleeping's website, forums and/or message boards concerning ESG or SpyHunter that members of Staff deleted, the content of such posting, the date of its deletion, and the member of Staff who deleted it.

**Response to Request No. 22:**

Defendant objects to this request as overly broad and unduly burdensome to the extent it requires Defendant to identify documents "concerning" ESG or SpyHunter that do not mention such by name.  Defendant objects to this request to the extent it requires it to create a document not in existence; the database software does not make a record of or retain deleted posts.

Without waiving these objections, documents responsive to this request are in folder "22".  Defendant otherwise refers to documents produced in response to Request for Production 1.  Due to the undue burden of a manual search, Defendant searched through all posts whose edit reason contain "link to non-Bleeping Computer", "deleted link to outside malware removal guide", "affiliate spam", or "link has been disabled" and performed a manual review of all SPAM that had been moved to a spam jail or topic jail.

**Request No. 23:**

All documents, including any communications, concerning any testing of SpyHunter conducted by Bleeping, Quietman7, or any member of Staff.

**Response to Request No. 23:**

Defendant objects to this request as overly broad and unduly burdensome to the extent it requires Defendant to identify documents "concerning" SpyHunter that does not mention such by name.  Defendant objects to this request as lacking foundation to the extent it suggests employment or control of Quietman7 or Staff by Defendant.

Without waiving these objections, documents responsive to this request are in folder "23".  Defendant further refers to those documents produced in response to Request for Production 1 and in response to Plaintiff's interrogatories.

**Request No. 24:**

All documents concerning Bleeping's awareness of allegations made against ESG in 2004 referenced in Paragraphs 83-85 of the Complaint, including Bleeping's awareness that these allegations were proven to be false.

**Response to Request No. 24:**

Defendant objects to this request as unduly burdensome to the extent it requires Defendant to differentiate between Plaintiff and any entity that might otherwise use the name "Enigma" or the abbreviation "ESG". Defendant objects to this request as lacking foundation to the extent it suggests such allegations were "false" or "proven to be false", and to the extent it suggests Defendant was aware of same.

Without waiving these objections, Defendant refers to documents produced in response to Plaintiff's interrogatories and Request for Production 1, to the extent responsive.


**Request No. 25:**

All documents that support, contradict or relate in any way to the statements about ESG or SpyHunter made by Quietman7 in Exhibits 6-8 and 10-11 of the Complaint.

**Response to Request No. 25:**

Defendant objects to this request as overly broad and unduly burdensome to the extent it requires Defendant to identify documents supporting, contradicting, or relating to ESG or SpyHunter that do not mention such by name. Defendant objects to this request as lacking foundation to the extent it suggests employment or control of Quietman7 by Defendant.

Without waiving these objections, documents responsive to this request are produced in response to Plaintiff's interrogatories, in response to Request for Production 29, and made exhibits to Defendant's counterclaims.

**Request No. 26:**

All communications concerning the reposting on other websites of information from Bleeping's forums or message boards relating to ESG and/or SpyHunter.

**Response to Request No. 26:**

Defendant objects to this request as overly broad and unduly burdensome to the extent it requires Defendant to identify documents supporting, contradicting, or relating to ESG or SpyHunter that do not mention such by name.

Without waiving these objections, no such responsive documents are known to be within Defendant's possession, custody, or control.

**Request No. 27:**

Documents sufficient to show each contribution to Bleeping's defense fund for this Litigation, including its amount and source.

**Response to Request No. 27:**

Defendant objects to this request as it is not reasonably calculated to lead to the discovery of admissible or relevant evidence.  Defendant objects as the request is overbroad and unduly burdensome, as it is not limited in scope or subject to disputed issues in this case.  Defendant objects as the request seeks constitutionally protected information of third parties, and the purpose of such request is to harass and chill donors.  See *Edward Lewis Tobinick, M.D. v. Novella,* Case No. 14-cv-80781 (S.D. Fla. Aug. 15, 2015) (sustaining objection to request for documents relating to legal defense fund).

In reliance on the foregoing objection, Defendant is withholding any such otherwise responsive documents.  No privilege log can reasonably be generated without disclosing the very information being withheld.

**Request No. 28:**

All communications between Bleeping and Malwarebytes or Marcin Kleczynski regarding this Litigation or contribution to Bleeping's defense fund.

**Response to Request No. 28:**

Defendant objects to this request as it is not reasonably calculated to lead to the discovery of admissible or relevant evidence. Defendant objects as the request is overbroad and unduly burdensome, as it is not limited in scope or subject to disputed issues in this case. Defendant objects as the request seeks constitutionally protected information of third parties, and the purpose of such request is to harass and chill donors. See *Edward Lewis Tobinick, M.D. v. Novella,* Case No. 14-cv-80781 (S.D. Fla. Aug. 15, 2015) (sustaining objection to request for documents relating to legal defense fund).

In reliance on the foregoing objection, Defendant is withholding any such otherwise responsive documents relating to the defense fund.

Defendant objects to this request under the doctrines of attorney-client privilege and work product, to the extent the request implicates a common interest agreement in this matter.

Without waiving these objections, documents otherwise responsive, to the extent such may be responsive to this request regarding this Litigation, are in folder "28" and in the folder "Disc 28" within the file "discovery2.pst". Defendant further refers to the documents produced in response to Request for Production 2.

**Request No. 29:**

All documents that Bleeping contends support its Affirmative Defense, set forth in its Answer, that "Plaintiff is libel proof, in that its reputation in the computer security community has been so low and so badly tarnished for so long that it is incapable of being further damaged."

**Response to Request No. 29:**

Defendant objects to this request to the extent it requires Defendant to produce documents in Plaintiff's possession, custody, or control.

Without waiving these objections, documents responsive to this request are in folder "29".  Defendant further refers to those documents produced in response to Request for Production 1 and in response to Plaintiff's interrogatories.

**Request No. 30:**

All documents that Bleeping contends support its Affirmative Defense, set forth in its Answer, that "Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands."

**Response to Request No. 30:**

Defendant objects to this request to the extent it requires Defendant to produce documents in Plaintiff's possession, custody, or control.

Without waiving these objections, documents responsive to this request were produced in response to Plaintiff's interrogatories and made exhibit to Defendant's counterclaims.

**Request No. 31:**

All documents that Bleeping relied upon in making the allegation, set forth in Paragraphs 17 and 19 of its Counterclaims, that "Enigma or its agent registered the domain name bleepingcomputerregistryfix.com" and "Enigma created, or has actual or constructive knowledge of, the content of [that] website."

**Response to Request No. 31:**

Defendant objects to this request to the extent it requires Defendant to produce documents in Plaintiff's possession, custody, or control.

Without waiving these objections, documents responsive to this request are in folder "31".  Defendant further refers to those documents produced in response to Plaintiff's Interrogatory 10.

**Request No. 32:**

All documents that Bleeping relied upon in making the allegation, set forth in Paragraphs 22, 30, and 32 of its Counterclaims, that "Enigma, directly or through an agent, created and published all of the nearly one-hundred URLs identified in Exhibit 'B' annexed hereto," has "created or has actual or constructive knowledge of the content of [those] websites," and "owns, operates and/or controls the Infringing URLs, directly or through its agents."

**Response to Request No. 32:**

Defendant objects to this request to the extent it requires Defendant to produce documents in Plaintiff's possession, custody, or control.

Without waiving these objections, documents responsive to this request are in folder "32".   Defendant further refers to those documents produced in response to Plaintiff's Interrogatory 10.

**Request No. 33:**

All documents that Bleeping relied upon in making the allegation, set forth in Paragraphs 35-36 of its Counterclaims, that "Enigma, directly or through an agent, caused the download page for ComboFix at http://www.combofix.org/download.php to display a 'Download Now!' link" and "Enigma directly or through its agent, created or has actual or constructive knowledge of the content of [that] page."

**Response to Request No. 33:**

Defendant objects to this request to the extent it requires Defendant to produce documents in Plaintiff's possession, custody, or control.

Without waiving these objections, documents responsive to this request are in folder "33".   Defendant further refers to those documents produced in response to Plaintiff's Interrogatory 10.

**Request No. 34:**

All documents that Bleeping relied upon in making the allegation, set forth in Paragraphs 45-46 of its Counterclaims, that "Enigma published the content of the source code or otherwise directs and controls the content of the source code of the webpages set forth in Exhibit 'D'" and "Enigma has actual or constructive knowledge of the misuse of Bleeping's mark and content in [that] source code."

**Response to Request No. 34:**

Defendant objects to this request to the extent it requires Defendant to produce documents in Plaintiff's possession, custody, or control.

Without waiving these objections, documents responsive to this request are in folder "34". Defendant further refers to those documents produced in response to Plaintiff's Interrogatory 10.

**Request No. 35:**

All documents that Bleeping relied upon in making the allegation, set forth in Paragraph 48 of its Counterclaims, that "Enigma has published, on multiple websites that market and promote the downloading and sale of SpyHunter, numerous false and defamatory statements of and concerning Bleeping and its programs, RKill.com and Unhide."

**Response to Request No. 35:**

Defendant objects to this request to the extent it requires Defendant to produce documents in Plaintiff's possession, custody, or control.

Without waiving these objections, documents responsive to this request are in folder "35". Defendant further refers to those documents produced in response to Plaintiff's Interrogatory 10 and made exhibit to Defendant's counterclaims.

**Request No. 36:**

All documents that Bleeping contends support its allegation, set forth in Paragraphs 65 and 92 of its Counterclaims, that ESG's alleged conduct has "damaged" and "injured" Bleeping.

**Response to Request No. 36:**

Without waiving any objections, Defendant responds that discovery is ongoing and any documents specifically responsive to this request will be produced.   Defendant otherwise generally refers to all other documents produced critical of Plaintiff and/or SpyHunter, to the extent that Plaintiff's conduct suggests an endorsement by Defendant of Plaintiff and/or SpyHunter.

**Request No. 37:**

All documents that you intend to introduce at trial or rely on as evidence in this Litigation.

**Response to Request No. 37:**

Defendant objects to the request to the extent it requires Defendant to disclose attorney work-product.   Defendant has made no particular determination as to what document it may introduce at trial or otherwise rely on as evidence.

Without waiving these objections, Defendant reserves the right to introduce or rely on any of the documents produced by Plaintiff, Defendant, or third-parties in the course of discovery in this matter, or attached to pleadings, motions, memoranda, or other documents filed or served in this matter.

. . .

. . .

. . .

Dated: October 26, 2016.                Respectfully Submitted,

                                        /s/ Jay M. Wolman
                                        Jay M. Wolman (JW0600)
                                        RANDAZZA LEGAL GROUP, PLLC
                                        100 Pearl Street, 14th Floor
                                        Hartford, Connecticut 06103
                                        Telephone:  702-420-2001
                                        Facsimile:  305-437-7662
                                        Email: ecf@randazza.com

                                        Marc J. Randazza
                                        RANDAZZA LEGAL GROUP, PLLC
                                        4035 South El Capitan Way
                                        Las Vegas, Nevada 89147
                                        Telephone: 702.420.2001
                                        Facsimile:  305.437.7662
                                        ecf@randazza.com

                                        Gregory W. Herbert
                                        GREENBERG TRAURIG, P.A.
                                        450 South Orange Avenue, Suite 650
                                        Orlando, Florida 32801
                                        Telephone:  407.420.1000
                                        Facsimile:  407.841.1295
                                        herbertg@gtlaw.com

                                        *Attorneys for Defendant,*
                                        *Bleeping Computer LLC*

23

CASE NO. 1:16-cv-00057-PAE

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of October 2016, I served a true and correct copy of the foregoing document via electronic mail on counsel for the Plaintiff ENIGMA SOFTWARE GROUP USA, LLC at:

Eric A. Prager
Eric R. I. Cottle
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
eric.prager@klgates.com
eric.cottle@klgates.com

Terry Budd
Christopher M. Verdini
Anna Shabalov
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA 15222
terry.budd@klgates.com
christopher.verdini@klgates.com
anna.shabalov@klgates.com

Respectfully submitted,

Employee,
Randazza Legal Group, PLLC

24

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                   :

ENIGMA SOFTWARE GROUP USA, LLC,   :
                                   :

                 Plaintiff,    :   Case No. __1:16-cv-7885__
                                   :

          -against-         :

MALWAREBYTES INC.,               :

             Defendant.   :   **COMPLAINT**
                                   :
                                   :
                                   :
--------------------------------------------------------x

      Plaintiff Enigma Software Group USA, LLC ("ESG"), by its attorneys, for its Complaint

against Defendant Malwarebytes Inc., formerly known as Malwarebytes Corporation

("Malwarebytes"), respectfully alleges as follows:

**SUMMARY OF THE CASE**

      1.      This is an action for civil remedies, including injunctive relief and damages, under

the federal Lanham Act and under New York State law, arising out of the unlawful, predatory

and bad faith practices of Malwarebytes, a direct competitor of ESG, aimed at unfairly

competing with ESG in the market for anti-malware and internet security software.

      2.      Malwarebytes, a self-professed "industry-lead[er]," has since 2008 provided

consumers with anti-malware and internet security software aimed at protecting consumers'

computers from malicious software (i.e., malware) which includes viruses, spyware and adware.

Its flagship product is known as "Malwarebytes Anti-Malware" ("MBAM").  That product

directly competes with ESG's anti-malware software known as SpyHunter.

      3.      As part of the MBAM product, Malwarebytes purports to detect "Potentially

1

Unwanted Programs" or PUPs and automatically quarantines PUPs and flags them as "threats" for its users as shown in the screen shot below:



4.      Malwarebytes knows that detecting and quarantining a competitor's products like SpyHunter and RegHunter as PUPs would cause immediate harm to the competitor in the form of lost sales and revenues and also cause irreparable harm to the competitor's business reputation as a result of being identified as a "threat" that a consumer should either not download or should remove from his or her computer.

5.      Malwarebytes also knows that a decision to identify competing products like SpyHunter and RegHunter as PUPs would likely result in other anti-malware companies following suit, which would cause exponentially more harm to its competitor in a short amount of time.

6.      Since its inception in 2008, Malwarebytes never identified SpyHunter or RegHunter as PUPs or any other type of malware.

7.     However, on October 5, 2016, Malwarebytes' CEO, Marcin Kleczynski, announced that Malwarebytes was revising its criteria to identify PUPs.  *See* Ex. 1.  Immediately thereafter, Malwarebytes' MBAM product began identifying SpyHunter and RegHunter as PUPs, meaning that Malwarebytes is now falsely representing to the consuming public that Enigma's programs are a "threat" and that the consuming public's security will be compromised if they download SpyHunter or RegHunter or, if already downloaded on a consumer's computer, the consumer does not remove SpyHunter or RegHunter.



8.     In addition, by identifying SpyHunter and RegHunter as PUPs, the MBAM product blocks and/or deactivates SpyHunter and RegHunter from operating on a consumer's computer.

9.     Malwarebytes' deliberate decision to change its PUP definition and begin falsely identifying SpyHunter and RegHunter as PUPs was not coincidental.  Rather, it was a bad faith decision made as a result of a lawsuit that ESG filed against Bleeping Computer LLC

("Bleeping") that is currently pending before this Court as Case No. 1:16-cv-00057-PAE (the "Bleeping Lawsuit").  Malwarebytes' actions show the extent to which Bleeping and Malwarebytes act in concert to promote their mutual interests.

10.     Malwarebytes and Bleeping have an affiliate relationship by which Bleeping promotes the MBAM product and earns commissions from Malwarebytes if a consumer purchases MBAM through a link on Bleeping's website.

11.     In the Bleeping Lawsuit, ESG alleges that Bleeping has engaged in a deliberate scheme of disseminating false, misleading and inaccurate information about ESG and its SpyHunter product and instructing consumers not to install or uninstall SpyHunter but instead to purchase Malwarebytes' competing MBAM product, thereby earning revenues for itself and for Malwarebytes while damaging ESG and thereby promoting Malwarebytes' business interests.

12.     Malwarebytes will be a witness in the Bleeping Lawsuit and in fact must respond to a subpoena for documents in the case by October 12, 2016.

13.     The transparent nature of Malwarebytes' bad faith conduct and its connection to the Bleeping Lawsuit are numerous.  For example, on Malwarebytes' forum where Mr. Kleczynski announced Malwarebytes' purported "New Criteria for Detecting Potentially Unwanted Products (PUPs)," the first question came from a Bleeping "Special Ops Tech" asking "what was added/removed/edited."  *See* Ex. 2.  In response, Malwarebytes explained "[t]he biggest change is this criteria we use: 'predominantly negative feedback or ratings from the user community.'"

14.     Bleeping has attempted to defend its unlawful conduct in the Bleeping Lawsuit by relying on supposed negative feedback from some unidentified "user community."

15.     Further, within hours of Malwarebytes publicly announcing its new stance on

4

PUPs, Bleeping's owner, Lawrence Abrams, posted a news story on the front page of Bleeping's website lauding Malwarebytes new "policy" and copying verbatim Malwarebytes "updated PUP criteria." *See* Exs. 3-4.

16.     The charade that is Malwarebytes' "new" policy was quickly recognized.  A Bleeping "Security Colleague" who posts under the name Angoid commented on Mr. Abrams' front page news story with a thinly veiled admission that Malwarebytes' policy was directed specifically at ESG and SpyHunter, given Bleeping's history of attacking ESG and the ongoing Bleeping Lawsuit: "What would be really strange is if anyone can think of any other anti-malware program that fits any one of those descriptions [the PUP criteria] . . . . not that I can think of one of course :)." *See* Ex. 4.

17.      ESG brings this lawsuit and, if necessary, will move for preliminary injunctive relief to put an immediate stop to the damage and irreparable harm that Malwarebytes has caused and will continue to cause to both ESG and the consuming public as a result of its bad faith campaign of unfair competition and false and misleading statements that identify SpyHunter and RegHunter as "threats" and PUPs and thereby deceive consumers.

**THE PARTIES**

18.     Plaintiff ESG is a Florida limited liability company, having merged with a Connecticut limited liability company of the same name.  ESG does business in this District.

19.     Upon information and belief, Defendant Malwarebytes is a corporation organized under the laws of Delaware and headquartered at 3979 Freedom Circle, 12th Floor, Santa Clara, CA 95054.  Malwarebytes was originally incorporated under the laws of Delaware on January 6, 2014 as Malwarebytes Corporation.  On December 21, 2015, Malwarebytes filed a Restated Certificate of Incorporation with the Delaware Secretary of State that amended the company name to Malwarebytes, Inc.

20.     Malwarebytes currently employs a Regional Vice President in the greater New York City area.  *See* Ex. 5.

21.     Even now, Malwarebytes is expanding its presence in the state and district by seeking to hire a Senior Sales Engineer in New York to work with the Regional Sales Manager to "present[] Malwarebytes security solution to prospective customers" and "work closely with customers as their primary point of feedback and resolution of issues."  *See* Ex. 6.

22.     Upon information and belief, Malwarebytes advertises to, provides its software for download to, and has sold its software to consumers residing in the State of New York, including in the Southern District of New York.  That software is currently wrongly detecting ESG's SpyHunter and RegHunter as PUPs and thereby misleading and deceiving consumers in the state.

## JURISDICTION AND VENUE

23.     This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.* and the laws of the State of New York.  This Court has subject matter jurisdiction, *inter alia*, pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

24.     Upon information and belief, this Court has personal jurisdiction over Malwarebytes because Malwarebytes regularly transacts business in the State of New York and this judicial district and Malwarebytes has committed tortious acts in the state by wrongly detecting and identifying SpyHunter and RegHunter as PUPs when its software runs scans on computers in this state and district, thereby misleading and deceiving consumers in this state and district.  As a result, Malwarebytes has intentionally availed itself of the privilege of conducting business in this state and district, has purposefully directed activity at this state and district, and has established sufficient minimum contacts with this state and district such that Malwarebytes can reasonably and fairly anticipate being haled into this Court.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) because Malwarebytes is subject to personal jurisdiction in, and so resides in, this district.

## FACTS

### Background

26.     ESG develops and markets computer security products with a particular focus on protecting its millions of customers from computer hacks, system breaches, identity theft and system computing malware, as well as other computer security threats.

27.     ESG protects its customers from this array of serious risks by providing software that detects and removes malware, enhances Internet privacy, and eliminates other security threats.

28.     ESG's flagship anti-malware product is a software program called SpyHunter, which presently is in version 4.

29.     SpyHunter is an adaptive malware detection and removal tool that provides rigorous protection against the latest malware threats including spyware, Trojans, rootkits, and other malicious software.

30.     Consumers can download a free scanning version of SpyHunter through a link entitled "Download Free Scanner."  The scanner detects whether a computer has malware or other threats.

31.     ESG informs consumers that they also have the choice to buy a license to the full version of SpyHunter and provides consumers with a "Buy Now" link.  The full version of SpyHunter includes the scanner, tools to remove malware and other security protection tools.

32.     ESG's advanced Windows registry cleaner and PC optimizer is a software program called RegHunter.  It repairs, restores, and boosts the performance of computers running the Windows operating system by removing registry errors, cleaning computer file clutter,

defragmenting hard drives, and other optimizations.

33. ESG sells licenses to SpyHunter and RegHunter solely over the Internet, including at its website, <http://www.enigmasoftware.com>. ESG enjoys worldwide sales of SpyHunter and RegHunter, including sales to citizens of the State of New York.

34. ESG's SpyHunter and RegHunter products have received top industry certifications and have both been certified as TRUSTe Certified Downloads.

35. ESG is a Better Business Bureau accredited business. Better Business Bureau accreditation standards include a "commitment to make a good faith effort to resolve any consumer complaints." ESG has received an "A+" rating from the Better Business Bureau.

36. Malwarebytes is a direct competitor of ESG in the anti-malware software market and offers free and paid versions of its competing MBAM software.

37. MBAM operates by scanning a user's computer for malware and other computer security threats, detecting any such threats, reporting to the user the results of the detection, and then taking remedial action, such as preventing a malicious download, removing the threat from the computer, or providing the user with an option to remove the detected program.

**ESG Files Suit Against Bleeping Computer**

38. On January 5, 2016, ESG filed a lawsuit against Bleeping seeking redress for Bleeping's pattern and practice of making false and misleading statements about ESG to drive consumers away from purchasing ESG's products, including SpyHunter, and toward purchasing Malwarebytes' products, including MBAM. The details of Bleeping's smear campaign against ESG are laid out in full in ESG's Second Amended Complaint, ECF No. 25, *Enigma Software Group USA, LLC v. Bleeping Computer LLC et al.*, Case No. 1:16-cv-00057 (PAE) (S.D.N.Y. Mar. 18, 2016).

39. As alleged in the Bleeping Lawsuit, Malwarebytes directly profited and continues

to profit from Bleeping's false and misleading statements about ESG, which drive customers away from ESG and to Malwarebytes.  *See id.* at ¶ 77.

40.    Indeed, Malwarebytes and/or its CEO, Mr. Kleczynski, have financially supported Bleeping in the Lawsuit by directly providing money to Bleeping in response to Bleeping's GoFundMe campaign to raise money for its defense costs.

41.    After the Court denied Bleeping's Motion to Dismiss ESG's Complaint finding, among other things, that the alleged false and misleading statements "unmistakably constitute advertisements" for Malwarebytes (ECF No. 45), the parties began fact discovery.

42.    On September 7, 2016, as part of that fact discovery, ESG served Malwarebytes with a subpoena to produce documents, information, or objects pursuant to Rule 45 of the Federal Rules of Civil Procedure ("Subpoena").

43.    The Subpoena requested that Malwarebytes produce documents reflecting the nature of its relationship with Bleeping and the extent of its involvement in Bleeping's smear campaign against ESG.

44.    Malwarebytes is required to produce documents responsive to the Subpoena by October 12, 2016.

**Malwarebytes Revises its Definition of a PUP**

45.    Less than a week before Malwarebytes is required by law to reveal the extent of its involvement in the illegal behavior ESG has pled in the Bleeping Lawsuit, Malwarebytes chose to level a new line of attack against ESG, this time directly interfering with ESG's relationships with existing and prospective customers and engaging in false statements about ESG's SpyHunter and RegHunter products.

46.    On October 5, 2016, Malwarebytes announced that it revised the criteria that its product MBAM uses to detect PUPs.  *See Ex.* 1.

47.     Malwarebytes markets MBAM as an "anti-malware and anti-spyware scanner" that "detects and removes malware like worms, Trojans, rogues, spyware, bots, and more." *See* https://www.malwarebytes.com/antimalware/.

48.     PUPs, however, are not the malware or spyware programs MBAM purports to detect and remove.

49.     Instead, MBAM now defines PUPs as any program that demonstrates at least one of the criteria that Malwarebytes itself has unilaterally declared makes a program "potentially unwanted." *See* Ex. 7.

50.     Malwarebytes' announced PUP criteria include (1) "obtrusive, misleading, or deceptive advertising, branding, or search practices"; (2) "excessive or deceptive distribution, affiliate or opt-out bundling practices"; (3) "aggressive or deceptive behavior especially surrounding purchasing or licensing"; (4) "unwarranted, unnecessary, excessive, illegitimate, or deceptive modifications of system settings or configuration (including browser settings and toolbars)"; (5) "difficulty uninstalling or removing the software"; (6) "predominantly negative feedback or ratings from the user community"; (7) "diminishes user experience"; and (8) "other practices generally accepted as riskware, scareware, adware, greyware, or otherwise commonly unwanted software by the user community." *Id.*

51.     Malwarebytes further "reserve[d] the right to adjust, expand and update our criteria" for PUP identification "without prior notice or announcements." *Id.*

52.     Malwarebytes has specifically designed these vague and unbounded criteria to enable it to block its users' access to SpyHunter and RegHunter for anticompetitive purposes or merely at its malicious whim.

53.     Unsurprisingly, Malwarebytes' criteria for PUP identification track the allegations

Bleeping made against ESG in its Counterclaims in the Bleeping Litigation.

54.     In fact, upon information and belief, Malwarebytes' revision of its PUP criteria is merely a pretense to begin identifying SpyHunter and RegHunter as PUPs, to damage ESG's business and gain leverage in the Bleeping Lawsuit.

55.      Demonstrating the connection between Malwarebytes' conveniently timed "revision" to its PUP definition and the Bleeping Lawsuit, on *the same day* that Malwarebytes announced its revised definition Bleeping announced the Malwarebytes change as the main story on the front page of its website, proclaiming "Malwarebytes going to battle with PUPs and Adware." *See* Ex. 3.

### Malwarebytes Begins Detecting and Blocking SpyHunter and RegHunter

56.     Once Malwarebytes announced its new PUP criteria, MBAM began to detect SpyHunter and RegHunter as PUPs and to block their download and installation.

57.     Before October 5, 2016, MBAM had ***never*** designated SpyHunter or any other ESG program a PUP or any other type of "threat" for which the program scans, despite the fact that Malwarebytes and SpyHunter have coexisted in the market for over seven years.

58.     Instead, Malwarebytes designated SpyHunter and RegHunter a "threat" only after it was served with the Subpoena in the Bleeping Litigation and was approaching the date it would have to reveal the extent of its involvement in Bleeping's unlawful and anticompetitive smear campaign.

59.     Since Malwarebytes revised its PUP criteria to specifically target ESG's products, when a user has MBAM installed and attempts to download and install SpyHunter and RegHunter, MBAM prevents the download and installation from completing.

60.     MBAM places the SpyHunter and RegHunter files in a "quarantine."  It further explains to the user that the "threats," *i.e.* legitimate and non-malicious SpyHunter and

RegHunter files, placed in the quarantine "do not pose a threat when quarantined" and if "deleted from quarantine will be permanently removed from [the user's] computer."

61.     MBAM then provides the user with the option to "delete," "delete all," or "restore" the quarantined files.

62.     Even if the user ignores MBAM's unjustified warning against SpyHunter and RegHunter and restores the SpyHunter and RegHunter files on the computer, every subsequent time MBAM scans the computer for threats, it again detects and reports SpyHunter and RegHunter as PUPs and encourages the user to remove the associated files.

63.     As of October 6, 2016, in at least some instances MBAM even more aggressively was automatically preventing the installation of SpyHunter entirely, without the user's consent and without providing the user an option to override MBAM's block.

64.     SpyHunter and ESG's other products are legitimate and pose no security threat to a user's computer.

65.     Malwarebytes knows ESG's products do not pose any security threat.

66.     Malwarebytes has listed ESG's products as PUPs solely as an anticompetitive attempt to avoid adverse consequences in the Bleeping Lawsuit and attempt to drive ESG out of business.

67.     Malwarebytes' conduct is willful and malicious.

68.     Malwarebytes' unlawful conduct is causing and will continue to cause harm to ESG.

69.     Shortly after Malwarebytes began unlawfully identifying SpyHunter and RegHunter as PUPs, ESG began suffering a drop in its sales of SpyHunter and RegHunter licenses.

70.     Additionally, by recommending to users who have already purchased a SpyHunter or RegHunter license and installed the programs that they delete SpyHunter and RegHunter because they are a "threat," ESG will be harmed as users request refunds for the previously purchased licenses.

71.     ESG has no adequate remedy at law for certain of the relief requested below.

## FIRST CAUSE OF ACTION

### (Violations of Lanham Act § 43(a))

72.     ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

73.     Malwarebytes' use in commerce of false and misleading statements about ESG SpyHunter and RegHunter constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

74.     Malwarebytes' use in commerce of false and misleading statements about ESG, SpyHunter and RegHunter is likely to deceive consumers as to the nature, quality, and efficacy of SpyHunter and RegHunter, including causing consumers to believe that SpyHunter and RegHunter are malicious or a threat.

75.     Such deception is material as it is likely to influence consumers not to purchase SpyHunter or RegHunter and/or to do business with ESG and to continue to utilize and subscribe to Malwarebytes' MBAM product.

76.     Malwarebytes' false and misleading statements have actually deceived or have the capacity to deceive a substantial portion of their intended audience, *i.e.*, users of MBAM who are also existing or potential customers of ESG and users of SpyHunter and/or RegHunter.

77.     Malwarebytes' false and misleading statements are shown to users of MBAM *every time* a user attempts to download and install SpyHunter or RegHunter and are part of an organized campaign by Malwarebytes to strengthen its position in the market for anti-malware

products by unfairly driving consumers away from ESG and SpyHunter and/or RegHunter.

78.     As a direct and proximate result of Malwarebytes' unlawful acts, ESG has suffered and will continue to suffer significant monetary and reputational injury, including losses of sales and a lessening of goodwill associated with its products, in amounts that will be proven at trial but that are believed to or will exceed $75,000, exclusive of interest and costs.

## SECOND CAUSE OF ACTION

(Violations of New York General Business Law § 349)

79.     ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

80.     Section 349 of New York's General Business Law prohibits the use of deceptive acts or practices in the conduct of business, trade or commerce or in the furnishing of any service in the State of New York.

81.     Malwarebytes' unfair competition through the wrongful detection of SpyHunter and RegHunter as PUPs in MBAM constitutes deceptive and unfair trade practices.

82.     Each time a consumer who has MBAM installed and running on his or her computer attempts to download and install SpyHunter or RegHunter, MBAM displays to the consumer the deceptive statement that SpyHunter and/or RegHunter is a PUP.  In certain instances, MBAM even automatically blocks the download of SpyHunter and RegHunter without giving consumers the option to override the block.

83.     Malwarebytes' statement that SpyHunter and RegHunter are PUPs and blocking of program downloads are materially misleading to consumers because these acts wrongly suggests that SpyHunter and RegHunter -- two legitimate and highly regarded programs -- are malicious or a threat.

84.     As a result, consumers are harmed by being misled into not downloading effective

14

antimalware software on false pretenses and even prevented from downloading the software without their consent.

85.     ESG has been and continues to be injured as a result of Malwarebytes' deceptive and unfair trade practices, including through losses of sales and a lessening of goodwill associated with its products, in amounts that will be proven at trial but that are believed to or will exceed $75,000, exclusive of interest and costs.

### THIRD CAUSE OF ACTION

(Tortious Interference with Contractual Relations)

86.     ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

87.     ESG has licensed the SpyHunter and RegHunter software to numerous customers.

88.     Malwarebytes knows that individuals seeking to download SpyHunter and/or RegHunter on their computer or who have SpyHunter and/or RegHunter already installed on their computer have licensed that software from ESG.

89.     By displaying messages that SpyHunter and RegHunter are PUPs to MBAM users that either also had SpyHunter or RegHunter installed on their computer or that were seeking to install SpyHunter or RegHunter, and by automatically blocking the download and installation of SpyHunter and RegHunter without user consent, Malwarebytes (i) has intentionally induced users to choose not to install SpyHunter or RegHunter or to delete SpyHunter or RegHunter and (ii) has disabled SpyHunter and RegHunter programs that ESG customers have paid to install and use, causing confusion and anger among ESG's customers.

90.     ESG has already begun receiving customer requests for refunds as a result of Malwarebytes' improper conduct.

91.     As a result of Malwarebytes' tortious interference, ESG has been damaged at least

through loss of license fees in amounts that will be proven at trial but that are believed to or will exceed $75,000, exclusive of interest and costs.

## FOURTH CAUSE OF ACTION

### (Tortious Interference with Business Relations)

92.     ESG repeats and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

93.     Certain computer users who seek to install SpyHunter and/or RegHunter are prospective customers of ESG who have not yet paid the SpyHunter or RegHunter license fee required to obtain full product functionality.

94.     Malwarebytes knows that individuals seeking to install SpyHunter or RegHunter may enter into a business relationship with ESG.

95.     By displaying messages that SpyHunter and RegHunter are PUPs to MBAM users that were seeking to install SpyHunter or RegHunter and by automatically blocking the download and installation of SpyHunter and RegHunter without user consent, Malwarebytes intentionally interfered with the prospective business relationship between those users and ESG by inducing the users not to complete the download and not to license SpyHunter and/or RegHunter.

96.     Wrongfully and misleadingly informing users that SpyHunter and RegHunter are PUPs and automatically blocking their download and installation without user consent is an improper and illegitimate means of competition that Malwarebytes undertook for the purpose of harming ESG's business.

97.     As a result of Malwarebytes' tortious interference, ESG has been damaged at least through loss of license fees in amounts that will be proven at trial but that are believed to or will exceed $75,000, exclusive of interest and costs.

16

**PRAYER FOR RELIEF**

WHEREFORE, ESG respectfully requests that the Court enter judgment in its favor as follows:

        a.      Declaring that Malwarebytes' conduct violates 15 U.S.C. § 1125(a);

        b.      Declaring that Malwarebytes' conduct constitutes a violation of New York General Business Law § 349;

        c.      Declaring that Malwarebytes' conduct constitutes tortious interference with contractual relations under the laws of the State of New York;

        d.      Declaring that Malwarebytes' conduct constitutes tortious interference with business relations under the laws of the State of New York;

        e.      Preliminarily and permanently enjoining Malwarebytes from programming MBAM to detect SpyHunter or RegHunter as PUPs and to notify users of that detection;

        f.      Preliminarily and permanently enjoining Malwarebytes from programming MBAM to prevent the download and installation of SpyHunter or RegHunter;

        g.      Awarding ESG damages in an amount proven at trial and believed to be in excess of $75,000, plus interest;

        h.      Awarding ESG punitive damages;

        i.      Awarding ESG its attorneys' fees and costs incurred in bringing this action; and

        j.      Awarding such other and further relief as the Court deems proper.

**JURY TRIAL DEMANDED**

ESG demands a trial by jury of all issues so triable in this action.

Dated:   New York, New York
         October 7, 2016

Respectfully submitted,

By:   /s/ Eric A. Prager
      Eric A. Prager
      K&L GATES LLP
      599 Lexington Avenue
      New York, NY 10022
      Telephone: 212.536.3900
      Facsimile: 212.536.3901
      eric.prager@klgates.com

      &

      Terry Budd
      Christopher M. Verdini
      Anna Shabalov
      (*pro hac vice applications to be filed*)
      K&L GATES LLP
      210 Sixth Avenue
      Pittsburgh, PA 15222
      Telephone: 412.355.6500
      Facsimile: 412.355.6501
      terry.budd@klgates.com
      christopher.verdini@klgates.com
      anna.shabalov@klgates.com

      *Attorneys for Plaintiffs*

# Exhibit 1

Blog     Threats     Scams     MBTV     Forums



CEO ANNOUNCEMENTS    |    MALWAREBYTES NEWS

# Malwarebytes gets tougher on PUPs

Posted October 5, 2016 by Marcin Kleczynski

Several years ago, I blogged that we would be increasing how aggressive we would be in detecting Potentially Unwanted Programs (PUPs) and our fantastic malware intelligence and research teams have delivered on that promise. Last year, we removed approximately *500 million traces of PUPs per month*!

In response, a lot of the PUP developers are making efforts to circumvent our criteria and continue distributing their damaging software to users. This is why we are getting even more critical about what we call a PUP, and what we are going to be detecting and removing from user systems.

Earlier this morning, Malwarebytes posted a revision to the criteria that we use to identify PUPs.

These changes are to help continue that fight against products and companies that scam users on the Internet.

Our efforts have resulted in making users' systems safer and more productive by removing these kinds of software. Unfortunately, we have also received a lot of negative attention from the PUP developers. This has resulted in backlash ranging from nasty blog posts and comments from fake profiles defending the products to, of course, a mountain of letters with legal letterheads demanding that we stop.

Now some people might think of this as something that would slow us down, but we see it as proof that we are making a dent in the development and distribution of PUPs.

You can learn more about our new PUP criteria here.

**SHARE THIS ARTICLE**

---

**COMMENTS**

- *Mike Yanczysin*

  Marcin: Good post, but I am wondering – during your long walks on beaches, how do you avoid the fish?

- *Uncle_Al*

  Marcin, I have never understood why security companies avoided dealing directly with PUPs. They are infections and instead of being PUPs, I have always viewed them as PUSS. Instead of Potentially >> Positively Unwanted Surreptitious Software or whatever one may feel fits best. I, however, hope you not are limited by law with respect to any of the definitions you posted in the explanation. Otherwise, you have certainly bitten off a big chunk. I will recommend that all of my friends, relatives, and those who ask me about security, buy your product if I am convinced it meets the tests. Over the years I have dealt with PUSS – starting with Windows 3.0. I think that it is more insidious than the more – uh – nefarious programs, including ransomware.

- *Marcin Kleczynski*

  It's complicated.

- *https://vivaldi.net/unity/profile/chas4o-blog Chas4*

    I reported a big developer who has been abusing their Developer ID and has 7 pieces of Malware in their 2 macOS apps (the malware changes Safari homepage, search and adds extensions, and displays ads, does it to other browsers also) and they have been doing so for a few years now, the malware, Malwarebytes for Mac detects

---

## RELATED ARTICLES

CEO ANNOUNCEMENTS    |    MALWAREBYTES NEWS

# Welcome to Malwarebytes Unpacked

April 20, 2012 - Malwarebytes was founded with the community in mind. Facebook, Twitter, our forums, and countless other outlets have allowed us to communicate with you, our community. We felt a major piece was missing. Welcome to Malwarebytes Unpacked. Malwarebytes Unpacked is the official Malwarebytes blog providing you with the latest exciting news and cutting edge research directly...

CONTINUE READING

6 Comments

CEO ANNOUNCEMENTS    |    MALWAREBYTES NEWS

# Yesterday's Database Update Issue

April 16, 2013 - It saddens me to report that at around 3 PM PST yesterday, Malwarebytes released a definitions update that disabled thousands of computers worldwide. Within 8 minutes, the update was pulled from our servers. Immediately thereafter, users flocked to our support helpdesk and forums to ask us for a fix. I want to offer my sincere...

CONTINUE READING

6 Comments

CEO ANNOUNCEMENTS    |    MALWAREBYTES NEWS

# Improvements to our Updating Process

April 18, 2013 - It's been a rough week here at Malwarebytes, and I'm sure for many of you as well. We've spent the entire week focused on supporting the users affected by Monday's false positive, as well as implementing systems to prevent this type of problem from ever happening again. If you have not yet received help, please route...

**CONTINUE READING**

 2 Comments

CEO ANNOUNCEMENTS    |    MALWAREBYTES NEWS

# Vulnerability Bounty Hunting In Action

July 23, 2013 - Last week, security researcher Roy Castillo posted a recount of interactions with Facebook about a bug that he had found. Will bug bounty hunting become the norm?

**CONTINUE READING**

 0 Comments

CEO ANNOUNCEMENTS    |    MALWAREBYTES NEWS

# Malwarebytes Adopts Aggressive PUP Policy

July 26, 2013 - Malwarebytes Anti-Malware previously detected only harmful or deceiving PUPs. Today, We're revising our policy to include PUPs that our users find annoying or misleading.

**CONTINUE READING**



10 Comments

**ABOUT THE AUTHOR**

Marcin Kleczynski

CEO and Co-Founder of Malwarebytes

Likes long walks on the beach and hates fish.

## CATEGORIES

101

Cybercrime

Malwarebytes news

Security world

Threat analysis

## SUBSCRIBE

Email

GO

Subscribe to RSS

## TOP POSTS

Top 10 ways to secure your mobile phone

PSA: DetoxCrypto Ransomware imitating Malwarebytes

IT companies unite against illegal online hate speech

Surfacing HTA infections

PUP Friday: Nikoff Security



Malwarebytes

3979 Freedom Circle, 12th Floor

Santa Clara, CA 95054

EULA   Privacy   Terms of Service   © 2016 Malwarebytes

Language: English

# Exhibit 2

Case 3:16-mc-80243-LB Document 2 Filed 11/16/16 Page 157 of 234



Interests: Technical Support,
Malware Removal & Analysis,
Information Security, Gaming.

---

### celee
Staff




**Administrators**
448 posts
Location: San Jose, Calif.

Posted Wednesday at 03:04 PM     ID: **3** 

Hi `@Aura`, according to our researchers, we're being more aggressive now i.e. Reg cleaners, optimizers, etc.

The biggest change is this criteria we use: "predominantly negative feedback or ratings from the user community"

https://www.malwarebytes.com/pup/

-Cecile

---

### Aura
Bleepin' Special Ops Tech
Warrior
●●●●●●



**Trusted Advisors**
1,986 posts
Location: Québec, Canada
Interests: Technical Support,
Malware Removal & Analysis,
Information Security, Gaming.

Posted Wednesday at 03:04 PM     ID: **4**

Guessed as much, thanks Cecile! 🙂

---

## Create an account or sign in to comment

You need to be a member in order to leave a comment

### Create an account
Sign up for a new account in our community. It's easy!

**Register a new account**

### Sign in
Already have an account? Sign in here.

**Sign In Now**

 **GO TO TOPIC LISTING**
Malwarebytes News

## Recently Browsing    0 members

No registered users viewing this page.

---

 Home  >  Announcements  >  Malwarebytes News  >                              All Activity
New Criteria for Detecting Potentially Unwanted Products (PUPs)

Privacy Policy    Contact Us

 Back to Top

# Exhibit 3

**BLEEPINGCOMPUTER**

LOGIN · SIGN UP

NEWS · DOWNLOADS · VIRUS REMOVAL GUIDES · TUTORIALS · DEALS · FORUMS · MORE



**THE WAR ON PUPS**
Malwarebytes going to battle with PUPs and Adware



WildFire rises from the grave as the rebranded Hades Locker



Cerber Ransomware switches to a Random Extension and Ends Database Processes

Kaspersky decrypts Ransomware from TeslaCrypt



**A ROYAL MESS**
Introducing Her Royal Highness, the Princess Locker Ransomware

The Donald Trump Ransomware tries to Build Walls around your Files

The Week in Ransomware - September 30 2016 - Princess Locker, Locky switching to ODIN, Decryptors, and More!

---

## LATEST ARTICLES



**SECURITY**
### Tech Support Scams use new Tricks to Hold Browsers Hostage

With malvertising and shady advertisers, it is becoming all to common to run into browser based tech support scams that try to trick you into calling a remote support number. These scams continue to evolve and use new and innovative approaches to prevent users from closing their browsers.

👤 LAWRENCE ABRAMS  🕐 OCTOBER 07, 2016  ⏱ 12:56 PM  💬 0



**SPONSORED** EBOOKS
### Learn Reverse Engineering Basics with the Free Antivirus Hacker's Handbook

The Antivirus Hacker's Handbook guides you through the process of reverse engineering antivirus software. You explore how to detect and exploit vulnerabilities that can be leveraged to improve future software design, protect your network, and anticipate attacks that may sneak through your antivirus' line of defense.

👤 LAWRENCE ABRAMS  🕐 OCTOBER 06, 2016  ⏱ 01:48 PM  💬 1

**SPONSORED**
### This won't last - at $5.99/month, all the shows and movies are yours for less

Get ready for fall watching with Hulu.

AD BY HULU



**SECURITY**
### Malwarebytes going to battle with PUPs and Adware

Today, Marcin Kleczynski, the Chief Executive Officer of Malwarebytes, announced in a blog post that Malwarebytes is going to battle with PUPs (Potentially Unwanted Programs) and thus the companies that make them.

👤 LAWRENCE ABRAMS  🕐 OCTOBER 05, 2016  ⏱ 07:31 PM  💬 6



**SECURITY**
### WildFire rises from the grave as the rebranded Hades Locker

The WildFire Locker ransomware has risen from the dead and rebranded itself using the name of Hades Locker. Its previous incarnation was shutdown after authorities seized the command & control servers. Unfortunately, the ransomware developers were not apprehended and have been biding their time before releasing a new ransomware.

👤 LAWRENCE ABRAMS  🕐 OCTOBER 05, 2016  ⏱ 05:39 PM  💬 2

**SPONSORED** DEALS
**SECURITY**
### New Deal: 96% off a Xamarin Cross Platform Development Bundle

This online course bundle contains 6 courses with over 57 hours in training on how to use Xamarin to create mobile apps. These courses would be normally priced at $1,046.00 if bought together, but have been discounted 96% to $35.  Please note that certificates of completion will not be provided.

👤 LAWRENCE ABRAMS  🕐 OCTOBER 04, 2016  ⏱ 05:20 PM  💬 0

**SECURITY**
Hacked Steam accounts spreading Remote Access Trojan

---

THE #1 MANAGED CLOUD COMPANY

- Certified in AWS, Microsoft Azure, OpenStack, and VMware
- Serving over 1/2 of the Fortune 100
- 3,000+ cloud experts accessible 24x7x365

 rackspace  YOUR CLOUDS. OUR EXPERTISE.

LEARN MORE

## LATEST FORUM TOPICS

CORRUPT SYSTEM FILES
passacaglia in Windows 7

Hp power supply on ASROCK motherboard
alexcomputer500 in Internal Hardware

BSOD problem
Atoz44 in Windows Crashes, BSOD, and Hangs Help and Support

## NEWSLETTER SIGN UP

To receive periodic updates and news from BleepingComputer, please use the form below.

Email Address...

Submit

## LATEST VIRUS REMOVAL GUIDES



Web-start.org Browser Hijacker Removal Guide
👤 LAWRENCE ABRAMS
👁 READ 211 TIMES

Tech-connect.biz Browser Hijacker Removal Guide
👤 LAWRENCE ABRAMS
👁 READ 641 TIMES

Isanalyze.com Browser Redirect Removal
👤 LAWRENCE ABRAMS
👁 READ 513 TIMES





### Hacked Steam accounts Spreading Remote Access Trojan

contain download links to the Trojan. Once the Trojan is installed, it will allow the attacker to gain full access to the computer and all the files contained on it.



👤 LAWRENCE ABRAMS    📅 SEPTEMBER 30, 2016    🕐 08:26 PM    💬 5

**GOOGLE, SECURITY**

### Google Chrome 53.0.2785.143 m fixes Remote Code Execution Vulnerabilities

Version 53.0.2785.143 m of Google Chrome was released today that fixes 2 remote code execution vulnerabilities that were submitted to Pwnium. Remote code execution vulnerabilities are considered critical as it could allow attackers and malicious web sites to remotely execute any command they wish on an affected computer.



👤 LAWRENCE ABRAMS    📅 SEPTEMBER 30, 2016    🕐 01:51 PM    💬 3

**SECURITY**

### The Week in Ransomware - September 30 2016 - Princess Locker, Locky switching to ODIN, Decryptors, and More!

This week really picked up when it comes to ransomware news. Lots of new variants, new decryptors, and new ransomware. Of particular interest this week is Locky switching to using the ODIN extension and for security companies releasing a lot of decryptors this week.



👤 LAWRENCE ABRAMS    📅 SEPTEMBER 30, 2016    🕐 11:20 AM    💬 0

**SPONSORED**   **DEALS**

### New Deal: 98% off the The Ultimate Software Testing Bundle

This online course bundle contains 11 courses with over 84 hours in training on how to be a software tester. These courses would be normally priced at $3,300.00 if bought together, but have been discounted 98% to $59.  Please note that certificates of completion will be provided, but no vouchers for any exams come with this deal.



👤 LAWRENCE ABRAMS    📅 SEPTEMBER 30, 2016    🕐 09:00 AM    💬 0

**SECURITY**

### Kaspersky decrypts Ransomware from TeamXRat

Kaspersky posted a great article about their TeamXRat Ransomware analysis and how they were able to create a decryptor for its victims.  Reported back in mid September in our forums, I and other security researchers were never able to find an actual sample of the malware.



👤 LAWRENCE ABRAMS    📅 SEPTEMBER 29, 2016    🕐 05:23 PM    💬 1

**SECURITY**

### Introducing Her Royal Highness, the Princess Locker Ransomware

Today we bring you Princess Locker; the ransomware only royalty could love.  First discovered by Michael Gillespie, Princess Locker encrypts a victim's data and then demands a hefty ransom amount of 3 bitcoins, or approximately $1,800 USD, to purchase a decryptor.

👤 LAWRENCE ABRAMS    📅 SEPTEMBER 28, 2016    🕐 06:42 PM    💬 5

**1**   2   3   4   5   ›   »

**VIEW MORE**



---

**NEWSLETTER SIGN UP**

Email Address...   **SUBMIT**

**Follow us:** 

**MAIN SECTIONS**
News
Downloads
Virus Removal Guides
Tutorials
Startup Database
Uninstall Database
File Database
Glossary

**COMMUNITY**
Forums
Forum Rules
Chat

**USEFUL RESOURCES**
Welcome Guide
Sitemap

**COMPANY**
About BleepingComputer
Contact Us
Advertising
Write for BleepingComputer
Social & Feeds
Changelog

User Agreement   ·   Privacy Policy     Copyright @ 2003 - 2016 Bleeping Computer® LLC - All Rights Reserved

---

### LATEST DOWNLOADS

**Windows Repair (All In One)**    844,674 DOWNLOADS
Version: 3.9.12

**VoodooShield**    13,924 DOWNLOADS
Version: NA

**VirtualBox for Windows**    12,728 DOWNLOADS
Version: 5.1.6

**Malwarebytes Anti-Ransomware**    166,982 DOWNLOADS
Version: 0.9.17.661

**Hardware Identify**    32,145 DOWNLOADS
Version: 2.1.1



# Exhibit 4



Home  ›  News  ›  Security  ›  Malwarebytes going to battle with PUPs and Adware　　　　◂ 106　　　◂ 6

# Malwarebytes going to battle with PUPs and Adware

By **Lawrence Abrams**　　　　October 5, 2016　　　07:31 PM　　　**6**



Today, Marcin Kleczynski, the Chief Executive Officer of Malwarebytes, announced in a blog post that Malwarebytes is going to battle with PUPs (Potentially Unwanted Programs) and thus the companies that make them.  With adware and PUP programs getting out of hand and many of them exhibiting malware-like characteristics, Malwarebytes had previously decided to be more aggressive against adware and PUP programs.

Unfortunately, over time the PUP developers and distributors created more aggressive distribution methods and new techniques to avoid security programs that detect them. Due to

this, Malwarebytes has updated their PUP criteria to be even more aggressive on how they categorize PUPs and target them.

Based on Malwarebyte's updated PUP criteria, starting today their products will detect programs that exhibit the following behavior:

- obtrusive, misleading, or deceptive advertising, branding, or search practices

- excessive or deceptive distribution, affiliate or opt-out bundling practices

- aggressive or deceptive behavior especially surrounding purchasing or licensing

- unwarranted, unnecessary, excessive, illegitimate, or deceptive modifications of system settings or configuration (including browser settings and toolbars)

- difficulty uninstalling or removing the software

- predominantly negative feedback or ratings from the user community

- diminishes user experience

- other practices generally accepted as riskware, scareware, adware, greyware, or otherwise commonly unwanted software by the user community

As I have said numerous times, PUP distributors and developers are getting out of control and need to be stopped. They are creating adware and PUPs that are not only distributed in a deceptive manner, but in many cases also include characteristics that are only found in computer infections. These characteristics could include backdoors, rootkits, and persistence techniques that make the programs difficult to remove.

Though anyone with common sense would say that these programs should be considered malware, instead they are classified as PUPs, or not detected at all, because security companies are afraid of legal threats from the PUP developers. In fact, the term PUP, or Potentially Unwated Program, was created to avoid calling these programs malware and to avoid legal consequences of doing so.

With that said, kudos to Malwarebytes for taking a stand against aggressive adware and PUPs.



**ADWARE**     **MALWAREBYTES**     **PUP**

### LAWRENCE ABRAMS ✉ 🐦

Lawrence Abrams is the creator and owner of BleepingComputer.com. Lawrence's area of expertise includes malware removal and computer forensics. Lawrence Abrams is a co-author of the Winternals Defragmentation, Recovery, and Administration Field Guide and the technical editor for Rootkits for Dummies.

| ‹ PREVIOUS ARTICLE | NEXT ARTICLE › |
|---|---|

## Comments



**TheJokerz** - 1 day ago

Go Malwarebytes!! Thanks for the share!



**Angoid** - 1 day ago

What would be really strange is if anyone can think of any other anti-malware program that fits any of those descriptions .... not that I can think of one of course :)



**Gorbulan** - 1 day ago

GOOD!



**Tonst3r** - 1 day ago

THANK GOD!! It's about time SOMEONE took a stand on this BS! PuP's are malware by every definition and I've been over their nonsense for years!!!!



**kenhall5551** - 22 hours ago

Bundled software is a real problem for many "free" programs and apps. If they made it clear and easy to 'opt-out" of these bundled offers, they might be O.K. Nothing wrong with trying to make a buck, but to be deceptive about it or to add new "features" to your device without your consent is just plain wrong.



**Bambinoo** - 2 hours ago

Excellent...thumbs up MWB!

## Post a Comment

**Community Rules**

You need to login in order to post a comment

**Login**

Not a member yet? Register Now

# You may also like



**WILDFIRE RISES FROM THE GRAVE AS THE REBRANDED HADES LOCKER**



**CERBER RANSOMWARE SWITCHES TO A RANDOM EXTENSION AND ENDS DATABASE PROCESSES**



**HACKED STEAM ACCOUNTS SPREADING REMOTE ACCESS TROJAN**



**KASPERSKY DECRYPTS RANSOMWARE FROM TEAMXRAT**



**LATEST FORUM TOPICS**

Hp power supply on
ASROCK
motherboard

alexcomputer500 in Internal
Hardware

BSOD problem

Atoz44 in Windows Crashes,
BSOD, and Hangs Help and
Support

Seeing Traffic from
195.22.26.248. Not
sure if this is bad.

Lerxst23 in Am I infected?
What do I do?

## NEWSLETTER SIGN UP

To receive
periodic updates
and news from
BleepingComputer,
please use the
form below.

Email Address...

**Submit**





## LATEST

## DOWNLOADS



### Windows Repair (All In One)

Version: 3.9.12

**844,667**
DOWNLOADS



### VoodooShield

Version: NA

**13,924**
DOWNLOADS



## VirtualBox for Windows

Version: 5.1.6

**12,728**
DOWNLOADS



## Malwarebytes Anti-Ransomware

Version: 0.9.17.661

**166,981**
DOWNLOADS



## Hardware Identify

Version: 2.1.1

**32,145**
DOWNLOADS





## NEWSLETTER SIGN UP

| Email Address... | **SUBMIT** |

**Follow us:**   

## MAIN SECTIONS

News

Downloads

Virus Removal Guides

Tutorials

Startup Database

Uninstall Database

File Database

Glossary

## COMMUNITY

Forums

Forum Rules

Chat

## USEFUL RESOURCES

Welcome Guide

Sitemap

## COMPANY

About BleepingComputer

Contact Us

Advertising

Write for BleepingComputer

Social & Feeds

Changelog

User Agreement  -  Privacy Policy

Copyright @ 2003 - 2016 **Bleeping Computer**® **LLC**  - All Rights Reserved

# Exhibit 5



Lakefront Land Sale - Premium Pickwick Lake lots starting at $29,900. Text "TNLAKE" to 555888. | Read More »   Ad



# RJ Singh
3rd

**Regional Vice President at Malwarebytes**

Greater New York City Area | Computer & Network Security

| | |
|---|---|
| Previous | Zscaler Inc., NitroSecurity (Intel Security), Q1 Labs (IBM Security) |
| Education | NYU |

**Send RJ InMail** ▾

**500+**
connections

https://www.linkedin.com/in/singhrj

## Posts

Published by RJ


**Ransomware growing and damaging across all...**
September 15, 2016


**Major institutional funding comes as...**
January 22, 2016


**Malwarebytes Tops $100 Million Run-Rate**
December 14, 2015

## Background

 Summary

RJ Singh is a seasoned sales leader with long history of successful coach and player roles at multiple technology start-ups. He shares deep and wide knowledge of technology industry and it's innovation that empowers people and businesses globally.

He has spent 25 plus years performing active roles in sales leadership, business development, partner relationships, and consulting services at variety of fast-growing technology companies and start-ups resulting in high growth revenue and increased shareholder value.

RJ leads as Regional Vice President at Malwarebytes. Previously, RJ led as Regional Sales Director at Zscaler, Sales Director at NitroSecurity (acquired by Intel Security) and Director of Eastern Sales at Q1 Labs (acquired by IBM). At these companies, RJ was instrumental in building business from ground-up, recruiting right channel partners and leading sales team to rapidly win high profile customers in key vertical markets. RJ spent eight years at Protegrity where he joined as Sales Director and rose through the ranks to lead North American sales team. Prior to this, RJ had successful careers at Memco (acquired by CA) and Trusted Information Systems (acquired by Network Associates).

RJ holds M.S. and B.S. degrees in Computer Science and double minors in Mathematics and Business Administration from Northern Illinois University. RJ studied Investment Banking and related topics at

Ad

Chris, picture yourself at Malwarebytes

 

**Senior Software Engineer**
Clearwater, Florida

View now

### People Also Viewed

 **Thomas Miller**
SVP Sales at Malwarebytes

 **Brian Henger**
Regional Vice President - Central US at Malwarebytes

**Roger Cobb**
Vice President of Worldwide Channel Sales at Malwarebytes

 **Marcin Kleczynski**
CEO at Malwarebytes

 **Linh Mings**
Director, Enterprise Sales at Malwarebytes

 **Anthony O'Mara**
Vice President EMEA at Malwarebytes

 **Peter Brownell**
Regional Vice President-West at Malwarebytes

**Rebecca Kline**
CMO at Malwarebytes

**Wendy Sanchez**
Regional Sales Manager- Southeast at Malwarebytes

**Monty Venkersammy**
Vice President of Business Development at Malwarebytes

 People also viewed   ✕
**Thomas Miller** SVP Sales at Malwarebytes   ❯



in  Search for people, jobs, companies, and more...  Advanced

Home   Profile   My Network   Learning   Jobs   Interests          Business Services   Try Premium for free

📄 Experience

## Regional Vice President
Malwarebytes
September 2015 – Present (1 year 2 months) | Greater New York City Area

Malwarebytes provides software designed to protect consumers and businesses against malicious threats that consistently escape detection by other antivirus solutions. Malwarebytes Anti-Malware Premium the company's flagship product, offers a highly advanced behavior-based detection engine that has removed more than five billion malicious threats from computers worldwide. More than 50,000 SMBs and enterprise businesses worldwide trust Malwarebytes to protect their data. Founded in 2008, the self-funded company is headquartered in California, operates offices in Europe, and employs a global team of researchers and experts. For more information, please visit us at www.malwarebytes.org.

## Regional Sales Director - New York
Zscaler Inc.
January 2013 – August 2015 (2 years 8 months) | Greater New York City Area

Zscaler Cloud Security Solution delivers unified, carrier-grade Internet security, advanced persistent threat (APT) protection, data loss prevention, SSL decryption, traffic shaping, policy management and threat intelligence – all without the need for on-premise hardware, appliances or software.

☐ Impacted revenue within 100 days closing 4 deals in excess of million dollars.
☐ Recognized as "Top Global Sales" during Zscaler 2013-2014 Third-QTR Review,.
☐ Finished Fiscal 2013-2014 strong and won "Presidents Club" at Zscaler Annual Awards.
☐ Recognized as "Top USA Sales Performer" during Zscaler 2014-2015 First-QTR Review.
☐ Finished Top-3 in Fiscal 2014-2015 and won Presidents Club at Zscaler Annual Awards.
☐ Increased ARR (Annual Recurring Revenue) five-fold during the tenure at the company.

▾ 12 recommendations, including:

**Mike Basoah**
Experienced Corporate Marketing & De...

I worked with RJ at Zscaler and it was an absolute pleasure ! He is the consummate sales professional. He has a great... View ↓

**Diederik Klijn**
Named Account Manager at Zscaler

RJ is a person that understands what it takes to start a company in a certain region. He will focus on creating revenue. We... View ↓

10 more recommendations ↓

## Sales Director
NitroSecurity (Intel Security)
August 2010 – December 2012 (2 years 5 months)

☐ Intel / McAfee acquired NitroSecurity.
☐ Technology sold included Log Mgmt, SIEM, IDS/IPS, Database and Application Monitoring.
☐ Sold over $200K revenue within 60 days of joining the company.
☐ Tripled number of customers in my region within 12 months.
☐ Achieved 100% quota every year.
☐ Actively participated in growing company revenue from $15M to $25M in 16 months.
☐ Actively participated in taking company from Niche player to Leader in Gartner Quadrant.
☐ Put company on the map with Financials, HealthCare, Pharma, NJ State and NYC agencies.
☐ Recruited and trained half a dozen VARs to independently sell Nitro solution.

▾ 2 recommendations

**Kevin Norr**
Security - Partner Development Mgr. - N...

RJ is a very professional sales person and is consultative in his approach to customers needs. He also has very strong... View ↓

**Pablo "Paul" Lupo**
Manager Sales & Support

I really enjoyed working with RJ during our time at NitroSecurity Inc together. His knowledge of the region, the accounts... View ↓

## Director of Eastern Area Sales
Q1 Labs (IBM Security)
August 2007 – July 2010 (3 years)

☐ IBM acquired Q1 Labs.
☐ Technology sold included Log Mgmt, SIEM and Application Monitoring.
☐ Doubled number of customers in my region within 90 days – a company first.

Justin Stark

Justin can introduce you to someone who knows RJ ▸

RJ Singh

People also viewed      ✕
**Thomas Miller** SVP Sales at Malwarebytes

in | Home | Profile | My Network | Learning | Jobs | Interests    Business Services    Try Premium for free

Search for people, jobs, companies, and more...    Advanced

- Recruited and trained a dozen VARs to independently sell Q1 Labs' solution.
- Teamed with billion dollar OEM partners to win major accounts.
- Put company on the map with Federal, NYC financials, State and City agencies.
- Actively participated in taking company from Niche player to Leader in Gartner Quadrant
- Actively participated in growing company revenue from $5M to $20M in two years.
- Won 5 major category Awards and President's Club in 24 months – a company first.

### Head of North American Sales
Protegrity
May 1999 – July 2007 (8 years 3 months)

- Technology sold included Database and File Level Encryption.
- Sold first beach head accounts at leading Financial, eCommerce and Consumer markets.
- Achieved 100% revenue and corporate objectives year after year.
- Increased revenue 10 fold ($300K to $3M) in 36 months.
- Executed Sales and Business Development Strategies to drive revenue.
- Built 12 members senior team throughout U.S. and Canada over the years.
- Built and executed channel strategy successfully for the company.
- Multiple Awards and Recognitions.

▾ 5 recommendations, including:

| Tobias Brink | Tamojit Das |
|---|---|
| Head MDU and business city network a... | Sr. Managing Consultant at IBM |
| My working experience after college started at Protegrity. There I had the pleasure having RJ as my boss. He proofed to be... View ↓ | RJ is a very rare talent, specially when it comes to selling. I had the pleasure of working with RJ for several years at... View ↓ |

3 more recommendations ↓

### Director of Systems Engineering
CA Technologies
May 1995 – April 1999 (4 years)

- Technology sold included Root and App Control, Security Audit, SSO and Firewall solutions.
- CA acquired Platinum which acquired Memco which acquired NIT.
- Network Associates acquired TIS (Trusted Information Systems) which acquired Haytack Labs.
- Led 3 member team as pre-sales and post-sales resource to win Fortune 1000 clients.
- Achieved over 100% team sales objectives.

### Scientific Computing Programmer
Northern Illinois University
May 1989 – April 1995 (6 years)

- Prepared and taught TCP/IP Internet technologies to Faculty and Graduate Students.
- Installed, maintained, and provided user support for Internet client/server TCP/IP systems.
- Wrote and published various technical articles on University Computing News publication.
- Provided technical leadership to 3 graduate students.

✋ Volunteer Experience & Causes

### Founder / Co-ordinator
TND Foundation
1992 – 2008 (16 years) | Social Services

### Opportunities RJ is looking for:
- Joining a nonprofit board

### Causes RJ cares about:
- Arts and Culture
- Children
- Economic Empowerment
- Education

People also viewed    ✕
Thomas Miller SVP Sales at Malwarebytes



Home | Profile | My Network | Learning | Jobs | Interests | Business Services | Try Premium for free

**Organizations RJ supports:**

- Peace Corps

 Education

**NYU**
Graduate Studies, Investment Banking
2008 – 2009

Activities and Societies: Venture Capital, Private Equity and Hedge Fund Seminars

**Northern Illinois University**
Master of Science (M.S.), Computer Systems Networking and
Telecommunications
1989 – 1991

Activities and Societies: International Student Organization

**Northern Illinois University**
Bachelor of Science (B.S.), Computer Science, Mathematics and Business
Administrations
1985 – 1989

Activities and Societies: International Student Organization, The ViewPoints Publication

**The Air Force School Academy**
Pre-College, Physics, Chemistry, Mathematics, English and Engineering Drawing
1983 – 1985

Activities and Societies: Music Group

**St. Xavier's School**
High School
1973 – 1983

Activities and Societies: Elocution Contests, Essay Competition, Spelling Contests, One-Act Play
Festivals, Music Club

 Courses

**Independent Coursework**

- Investment Banking, IPO, M&A, Hedge Funds and Corporate Finance
- Enterprise Sales and Marketing Strategies
- Stocks & Bonds Investment Seminars
- REITS for profit Seminars
- Business Risk and Information Security
- TCP/IP Systems and Network Administration
- Microsoft Certified Systems Engineer
- Novell Certified Systems Engineer
- MVS System and Applications Admininstration

 Skills

Top Skills


People also viewed
Thomas Miller SVP Sales at
Malwarebytes





Home  Profile  My Network  Learning  Jobs  Interests                              Business Services   Try Premium for free

**Recommendations**

Received (19) ▾        Given (3)

## Regional Sales Director - New York
Zscaler Inc.



**Mike Basoah**
Experienced Corporate Marketing & Demand Generation Executive. Building & Accelerating Revenue Growth

I worked with RJ at Zscaler and it was an absolute pleasure ! He is the consummate sales professional. He has a great ability to listen and focus on the customer needs, build relationships at all levels, marshal all internal resources to home in on the customer needs, is dedicated, and very hard working. At the end of the day he is focused on the end result and always hits... **more**

October 14, 2015, Mike worked with RJ at Zscaler Inc.



**Diederik Klijn**
Named Account Manager at Zscaler

RJ is a person that understands what it takes to start a company in a certain region. He will focus on creating revenue. We worked together on several deals, which was a pleasure.

October 11, 2015, Diederik worked with RJ at Zscaler Inc.



**Vincent Vermeulen**
Sr. Security Architect at Comodo

RJ is a consummate sales professional and top performer. Working as his technical resource was a pleasure, as he was always prepared, prompt and poised to bring the best solution to his clients.

September 29, 2015, Vincent worked directly with RJ at Zscaler Inc.



**Jean-David Faurie**
Director of Strategic Accounts

RJ has always overachieved and is customer driven senior sales professional.
He has demonstrated his abilities in maintaining relationships with clients resulting in add-on sales and renewals.
He has always a positive attitude. He is definitely an incredible sales leader for any organization. I would definitely recommend him. It was pleasure working with him and would... **more**

September 25, 2015, Jean-David worked with RJ at Zscaler Inc.



**Matt Drugan**
National Channel Manager

RJ is high performance oriented sales leader. A team player who leads by example, RJ works very well with employees, customers and partners alike. He is extremely valuable asset in any company.

September 23, 2015, Matt worked with RJ at Zscaler Inc.

˅  See More  ˅

Help Center   About   Careers   Advertising   Talent Solutions   Sales Solutions   Small Business   Mobile   Language   **Upgrade Your Account**

LinkedIn Corporation © 2016   User Agreement   Privacy Policy   Ad Choices   Community Guidelines   Cookie Policy   Copyright Policy   Send Feedback



People also viewed
Thomas Miller SVP Sales at Malwarebytes

# Exhibit 6

## Malwarebytes
Click for Full Company Profile (companyprofile.php?cid=12079)

Senior Sales Engineer - NY (Remote)

### Investors :

Highland Capital Partners (investorprofile.php?cid=168) | Highland Europe (investorprofile.php?cid=15185)

### Location :

10 Almaden Blvd
Tenth Floor
San Jose, CA 95138

### Overview :

Malwarebytes is community. Malwarebytes is technology. Malwarebytes is a belief that every person has a fundamental right to a malware-free existence.f

Hide company information

**Send to Friend:** 

# Job Details



## Senior Sales Engineer - NY (Remote)
## New York, US

Malwarebytes - Full-Time | Job date : 09-21-2016

### Description
Who We Are

Malwarebytes is a leading provider of anti-malware software solutions to consumers and businesses alike. Our flagship technologies and products protect more than 120 million computers around the world! In the highly competitive security software sector, we have earned an international reputation for our rapid response and high success rate in combating new malicious threats. We're growing fast and we need your help!

Who We Need

As a Malwarebytes Senior Sales Engineer you and your Regional Sales Manager will be responsible for presenting Malwarebytes security solution to prospective customers, creating and delivering demonstrations of the products, gathering customer technical requirements, creating evaluation test plans with customers, and then managing the evaluation process to a successful conclusion. You will work closely with customers as their primary point of contact for feedback and resolution of issues, and will be the customers' advocate for issues that require assistance from the HQ Customer Success team. You will provide feedback to the Product Management team on new feature requests and product enhancements from your customer base. Extensive domestic travel within the territory is required.

What You'll Do

We are looking for a skilled Security Engineer to analyze software designs and implementations from a security perspective, and identify and resolve security issues. You will include the appropriate security analysis, defences and countermeasures at each phase of the software development lifecycle, to result in robust and reliable software.

Skills You'll Need to Have

Identifies current and future customer service requirements by establishing personal rapport with potential and actual customers and other persons in a position to understand service requirements.
Provides product, service, or equipment technical and engineering information by answering questions and requests.
Establishes new accounts and services accounts by identifying potential customers; planning and organizing sales call schedule.
Prepares cost estimates by studying blueprints, plans, and related customer documents; consulting with engineers, architects, and other professional and technical personnel.
Gains customer acceptance by explaining or demonstrating cost reductions and operations improvements.
Develops customer's staff by providing technical information and training.
Complies with federal, state, and local legal requirements by studying existing and new legislation; anticipating future legislation; advising customer on product, service, or equipment adherence to requirements; advising customer on needed actions.
Prepares sales engineering reports by collecting, analyzing, and summarizing sales information and engineering and application trends.
Maintains professional and technical knowledge by attending educational workshops; reviewing professional publications; establishing personal networks; participating in professional societies.
Contributes to sales engineering effectiveness by identifying short-term and long-range issues that must be addressed; providing information and commentary pertinent to deliberations;

recommending options and courses of action; implementing directives.
Contributes to team effort by accomplishing related results as needed.
Who We Are

Malwarebytes is a leading provider of anti-malware software solutions to consumers and businesses alike. Our flagship technologies and products protect more than 120 million computers around the world! In the highly competitive security software sector, we have earned an international reputation for our rapid response and high success rate in combating new malicious threats. We're growing fast and we need your help!

Who We Need

Malwarebytes is growing rapidly. We are engaged in a constant, escalating fight against malware writers who play by no rules. As a result, we face challenges requiring more than just intelligence and technical fluency. Of equal importance are flexibility, independence, a drive to learn new skills, and a creative approach to problem-solving. We're not looking for people who know all the answers; we want people who can create solutions.

What You'll Do

Work in an agile development environment on our Mac OS product, collaborating with the team to deliver quality software iteratively
Convert requirements into test cases and help define use case scenarios based on product and domain knowledge
Find defects according to test case execution steps. Provide specific steps to reproduce reported problems
Work with developers to debug and identify defect root cause. Independently perform the testing effort for a component of the product
Plan and scope the test strategy for a small feature or component of a feature
Simulate customer environments and work with Customer Facing Teams to perform escalation root cause analysis and convert them to test cases
Design and implement automated testing for product components

Skills You'll Need to Have

Experience on installation and configuration of Mac OSx 10.7 or higher
Experience with scripting languages like Python/BASH/Perl or object-oriented programming languages like Java/C++ is required
Experience with Malware and Adware removal Testing on a Mac is a strong plus
Knowledge of how to apply test automation for efficient testing practices is preferred
Knowledge about various types Consumer and Enterprise level Mac AV Products is a big plus
2-4 years of software industry experience with hands-on QA experience
BS/MS in Computer Science or a related technical discipline, or equivalent work experience is required
Experience working in a fast-paced, cross-geography engineering environment
Understanding of QA methodologies, best practices and terminology

Strong technical, analytical and problem-solving skills
Able to work independently and as part of a team
Excellent verbal and written communication skills
What We Offer

An opportunity to do something great for yourself and the world
A great work environment that supports growth and development
Competitive compensation and benefit packages
401(k) matching program
Open time off policy
Stocked kitchen with healthy (and some unhealthy) drinks, snacks, fruit and lunch options
A company who enjoys having fun; holiday and summer parties, annual global company off-site,
experienced a private Star Wars pre-opening day viewing and lots of other great stuff

APPLY NOW (JOBAPPLY.PHP?JOBID=551201)

*Disclaimer: Local Candidates Only*

## Jobseekers

Register Now (register.php)

Search Jobs (job_search.php)

Login (login.php)

Contact us (contactus.php)

## Information

About Us (aboutus.php)

Advertise With Us (mailto:sales@ventureloop.com)

Terms & Conditions (termsofservice.php)

Privacy Policy (privacy.php)

Help (help.php)

## Contact Us

✉ help@ventureloop.com (mailto:help@ventureloop.com)

## Get the latest startup news in your email box:

VentureLoop Startup Newsletter

 Enter Your Email Here

©2007-2016 VentureLoop. All Rights Reserved.

f

in



# Exhibit 7



# PUP Reconsideration Information

### How do we identify potentially unwanted software?

Analyzing and categorizing potentially unwanted software is a complex problem. Developers of potentially unwanted software rapidly evolve their products. Some even contain a few characteristics that resemble legitimate software to mask the unwanted functionality. It's an on-going process, and we work hard to identify common behaviors that help provide you the highest level of protection. In some cases, where the behavior is questionable, we will list the application even if it does not neatly fit into the listed criteria. In other words, we use our judgment.

While we highlight potentially unwanted programs, you then make a choice in the exclusions list and select what you want to keep or remove.

Here are some of the criteria we use:

- obtrusive, misleading, or deceptive advertising, branding, or search practices

- excessive or deceptive distribution, affiliate or opt-out bundling practices

- aggressive or deceptive behavior especially surrounding purchasing or licensing

- unwarranted, unnecessary, excessive, illegitimate, or deceptive modifications of system settings or configuration (including browser settings and toolbars)

- difficulty uninstalling or removing the software

- predominantly negative feedback or ratings from the user community

- diminishes user experience

- other practices generally accepted as riskware, scareware, adware, greyware, or otherwise commonly unwanted software by the user community

To keep our analysis useful, we regularly update our software with applications meeting our criteria. While we work hard not to, sometimes we get it wrong. If you want to submit your application for reconsideration, please email legal@malwarebytes.com.

For the most part, publishers of potentially unwanted software are not hobbyists. They are sophisticated businesses with big budgets and infrastructure. Given this, new forms of potentially unwanted software frequently emerge and proliferate. To respond promptly, we reserve the right to adjust, expand and update our criteria without prior notice or announcements.



# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
ENIGMA SOFTWARE GROUP USA, LLC,    :
    :
                Plaintiff,    :
    :
        -against-    :   Case No.: 1:16-cv-00057-PAE
    :
BLEEPING COMPUTER LLC and    :
DOES 1-10,    :
    :
             Defendants.    :
--------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**AS TO DEFENDANT BLEEPING COMPUTER LLC**

# **TABLE OF CONTENTS**

1.0    INTRODUCTION .......................................................................................... - 1 -

2.0    FACTUAL BACKGROUND ......................................................................... - 1 -

3.0    LEGAL STANDARDS ................................................................................. - 2 -

4.0    ARGUMENT ................................................................................................ - 3 -

    4.1    47 U.S.C. § 230 bars all Plaintiff's Claims ....................................... - 3 -

    4.2    Plaintiff's Claims are Time-Barred .................................................... - 8 -

    4.3    Plaintiff Failed to State a Claim for Relief for Defamation .............. - 10 -

        4.3.1    Plaintiff is a Public Figure and Must Plausibly Allege Actual
Malice ................................................................................... - 11 -

        4.3.2    Most of the Statements Are True as Admitted on the Face of the
Complaint .............................................................................. - 13 -

        4.3.3    The Remaining Statements Are Statements of Opinion ........ - 14 -

    4.4    Plaintiff Has Failed to State a Claim for Relief for Trade Libel or
Commercial Disparagement ................................................................ - 19 -

    4.5    Plaintiff Failed to State a Claim Under § 43(a) of the Lanham Act ....... - 20 -

        4.5.1    The Statements Do Not Constitute Commercial Advertising or
Promotion .............................................................................. - 21 -

        4.5.2    The Statements Are Neither False nor Misleading ............... - 24 -

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adelson v. Harris*,
   973 F. Supp. 2d 467 (S.D.N.Y. Sept. 30, 2013) ...........................................................14, 18

*Alvi Armani Med., Inc. v. Hennessey*,
   629 F. Supp. 2d 1302 (S.D. Fla. 2008) ........................................................................4

*Ascentive, LLC v. Opinion Corp.*,
   842 F. Supp. 2d 450 (E.D.N.Y. 2011) ..................................................................4, 5, 6

*Atl. Recording Corp. v. Project Playlist, Inc.*,
   603 F. Supp. 2d 690 (S.D.N.Y. 2009) ........................................................................4

*In re Axonyx Sec. Litig*,
   2009 U.S. Dist. LEXIS 26029 ..............................................................................13

*Batzel v. Smith*,
   333 F. 3d 1018 (9th Cir. 2003) ..........................................................................5, 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................3

*Best Western Int'l, Inc. v. Furber*,
   2008 WL 4182827 (D. Ariz. Sept. 5, 2008) ..............................................................7

*BidZirk, LLC v. Smith*,
   2007 WL 3119445 (D.S.C. Oct. 22, 2007) ..............................................................18

*Biro v. Conde Nast*,
   963 F. Supp. 2d 255 (S.D.N.Y. 2013) ................................................3, 9, 11, 12, 19

*Bolger v. Young Drug Products Corp.*,
   463 U.S. 60 (1983) ....................................................................................22, 23

*Boule v. Hutton*,
   328 F.3d 84 (2d Cir. 2003) ................................................................................22

*Brahms v. Carver*,
   33 F. Supp.3d 192, 195 (E.D.N.Y 2014) ..................................................................15

*Camprubi-Soms v. Aranda*,
   2001 U.S. Dist. LEXIS 11291 (S.D.N.Y. June 12, 2001) ..............................................11

*Cantor Fitzgerald Inc. v. Lutnick*,
   313 F.3d 704 (2d Cir. 2002) ................................................................................8

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
   447 U.S. 557 (1980) ........................................................................................22

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014) ................................................................................15

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993) ........................................................................................22

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y 2004) .......................................................................14, 15

*Curtis Publ'g Co. v. Butts*,
  388 U.S. 130 (1967) ..............................................................................................3, 11

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ........................................................................................3

*Directory Assistants, Inc. v. Supermedia, LLC*,
  884 F. Supp. 2d 446 (E.D. Va. 2012) .........................................................................7

*Donini Int'l, S.P.A. v. Satec (USA) LLC*,
  2004 WL 1574645 (S.D.N.Y. July 13, 2004) ...........................................................24

*Egiazaryan v. Zalmayev*,
  880 F. Supp. 2d 494 (S.D.N.Y. 2012)........................................................................11

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F.3d 48 (2d Cir. 2002)...................................................................................21, 24

*Flamm v. Am. Assoc. of Univ. Women*,
  201 F.3d 144 (2d Cir. 2000).......................................................................................15

*Fleiss v. Wiswell*,
  157 Fed. Appx. 417 (2d Cir. 2005).............................................................................15

*Gertz v. Robert Welch*,
  418 U.S. 323 (1974) ...................................................................................................14

*Gmurzynska v. Hutton*,
  355 F.3d 206 (2d Cir. 2004).......................................................................................22

*Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. Of Physics*,
  859 F. Supp. 1521 (S.D.N.Y. 1994).............................................................10, 22, 24

*Graboff v. Am. Ass'n of Orhopaedic Surgeons*,
  559 F. App'x. 191 (3d Cir. 2014) .................................................................................9

*Graziano v. Pataki*,
  689 F.3d 110 (2d Cir. 2012).........................................................................................3

*Gristede's Foods, Inc. v. Unkechauge Nation*,
  2008 WL 3334032 (E.D.N.Y. Aug. 8, 2008)...............................................................9

*Groden v. Random House, Inc.*,
  1994 U.S. Dist. LEXIS 11794 (S.D.N.Y. Aug. 22, 1994)..........................................24

*Groden v. Random House, Inc.*,
  61 F.3d 1045 (2d Cir. 1995)........................................................................................20

*Gucci Am., Inc. v. Hall & Assocs.*,
  135 F. Supp. 2d 409 (S.D.N.Y. 2001)..........................................................................5

*Hatfill v. Foster*,
  401 F. Supp. 2d 320 (S.D.N.Y 2005), *rev'd on other grounds*, 415 F. Supp. 2d
  353 (S.D.NY. 2006)....................................................................................................19

*Haywood v. St. Michael's College*,
  536 F. App'x 123 (2d Cir. 2013) ..................................................................................3

*Higher Balance, LLC v. Quantum Future Group, Inc.*,
  2008 WL 5281487 (D. Or. Dec. 18, 2008) ..................................................................7

*Imig, Inc. v. Electrolux Home Care Products, Ltd*,
  2007 WL 900310 (E.D.N.Y. Mar, 22, 2007) ........................................................20

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ...............................................................................................23

*Lerman v. Flynt Distrib. Co.*,
  745 F.2d 123 (2d Cir. 1984) ................................................................................3, 11

*Lesesne v. Brimecome*,
  918 F. Supp. 2d 221 (S.D.N.Y 2013) ........................................................10, 20, 21

*M.A. v. Vill, Voice*,
  809 F. Supp. 2d 1041 (E.D. Mo. 2011) ...................................................................5

*Masson v. New Yorker Magazine*,
  501 U.S. 496 (1991) ...............................................................................................17

*McCabe v. Rattiner*,
  814 F.2d 839 (1st Cir. 1987) ..................................................................................18

*Medtech Prods. v. Rani, LLC*,
  596 F. Supp. 2d 778 (S.D.N.Y. 2008) ....................................................................12

*Merck Eprova AG v. Brookstone Pharms., LLC*,
  920 F. Supp. 2d 404 (S.D.N.Y. 2013) ....................................................................20

*Mr. Chow of New York v. Ste. Jour Azur S.A.*,
  759 F.2d 219 (2d Cir. 1985) ...................................................................................15

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ...............................................................................................11

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ...................................................................................4

*Old Dominion Branch No. 496 v. Austin*,
  418 U.S. 264 (1974) ...............................................................................................14

*Parker v. Google*,
  422 F. Supp. 2d 492 (E.D. Pa. 2006), *aff'd*, 242 F. App'x. 833 (3d Cir. 2007) .......................7

*PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*,
  578 F. Supp. 196 (S.D.N.Y. 1984) .........................................................................10

*In re Phila. Newspapers, LLC*,
  690 F.3d 161 (3d Cir. 2012) .....................................................................................9

*Potomac Valve & Fittin, Inc. v. Crawford Fitting co.*,
  829 F.2d 1280 (4th Cir. 1987) ................................................................................18

*Pusey v. Bank of Am., N.A.*,
  2015 U.S. Dist. LEXIS 91083 (E.D.N.Y. July 13, 2015) .......................................20

*Ricci v. Teamsters Union Local 456*,
  781 F.3d 25 (2d Cir. 2015) .......................................................................................6

*Roca Labs, Inc. v. Consumer Op. Corp.*,
  2015 WL 6437786 (M.D. Fla. Oct. 21, 2015) ..........................................................6

*Rubenstein v. Transit Workers' Union of Greater New York*,
  2005 U.S. Dist. LEXIS 19969 (S.DN.Y. Sept. 6, 2005)..........................................17

*Sandler v. Simoes*,
    609 F. Supp. 2d 293 (E.D.NY. 2009) ................................................................. 18

*Sentementes v. General Elec. Co.*,
    2014 WL 2881441 (D. Conn. June 25, 2014) ........................................................ 3

*Sherrod v. Enigma Software Grp. USA, LLC*,
    2016 U.S. Dist. LEXIS 179 (S.D. Ohio Jan. 4, 2016) ........................................ 12

*Smith v. Local 819 I.B.T. Pension Plan*,
    291 F.3d 236 (2d Cir. 2002) ................................................................................. 6

*Stevo Design, Inc. v. SBR Mktg., Ltd.*,
    919 F. Supp. 2d 1112 (D. Nev. 2013) ................................................................... 7

*Thomas v. Waugh*,
    2015 U.S. Dist. LEXIS 133859 (N.D.N.Y. July 25, 2015) ................................. 13

*Tobinick v. Novella*,
    108 F. Supp. 3d 1299 (S.D. Fla. 2015) ............................................................... 18

*Tobinick v. Novella*,
    2015 U.S. Dist. LEXIS 150083 (S.D. Fla. Sept. 30, 2015) ............................ 21, 23

*Torain v. Liu*,
    279 Fed. Appx. 46 (2d Cir. 2008) ...................................................................... 15

*Treppel v. Biovail Corp.*,
    2004 U.S. Dist. LEXIS 20714 (S.D.N.Y. Oct. 15, 2004) ................................... 14

*Van-Go Transp. Co. v. New York City Bd. of Educ.*,
    971 F. Supp. 90 (E.D.N.Y. 1997) ...................................................................... 19

*Washington v. Smith*,
    893 F. Supp. 60 (D.D.C. 1995) .......................................................................... 18

*Westlake Legal Group v. Yelp, Inc.*,
    599 F. App'x 482 (4th Cir. 2015) ......................................................................... 5

**State Cases**

*Brian v. Richardson*,
    87 N.Y.2d 46 (1995) .......................................................................................... 15

*Firth v. State*,
    98 N.Y.2d 365 (2002) ....................................................................................... 8, 9

*Gregoire v. Putnam's Sons*
    298 N.Y. 119 (1948) ............................................................................................ 8

*Gross v. New York Times Co.*,
    82 N.Y.2d 146 (1993) ........................................................................................ 16

*Haefner v. New York Media, L.L.C.*,
    27 Misc. 3d 1208(A) (Sup. Ct. N.Y. County 2009) ............................................. 9

*Immuno AG v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991) ........................................................................................ 16

*Internet Brands, Inc. v. Jape*,
    760 S.E.2d 1 (Ga. Ct. App. 2014) ........................................................................ 7

*Jeweler Magazine, Inc.*, 2006 WL 2254818, (S.D.N.Y. Aug. 7, 2006) .......................... 23

*Martin v. Daily News, L.P.*,
121 A.D.3d 90 (1st Dep't 2014) ........................................9

*Sandals Resorts Int'l v. Google, Inc.*,
910 N.Y.S.2d 408 (Sup. Ct. N.Y. Cty. 2010), *aff'd*, 925 N.Y.S.2d 407 (1st
Dep't 2011) ........................................15

*Shiamli v. Real Estate Group of N.Y., Inc.*,
17 N.Y.3d 281 (2011) ........................................6, 7

*Silvercorp Metals Inc. v. Anthion Mgm't LLC*,
2012 WL 3569952 (Sup. Ct. N.Y. Co. 2012) ........................................17

*Themed Restaurants, Inc. v. Zagat Survey, LLC*,
801 N.Y.S.2d 38 (1st Dep't 2005) ........................................18

*Vazquez v. Buhl*,
2012 WL 3641581 (Conn. Super. Ct. 2012)........................................7

*Versaci v. Richie*,
815 N.Y.S.2d 350 (3d Dep't 2006)........................................15

## Federal Statutes

47 U.S.C. § 230........................................3, 4, 5, 6, 7, 8, 9, 11

47 U.S.C. § 230(c)(1)........................................4

## Rules

Fed. R. Civ. P. 12(b)(6)........................................1, 3

## 1.0   INTRODUCTION

Plaintiff comes before this Court with its third attempt to plead plausible claims that can survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  It failed to do so before, and it has failed to do so once again.  This is still, at its heart, a defamation case by a public figure seeking to censor critical speech and negative reviews, with a Lanham Act claim included for the sole purpose of circumventing the First Amendment.  Plaintiff is grasping at straws in a desperate attempt to keep its case alive, as is evident from the new allegations in its Second Amended Complaint ("SAC").  These new allegations are simply cynical attempts to plead around the fatal defects in its prior complaints, but this artful pleading only serves to expose the abusive nature of this suit.  The Court should dismiss the SAC, with prejudice, in its entirety.

## 2.0   FACTUAL BACKGROUND

Defendant operates the website <bleepingcomputer.com> (the "Website").  The Website offers free advice and articles on computer security topics such as how to remove viruses and other malicious software from computers, and other computer tips.  In addition to the articles, the Website provides forums where users can help one another, share information, and hold independent discussions.

One of the users of this forum is someone known only by the screen name "quietman7." He authored a few posts providing information on Plaintiff's "SpyHunter" software in response to questions from a forum user.  These posts were published on the Website's forums on December 10, 2013 (Doc. No. 25-7 at 2-3), September 28, 2014 (Doc. No. 25-6 at 3-5), November 29, 2014 (Doc. No. 25-7 at 4), December 4, 2014 (Doc. No. 25-8 at 3), May 7, 2015 (Doc. No. 25-10 at 3-4), June 1, 2015 (Doc. No. 25-10 at 10), August 5, 2015 (Doc. No. 25-11 at 5), and October 31, 2015 (Doc. No. 25-10 at 13-14).[1]   Quietman7 wrote a review of Plaintiff's software "SpyHunter,"

---

[1] Plaintiff also complains of a post on January 26, 2015, but this only refers back to an earlier posting outside the applicable statute of limitations.  (*See* Doc. No. 25-9 at 3-4.)

reporting that many other users complained about it. Plaintiff then filed suit against Defendant itself, rather than the individual who actually penned the review.[2]

Plaintiff identifies eight allegedly defamatory statements contained in these posts. (*See* Doc. No. 25 at ¶80.) However, Plaintiff does not actually plead the precise statements made, but rather creatively re-phrases them in order to make them seem more critical than the statements actually posted. However, even accepting Plaintiff's misleading re-phrasing, the statements are not reasonably susceptible of a defamatory meaning.

For example, the SAC alleges that one of quietman7's posts states that SpyHunter "is and/or should be considered a 'rogue product,'" and providing a definition for the term that begs for subjective evaluation. (*Id.*) This is a misleading characterization of the actual post, however, which in reality states that SpyHunter "was previously listed as a rogue product on the Rogue/Suspect Anti-Spyware Products List." (Doc. No. 25-7 at 3; Doc. No. 25-8 at 3.) Similarly, Plaintiff attempts to mislead the Court by alleging that quietman7 stated Plaintiff "engages in deceptive pricing." (Doc. No. 25 at ¶80.) The actual statement posted was "many customers have reported deceptive pricing." (Doc. No. 25-8 at 3.) There is a big difference.

Likewise, none of the statements at issue claim that SpyHunter is "malware" or "rogue security software," as deceptively alleged in the SAC (Doc. No. 25 at ¶80.) In fact, the opposite is true. The statement actually posted makes clear that SpyHunter "is not classified as malware or rogue security software and other antivirus and antimalware vendors do not target it for removal." (Doc. No. 25-6 at 4.) In other words, Plaintiff is suing over statements that are its own fictional re-creations of what was actually published.[3] That's not how a defamation claim works.

## 3.0    LEGAL STANDARDS

---

[2] Defendant appoints certain users of the Website's forums to act as moderators who ensure that users are complying with the forum's rules. These moderators are volunteers; they are not employed by Defendant, but merely have the ability to police the forums. (*See* Doc. No. 17-3.) The Website "is paid for completely by advertisement revenue and the staff are all volunteers." (*Id.*) The Website also encourages users to be patient in waiting for a response to questions on the Website's forums since "everyone here is a volunteer." (*Id.*) When the Website's moderators post on their own, they are not doing so as agents of Defendant.

[3] The SAC adds the caveat "is and/or should be considered" to this allegedly defamatory phrase, but the addition of "should be considered" simply describes a protected statement of opinion.

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (Rule 12(b)(6)); *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (Rule 12(c)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But "naked assertions" or "conclusory statements" are not enough. *Id.* (quotation omitted).

Further, public figures must meet a heightened standard and "show that the statements were made with 'actual malice'—that is, with knowledge that the statements were false or with reckless disregard as to their falsity." *Biro*, 807 F.3d at 544 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)) (public officials); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967) (public figures); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 137, 139 (2d Cir. 1984) (limited-purpose public figures). "[Actual] malice must be alleged plausibly in accordance with Rule 8." *Biro*, 807 F.3d at 545.

The Second Circuit has affirmed the dismissal of defamation claims for failure to plausibly plead facts that satisfy the exacting actual malice standard. *See, e.g., Biro*, 807 F.3d at 546; *Haywood v. St. Michael's College*, 536 F. App'x 123, 124 (2d Cir. 2013) (holding that "the complaint simply does not plausibly allege that [defendants] acted with actual malice"); *Sentementes v. General Elec. Co.*, 2014 WL 2881441, at *11 (D. Conn. June 25, 2014) (dismissing defamation claim where plaintiffs failed to allege facts tending to show knowledge of falsity or reckless disregard for the truth, "despite using the word 'maliciously' in their pleadings"). This Court in particular recently emphasized the special role the courts must play at the pleading stage when First Amendment freedoms are at stake: "[I]n defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013).

## 4.0    ARGUMENT

### 4.1    47 U.S.C. § 230 bars all Plaintiff's Claims

Plaintiff asserts four claims: defamation, defamation *per se*, trade libel/commercial disparagement, and false advertising. (*See* Doc. No. 25 at ¶¶101-27.) Each of these claims seeks to hold Defendant liable for statements that were not authored by Defendant, but merely were published on an online forum operated by Defendant. This is precisely the factual scenario contemplated by the Communications Decency Act, 47 U.S.C. § 230 (the "CDA" or "Section 230"). The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The effect of the statute is to bar "'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content.'" *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 472 (E.D.N.Y. 2011) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)). "'Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium.'" *Ascentive*, 842 F. Supp. at 473 (quoting *Zeran*, 129 F.3d at 330)). The statute thus reflects the policy decision by Congress to "'overrule . . . any . . . decisions which have treated [interactive computer service] providers and users as publishers of or speakers of content that is not their own.'" *Ascentive*, 842 F. Supp. 2d at 472; *see also Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306 (S.D. Fla. 2008) (stating that "'[t]he purpose of the CDA is to establish 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'"). Accordingly, "[c]ourts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 700-01 (S.D.N.Y. 2009).

This dispositive statutory defense is of particular significance because "Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). For this reason, dismissal of a complaint on Section 230 grounds "is appropriate unless the complaint pleads non-conclusory facts that plausibly indicate that 'any alleged drafting or revision by [the defendant] was something more than a website operator performs as part of its traditional

editorial function,' thereby rendering it an information content provider." *Westlake Legal Group v. Yelp, Inc.*, 599 F. App'x 482, 485 (4th Cir. 2015).

A provider of an interactive computer service for purposes of the statute is one who operates "'any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server.'" *Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 412 (S.D.N.Y. 2001); *see Batzel v. Smith*, 333 F. 3d 1018, 1030 (9th Cir. 2003). "Courts generally conclude that a website falls within this definition." *Ascentive*, 842 F. Supp. 2d at 473 (collecting cases; finding that operators of consumer review web site were interactive service providers for purposes of Section 230). Plaintiff pleads no plausible factual allegations in its SAC that Defendant acted in any capacity other than as the provider of an interactive computer service here. It admits that Defendant, owns and controls the Beeping website, which is divided into several sections," including the forums. (Doc. No. 25 at ¶34.) The allegedly defamatory statements at issue were authored by an individual known as "quietman7". (*Id.* ¶80; *see also* Doc Nos. 25-6, 25-7, 25-8, 25-9, 25-10, 25-11.)

Section 230 only fails to apply in instances where an information service provider acts as an "information content provider" with respect to the statements in question, such that it is "responsible, in whole or in part, for the creation or development of [the] information." *Ascentive*, 842 F. Supp. 2d at 474 (internal citation and quotation marks omitted). "Asserting or implying the mere possibility" that a defendant played a more involved role in the creation of statements beyond that of a publisher is insufficient to defeat Section 230 immunity. *Id.* at 474-75. Whether a defendant profits from the online service it provides does not affect Section 230 immunity; "'the fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content.'" *M.A. v. Vill, Voice*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011) (quoting *Goddard v. Google*, 2008 U.S. Dist. LEXIS 101890, *3 (N.D. Cal. 2008), and citing *Universal Commun. Sys. V. Lycos, Inc.*, 478 F.3d 413, 420-21 (1st Cir. 2001). While Plaintiff alleges that Defendant made the statements in question, the exhibits to its SAC reflect statements authored only by "quietman7" and other users of Defendant's forums.

In direct response to Defendant's arguments in its Motion to Dismiss the First Amended Complaint, Plaintiff adds allegations that quietman7 "acts as an agent of Bleeping" merely by virtue of being "one of only three Global Moderators and as a 'staff member' of Bleeping." (Doc. No. 25 at ¶74.) To support this allegation, Plaintiff points to the fact that quietman7 refers to himself as Defendant's "staff," as well as the unsupported allegation that quietman7 is a "spokesman" for Defendant. (*Id.* at ¶72.) These new allegations ignore the clear statement on the Website that it "is paid for completely by advertisement revenue and the staff are all volunteers." (Doc. No. 17-3 at 12.)[4] As much as Plaintiff tries to torture the facts, it cannot plausibly allege that quietman7 authored the statements in question as an agent of Defendant. These are merely the sort of "[c]onclusory allegations or legal conclusions masquerading as factual conclusions [that] will not suffice to [defeat] a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).

Courts all over the country have found defendants to be immune from suit in situations comparable to the facts here. *See, e.g., Ascentive*, 842 F. Supp. 2d at 478-79 (denying preliminary injunction against consumer review web site); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28-29 (2d Cir. 2015) (affirming dismissal of complaint on Section 230 grounds and finding that assertion of Section 230 defense "can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint"); *Roca Labs, Inc. v. Consumer Op. Corp.*, 2015 WL 6437786 (M.D. Fla. Oct. 21, 2015) (granting summary judgment on Section 230 grounds); *Shiamli v. Real Estate Group of N.Y., Inc.*, 17 N.Y.3d 281 (2011) (affirming dismissal on Section 230 grounds as to statements authored by third parties despite adding headings to complained-of statements); *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) ("merely editing portions of an e-mail and selecting material for

---

[4] Plaintiff also alleges that Defendant states on the Website that its "staff . . . can be trusted to give correct and understandable answers" (Doc. No. 25 at ¶3), that Defendant holds its "staff" out as "experts in computer security technical and operational matters" (*Id.* at ¶32), and that "Bleeping holds Global Moderators out to its members as top computer system experts." (*Id.* at ¶49.) This if false, as Plaintiff intentionally neglects to mention that these descriptions only apply to Defendant's Advisors (which quietman7 is not), and not to its Global Moderators (which quietman7 is). Plaintiff does not identify any statement from Defendant on the Website claiming that quietman7 or any other Global Moderator is computer system, security, or technology expert.

publication" did not remove service provider from Section 230 immunity); *Parker v. Google*, 422 F. Supp. 2d 492, 500-01 (E.D. Pa. 2006), *aff'd*, 242 F. App'x. 833 (3d Cir. 2007) (granting dismissal under Section 230 grounds for statements authored by third parties); *Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 453 (E.D. Va. 2012) (compiling and distributing links to allegedly defamatory statements did not remove Section 230 immunity); *Vazquez v. Buhl*, 2012 WL 3641581, at *4 (Conn. Super. Ct. 2012) (finding that Section 230 immunity applied despite defendant's providing introduction and hyperlink to allegedly defamatory content).

Plaintiff attempts to plead around 47 USC § 230 by alleging that quietman7 is a moderator on the forums, but for Section 230 purposes, this is not legally relevant. Courts that have dealt with statements by online forum moderators have found that this does not diminish Section 230 immunity. *See Higher Balance, LLC v. Quantum Future Group, Inc.*, 2008 WL 5281487, at *7 (D. Or. Dec. 18, 2008) (finding that, without evidence that forum moderators were employees of defendant, defendant was immune under Section 230 for statements made by moderators); *Stevo Design, Inc. v. SBR Mktg., Ltd.*, 919 F. Supp. 2d 1112, 1126 (D. Nev. 2013) (finding that message boards with only occasional curation by message board moderators warrant immunity under section 230); *Shamili v. Real Estate Group of N.Y., Inc.*, 17 N.Y.3d 281, 292-93 (2011); *Internet Brands, Inc. v. Jape*, 760 S.E.2d 1, 4 (Ga. Ct. App. 2014) (online forum operator immune under Section 230 as to statements published by forum moderator; mere implicit endorsement of a statement did not make operator an information content provider); *Best Western Int'l, Inc. v. Furber*, 2008 WL 4182827, at *9-10 (D. Ariz. Sept. 5, 2008) (finding that co-operators of web site were immune under Section 230 as to statements authored by other co-operator).

Plaintiff's Complaint reveals it seeks to premise liability on Plaintiff's actions as a publisher, rather than a creator, of content.[5] Count II, the trade libel claim, asserts that "Defendants have maliciously **published** and disseminated false statements that disparage ESG and its SpyHunter product." (Doc. No. 25. at ¶109) (emphasis added.) Counts III and IV, the defamation claims,

---

[5] In an example of artful pleading in direct response to Defendant's prior Motion to Dismiss, Plaintiff completely removed the word "publish" from Count I, its false advertising claim, in an attempt to circumvent Section 230.

assert that "Defendants' **published** and disseminated statements concerning ESG and SpyHunter are false and bring ESG into disrepute or contempt and impeach its integrity and reputation," that "Defendants have **published** and disseminated their false statements to the public by means of the Internet and specifically, at least the Bleeping Website," and that "Defendants' **published** and disseminated statements tend to cause injury to ESG's profession and business." (*Id.* at ¶¶117-18, 125) (emphasis added.) None of these claims relate at all to Defendant's business practices or how they operate their forums. They are premised entirely on statements authored solely by Defendant's moderators and users. Defendant is thus immune from suit under Section 230.

### 4.2    Plaintiff's Claims are Time-Barred

Plaintiff's attempts to plead around the statute of limitations defenses and "single publication rule," raised in Bleeping's Motion to Dismiss the First Amended Complaint, are to no avail. Plaintiff's claims for defamation and trade libel/commercial disparagement are common law torts asserted under New York law. (*See* Doc. No. 25 at ¶19.) CPLR § 215(3) provides that "an action to recover damages for . . . libel, slander, [or] false words causing special damages . . . shall be commenced within one year."[6] New York has adopted and strictly adhered to the "single publication rule," set out in *Gregoire v. Putnam's Sons*, establishing that "the publication of a defamatory statement in a single issue of a newspaper, or a single issue of a magazine, although such publication consists of thousands of copies widely distributed, is, in legal effect, one publication which gives rise to one cause of action and that the applicable Statute of Limitations runs from the date of that publication." 298 N.Y. 119, 123 (1948). The New York Court of Appeals has expanded this rule to apply to online communications. *See Firth v. State*, 98 N.Y.2d 365, 370 (2002). The statute of limitations is only "retrigger[ed]" by a "republication" of the statement on a separate occasion from the original that is meant to reach a new audience. *See id.* at 371 (quoting *Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422, 435 (1981)). For example, a new edition of a book might be a

---

[6] This limitation period applies to Plaintiff's state claims because "a statute's rules providing for the start and length of the statute of limitations is substantive law." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002).

republication that triggers a new limitation period, but recirculating the same edition is not. *See Firth*, 98 N.Y.2d at 371. It is also "irrelevant, for statute of limitations purposes, that a story remains online after its publication." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 267 (S.D.N.Y. Aug. 1, 2013).

The SAC and its exhibits, on their face, reveal that almost none of the complained-of statements was published within one year of Plaintiff initiating this action. (*See* Doc. No. 25-6 at 3-5; Doc. No. 25-7 at 3-4; Doc. No. 25-8 at 3.) Some of the only posts attributed to quietman7 falling within the statute of limitations merely refer viewers to his post on September 28, 2014 via hyperlink. (*See* Doc. No. 25-6 at 7, 9.) The law is clear that merely hyperlinking to an earlier publication does <u>not</u> constitute a republication of an allegedly defamatory statement that retriggers the limitation period. *See Haefner v. New York Media, L.L.C.*, 27 Misc. 3d 1208(A) (Sup. Ct. N.Y. County 2009); *see also Martin v. Daily News, L.P.*, 121 A.D.3d 90, 103 (1st Dep't 2014); *In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) (finding that merely linking to allegedly defamatory statement is not a republication triggering a new limitation period); *Graboff v. Am. Ass'n of Orthopaedic Surgeons*, 559 F. App'x. 191, 195 (3d Cir. 2014) (same). Nearly all of the statements at issue in Plaintiff's state law claims were thus published more than one year prior to Plaintiff initiating this suit, and are time-barred. The Court must dismiss them with prejudice. This means that the only allegedly defamatory statements that may proceed to a substantive analysis (assuming *arguendo* that Section 230 immunity does not apply) are "[t]hat SpyHunter 4 is a 'dubious and ineffective program' and is part of a 'scam.'" (Doc. No. 25 at ¶80; Doc. No. 25-10 at 3, 10, 14; Doc. No. 25-11 at 5.)

The Court should also find that Plaintiff's Lanham Act claim is time-barred as to the same statements. The Lanham Act does not contain its own statute of limitations, and so the applicable limitation period "'is that which New York would enforce had an action seeking similar relief been brought in a court of that state.'" *Gristede's Foods, Inc. v. Unkechauge Nation*, 2008 WL 3334032, at *2 (E.D.N.Y. Aug. 8, 2008). Traditionally, courts in this Circuit have found false advertising claims are analogous to fraud claims and thus the six-year statute of limitations for fraud claims applies. *Id.* at *7-8. But this is a rule arrived at by analogy, and changes based on the facts of each case. *See*

*PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F. Supp. 196, 199 (S.D.N.Y. 1984). Further, "courts in New York have . . . kept a watchful eye for claims sounding in defamation that have been disguised as other causes of action . . . New York courts maintain this distinction because '[a] contrary result might very well enable plaintiffs in libel and slander cases to circumvent the otherwise short limitations period' for defamation claims." *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 224 (S.D.N.Y 2013) (quoting *Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 458-59 (1967)).

This Court in *PepsiCo*, which created the general rule of applying the fraud limitations period in false advertising claims, dealt with the question of whether to use this period or the one-year period for defamation claims. There, this Court elected to use the period for fraud claims, finding that more applicable because false advertising claims are distinguishable from mere commercial disparagement or defamation claims. *PepsiCo*, 578 F. Supp. at 200. Plaintiff's Lanham Act claim here is exactly the sort of claim disclaimed by the *PepsiCo* court. The statements in question were made on a forum operated by a company that allegedly receives affiliate commissions from a competitor of Plaintiff. The statements at issue only concern Plaintiff and its products, not a competitor's. Indeed, Defendant does not offer any products. While the Lanham Act was amended in 1988, after *PepsiCo*, to include statements about the goods or services of a competitor (rather than one's own goods), this change only makes it more apparent that the defamation statute of limitations should apply, and courts that have adopted the reasoning in *PepsiCo* have not addressed the Lanham Act's amendments. *See Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. Of Physics*, 859 F. Supp. 1521, 1528-30 (S.D.N.Y. 1994). This is a defamation claim poorly disguised as a Lanham Act claim; it is a claim about criticism of Plaintiff's products, and does not implicate any concerns of preventing fraud or consumer confusion. As such, the statute of limitations for defamation claims should apply, and the Court should find that Plaintiff's Lanham Act claim is time-barred.

### 4.3      Plaintiff Failed to State a Claim for Relief for Defamation[7]

---

[7] Plaintiff alleges both libel and libel *per se*, but both claims fail for the same reasons and need not be addressed separately.

Assuming *arguendo* that Section 230 does not immunize Defendant from all of Plaintiff's claims, and Plaintiff timely brought its claims, Plaintiff has not stated a cognizable claim for relief in its SAC. The elements of a defamation claim are: "(1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) 'of and concerning' the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) causing special harm or constituting [defamation] *per se*; and (7) not protected by privilege." *Camprubi-Soms v. Aranda*, 2001 U.S. Dist. LEXIS 11291, *37 (S.D.N.Y. June 12, 2001) (citing *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001)). A statement can only be defamatory if it is a statement of fact that is provably true or false, and when a statement is "substantially true," such that "'the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done.'" *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 503-04 (S.D.N.Y. 2012).

### 4.3.1  Plaintiff is a Public Figure and Must Plausibly Allege Actual Malice

The fault that a defamation plaintiff must prove depends on the plaintiff's status and the subject matter of the allegedly defamatory material. Defamation law creates three classes of plaintiffs: (1) general public figures, who are public officials or individuals whose conduct is generally a matter of interest to the public; (2) limited-purpose public figures, whose conduct is a matter of interest to certain portions of the public within certain contexts; and (3) private figures. *See Sullivan*, 376 U.S. at 279-80 (public officials); *Butts*, 388 U.S. at 154-55 (public figures); *Lerman* 745 F.2d, at 137, 139 (limited-purpose public figures). Public figures must establish "actual malice," "that is . . . knowledge that the statements were false or [made] with reckless disregard as to their falsity," in order to establish liability for a defamation claim. *See Biro*, 807 F.3d at 544 (collecting cases). The Second Circuit has established a four-part test in determining whether a plaintiff is a limited-purpose public figure. The plaintiff must have:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in

the public controversy; and (4) maintained regular and continuing
access to the media.

*Biro*, 963 F. Supp. 2d at 270.  Plaintiff's SAC satisfies these elements.  Plaintiff alleges that it "develops and markets computer security products with a particular focus on protecting its *millions of customers* from computer hacks, system breaches, identity theft and system computing malware, as well as other security threats."  (Doc. 25 at ¶21) (emphasis added.)  Plaintiff claims that it "enjoys *worldwide sales* of SpyHunter."  (*Id.* ¶25) (emphasis added.)  It also alleges that SpyHunter "has received top industry certifications" and "has received the Checkmark Certification from West Coast Labs," which "is a *highly regarded* accreditation program, *recognized globally* by vendors, end users, and government agencies . . . ."  (Doc. No. 25 at ¶¶29-30) (emphasis added.)

Additionally, Plaintiff has a reputation in the software security community for being highly litigious in response to claims about its products.  (*See* Doc No. 17-4) (collecting numerous demand letters and lawsuits from Plaintiff regarding claims of the efficacy of its products.)[8]  Plaintiff's products and business practices have also spurred litigation from unhappy customers, with at least one seeking to bring a class action suit against Plaintiff for its misleading pricing.  *See Sherrod v. Enigma Software Grp. USA, LLC*, 2016 U.S. Dist. LEXIS 179 (S.D. Ohio Jan. 4, 2016).

Plaintiff is a public figure, especially within the relevant software security community.  Accordingly, it must prove actual malice to prevail on its defamation claim.  And to survive a motion to dismiss, it must "allege[] [malice] plausibly in accordance with Rule 8."  *Biro*, 807 F.3d at 545.  (holding that "a public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice") (quoting *Twombly*, 550 U.S. at 556).  Even if Plaintiff were not a public figure, it has alleged actual malice by claiming that "Bleeping *knew, recklessly disregarded*, or should have known, that its

---

[8] This document is referenced in one of the exhibits attached to the SAC.  It, and all other documents referenced in the exhibits, are thus properly before the Court in deciding this Motion to Dismiss.  *See Medtech Prods. v. Rani, LLC,* 596 F. Supp. 2d 778, 802 (S.D.N.Y. 2008) (stating that, in deciding a motion to dismiss, the court may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference").

statements about ESG and SpyHunter were false and misleading when made." (Doc. No. 25 at ¶83.) Plaintiff has not, and cannot, meet this heightened pleading burden.

### 4.3.2 Most of the Statements Are True as Admitted on the Face of the Complaint

To the extent that Plaintiff asserts that some of the statements at issue are not opinion, and could plausibly be deemed to be statements of fact, such statements are accurate and thus incapable of supporting a defamation claim. *See Thomas v. Waugh*, 2015 U.S. Dist. LEXIS 133859, *27 (N.D.N.Y. July 25, 2015) (using admission on face of Complaint as basis for dismissing claim); *In re Axonyx Sec. Litig*, 2009 U.S. Dist. LEXIS 26029, *9-10 (in dismissing claim under Section 10(b) of Exchange Act, noting that plaintiff on face of complaint admitted to truthfulness of allegedly misleading statements). Plaintiff alleges Defendant stated that its SpyHunter product "is and/or should be a 'rogue product'" and that Plaintiff has a "history of employing aggressive and deceptive advertising." (Doc. No. 25 at ¶80.) None of the statements claim that SpyHunter is a "rogue product;" rather, quietman7's posts on December 10, 2013 (Doc. No. 25-7 at 3) and December 4, 2014 (Doc. No. 25-8 at 3) state that SpyHunter "was previously listed as a rogue product on the Rogue/Suspect Anti-Spyware Products List . . . because of the company's history of employing aggressive and deceptive advertising." These claims are undeniably true. The source that the posts provide (Doc. No. 17-5), states that SpyHunter "was listed on this page primarily because of the company's history of employing aggressive, deceptive advertising." Quietman7's statement is thus nothing more than a true and accurate summary of the <spywarewarrior.com> article.

The same can be said for the complained-of statement that Plaintiff engages in "deceptive pricing." (Doc. No. 25 at ¶80.) This statement appears in Doc. No. 25-6 at 3, and reads "my main concern is the reports by customers of deceptive pricing . . . ." The post does not allege that Plaintiff is engaged in deceptive pricing, but rather that **customers have reported** such activities. This is verifiably true, as reflected by the sources quietman7 cites. (*See* Doc. Nos. 17-6 & 17-7.)

Plaintiff's liberal paraphrasing of quietman7's statements continues with the alleged statement "[t]hat ESG deceives consumers of SpyHunter 4 because the consumers 'are not aware that when purchasing SpyHunter, they have agreed to a subscription service with an automatic renewal policy.'" (Doc. No. 25 at ¶80.)[9]  Again, this is not what the actual post says; quietman7 only states that "*some* users are not aware" of this practice.  (Doc. No. 25-6 at 3) (emphasis added.)  And once again, this is readily ascertainable from the sources quietman7 cites.  (*See* Doc. No. 17-6.)

Finally, Plaintiff complains about the statement "[t]hat SpyHunter 4 is and/or should be considered 'malware' or 'rogue security software' despite not being classified as such by security vendors." (Doc. No. 25 at ¶80.)  Quietman7's actual statement is "**SpyHunter is not classified as malware** or **rogue security software** and other antivirus and antimalware vendors do not target it for removal." (Doc. No. 25-6 at 4) (emphasis original.)[10]  Plaintiff and quietman7 appear to be alleging the same thing.  There is nothing defamatory about this statement and no plausible allegations in the Complaint make this statement actionable.

### 4.3.3  The Remaining Statements Are Statements of Opinion

Statements of opinion or rhetorical hyperbole are not statements of fact, and thus cannot be defamatory.  As the Supreme Court has famously noted, there "is no such thing as a false idea." *Gertz v. Robert Welch*, 418 U.S. 323, 339-40 (1974); *see also Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 286 (1974) (finding "rhetorical hyperbole" and "lusty and imaginative expression" not actionable).  Whether a statement is factual is a question of law that the court can dispose of at the pleading stage.  *See Gertz*, 418 U.S. at 339-40; *Condit v. Dunne*, 317 F. Supp. 2d 344, 358 (S.D.N.Y 2004); *Treppel v. Biovail Corp.*, 2004 U.S. Dist. LEXIS 20714, *36-37 (S.D.N.Y. Oct. 15, 2004); *Adelson v. Harris*, 973 F. Supp. 2d 467, 482 (S.D.N.Y. Sept. 30, 2013).  Further, a court must consider the overall context, tone, and apparent purpose of a statement and whether a reasonable reader, not any

---

[9] This allegedly defamatory statement has received more aggressive editorialization between the First and Second Amended Complaints than any other statement.
[10] The "should be" portion of this allegation will be addressed in Section 4.3.3, *infra*.

conceivable reader, would interpret a given statement literally or otherwise view it as a mere expression of opinion, hyperbole or otherwise. *See Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 229 (2d Cir. 1985); *see also Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014); *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995); *Torain v. Liu*, 279 Fed. Appx. 46, 46 (2d Cir. 2008); *Fleiss v. Wiswell*, 157 Fed. Appx. 417, 417 (2d Cir. 2005) (summary order). In particular, courts often hold statements made in an online forum to be non-actionable opinion. *See, e.g., Sandals Resorts Int'l v. Google, Inc.*, 910 N.Y.S.2d 408 (Sup. Ct. N.Y. Cty. 2010), *aff'd*, 925 N.Y.S.2d 407 (1st Dep't 2011) (finding that because readers give less credence to allegedly defamatory Internet communications, courts should "learn to view libel allegations within the unique context of the Internet"); *Brahms v. Carver*, 33 F. Supp.3d 192, 195 (E.D.N.Y 2014) (noting that statement was made on Internet forum "where people generally solicit and express opinion"); *Versaci v. Richie*, 815 N.Y.S.2d 350 (3d Dep't 2006). Further, "'when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts, leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.'" *Dunne*, 317 F. Supp. 2d at 364 (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995)).

The New York Constitution provides even greater protection for statements of opinion, finding that statements of "pure" opinion are absolutely protected. *See Flamm v. Am. Assoc. of Univ. Women*, 201 F.3d 144, 147-48 (2d Cir. 2000). New York uses "a flexible approach in distinguishing actionable fact from non-actionable opinion," considering factors such as:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Id.* at 153 (quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (1993)). More important than a mechanical application of factors is a focus "on the overall context in which the complained-of assertions were made." *Flamm*, 201 F.3d at 154; *see Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995) (finding that statements in an Op Ed section of a newspaper were more likely to be viewed as

statements of opinion); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 155 (1993) (stating that "the courts are obligated to consider the communication as a whole, as well as its immediate and broader social contexts, to determine whether the reasonable listener or reader is likely to understand the remark as an assertion of provable fact"); *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 253 (1991).

Plaintiff complains about the statement that SpyHunter or Plaintiff engages in "deceptive advertising which violates several consumer protection laws in many states." (Doc. No. 25 at ¶80.) This statement is made in posts on December 10, 2013 (Doc. No. 25-7 at 3) and December 4, 2014 (Doc. No. 25-8 at 3). In both of these posts, quietman7 provides links to the web site Complaints Board, which contains numerous consumer complaints about the quality of SpyHunter and about Plaintiff's business practices. (*See* Doc. No. 17-6.) These complaints include allegations that Plaintiff failed to disclose to consumers costly registration and subscription fees (*see* post by SeattleTW, Dec. 7, 2010) (claiming that "when I hit 'register' it told me I was being charged only $39.95, but when I hit 'confirm,' it charged me $69.95, a classic 'bait and switch' scheme); that consumers were charged for additional products that customers did not order (*see* post by colliers, July 12, 2013) (claiming that "[t]hey had charged me $39.99 for SpyHunter instead of the stated $29.99 and added and [sic] additional $29.99 for RegHunter which I did not order"); that Plaintiff's product does not work as advertised (*see* post by OMGmom, Feb. 21, 2014) (claiming that "[o]nce you get [SpyHunter], you CANNOT UNINSTALL IT!" and "after declining to renew [SpyHunter], it infected my computer with the exact same thing I originally bought it to get rid of in the first place"); and that Plaintiff gives no or inadequate customer support when problems with SpyHunter arise (*see* post by Angela1031, Apr. 28, 2012) (customer claiming that she "cannot get support/answers from them," that Plaintiff did not respond to a registered letter, and that her "E-mails and 'open tickets' [are] left unanswered"). Quietman7 disclosed these facts in his posts, and formed a personal opinion based on them. Plaintiff does not allege that any of these underlying statements are false. The statement is thus protected as privileged opinion based on disclosed facts.

The same analysis applies to the statements that SpyHunter "is and/or should be considered a 'rogue product'" and it "is and/or should be considered 'malware' or 'rogue security software.'"

(Doc. Nos. 25-7 at 3; 25-8 at 3; 25-6 at 4.)  As discussed above, quietman7 did not actually state that SpyHunter is and/or should be considered a rogue product, malware, or rogue security software; these allegations are of Plaintiff's own making.  But to the extent that quietman7's posts may imply this (which they do not), this is a reasonable opinion based on the disclosed facts in the posts, particularly reports of SpyHunter installing malicious software on users' computers after attempting to remove SpyHunter.

Plaintiff additionally complains of the statement "[t]hat SpyHunter or ESG have not cooperated in submitting their program for testing 'most likely due to the program's ineffectiveness and high rate of false positives.'"  (*Id.* at ¶80.)[11]  The latter portion of this statement is, like the statement above, an opinion based on disclosed facts as to SpyHunter's lack of efficacy.  (*See* Doc. Nos. 17-6, 17-7.)  And as for the former portion of the statement, it is verifiably true, and presumably not denied, that <av-test.org> does not include SpyHunter in its list of testing analyses. (*See* AV-Test Windows Home User results for December 2014, attached as **Exhibit 1**;[12] AV-Test Android results for November 2014, attached as **Exhibit 2**;[13] AV-Test Windows Client Business User results for December 2014, attached as **Exhibit 3**.)[14]  At worst, claiming that this is due to Plaintiff not cooperating with Av-Test is mild editorialization that has no effect on the "gist" or "sting" of the statement, and thus does not make it defamatory, particularly in light of the overall context of the statements at issue.  *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991) (holding that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge is justified); *see Rubenstein v. Transit Workers' Union of Greater New York*, 2005 U.S. Dist. LEXIS 19969 (S.DN.Y. Sept. 6, 2005) (finding that statements that union president was a bigot and anti-Semite were protected as opinion based on disclosed facts); *Silvercorp Metals Inc. v. Anthion Mgm't*

---

[11] There is more creative paraphrasing here: the statement in question only refers to the web site AV-Test, located at <av-test.org>, not to antivirus testing in general.

[12] Available at: https://www.av-test.org/en/antivirus/home-windows/windows-7/december-2014/ (last accessed Apr. 8, 2016).

[13] Available at: https://www.av-test.org/en/antivirus/mobile-devices/android/november-2014/ (last accessed Apr. 8, 2016).

[14] Available at: https://www.av-test.org/en/antivirus/business-windows-client/windows-7/december-2014/ (last accessed Apr. 8, 2016).

*LLC*, 2012 WL 3569952, at *11 (Sup. Ct. N.Y. Co. 2012) (finding that letters with supporting hyperlinks claiming plaintiff misstated its financial figures and valuations were protected as opinion based on disclosed facts); *Themed Restaurants, Inc. v. Zagat Survey, LLC*, 801 N.Y.S.2d 38, 39-40 (1st Dep't 2005) (finding that restaurant review based on anonymous consumer reviews was protected as opinion); *Sandler v. Simoes*, 609 F. Supp. 2d 293 (E.D.NY. 2009) (finding that complaints about plaintiff's products with consumer protection agencies warning of unethical business practices were clearly dissatisfied customer opinions).

New to the SAC is the entirely meritless claim based on the following statement: "SpyHunter 4 is a 'dubious and ineffective program' and is part of a 'scam'". These are classic statements of opinion, and numerous courts have found they cannot support a claim for defamation. The term "scam":

> means different things to different people . . . and there is not a single usage in common phraseology. While some connotations of the word may encompass criminal behavior, others do not. The lack of precisions makes the assertion "X is a scam" incapable of being proven true or false.

*McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987); *see also Potomac Valve & Fittin, Inc. v. Crawford Fitting co.*, 829 F.2d 1280, 1287 (4th Cir. 1987) (citing *McCabe* with approval); *Harris*, 973 F. Supp. 2d 467, 491 (S.D.N.Y. 2013) (same); *BidZirk, LLC v. Smith*, 2007 WL 3119445 (D.S.C. Oct. 22, 2007) (same); *Washington v. Smith*, 893 F. Supp. 60, 63 (D.D.C. 1995) (same). The same analysis applies to the opinion that SpyHunter is a "dubious and ineffective program." *See Tobinick v. Novella*, 108 F. Supp. 3d 1299 (S.D. Fla. 2015) (finding that a neurologist calling another doctor's medical clinic "dubious" was not actionable). And even if these terms could ever be actionable, they are not here; the complaints referenced by quietman7 provide ample basis for his opinion that SpyHunter is a dubious and ineffective piece of software, and is part of a scam.

Even if these were not statements of opinion, Plaintiff has not plausibly alleged facts that allow for an inference of actual malice, which it must do as a public figure defamation plaintiff. Aside from conclusory allegations as to Defendant's knowledge of the falsity of these statements, Plaintiff only alleges that these statements are based on "third-hand information that is between 7-10

years old and that was generated by a group of individuals who previously were engaged in an anticompetitive campaign against ESG," and that Plaintiff eventually "prov[ed] each claim to be false." (Doc. No. 25 at ¶¶83-84.)  These allegations ignore the numerous consumer complaints on web sites such as Complaints Board, which quietman7 cites, about Plaintiff's business practices and its SpyHunter product that were continuously published before the posts at issue on Defendant's forums.  (*See* Doc. Nos. 17-6, 17-7.)  Plaintiff also alleges no plausible facts tending to show that Defendant "knew, recklessly disregarded, or should have known" that the claims from third parties about Plaintiff were proven false (assuming they actually were "proven false").  A mere "failure to investigate the veracity of the allegation [cannot] establish actual malice," unless such a failure "amounts to a 'purposeful avoidance,' that is, conduct that 'evinces an intent to avoid the truth.'" *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 105 (E.D.N.Y. 1997) (quoting *Sweeney v. Prisoners' Legal Servs. of New York, Inc.*, 84 N.Y.2d 786, 793 (N.Y. 1995)).  At most, Plaintiff has alleged a failure to investigate claims with sufficient diligence, which is insufficient to plead actual malice, and thus Plaintiff's defamation claims must be dismissed.  *Biro*, 807 F.3d at 546-47.

## 4.4      Plaintiff Has Failed to State a Claim for Relief for Trade Libel or Commercial Disparagement

Plaintiff's trade libel/commercial disparagement claim is nothing more than a naked attempt to do an "end run" around the First Amendment.  This claim fails for the same reason its defamation claims fail.  It is based on the same statements as the defamation claim which are either facially true, or are statements of opinion based on disclosed facts.  Additionally, this claim is duplicative of the defamation claim.  *See Hatfill v. Foster*, 401 F. Supp. 2d 320, 344 (S.D.N.Y 2005), *rev'd on other grounds*, 415 F. Supp. 2d 353 (S.D.NY. 2006) (quoting *O'Brien v. Alexander*, 898 F. Supp. 162, 172 (S.D.N.Y 1995) (finding that "a claim for injurious falsehood is properly dismissed as duplicative where the claim 'relies on the same statements that form the basis for the defamation claim'")).  "New York courts have 'kept a watchful eye for claims sounding in defamation that have

been disguised as other causes of action.'  As such, '[u]nder New York law, tort claims are construed as defamation claims not just when they seek damages [] for injury to reputation, but also where the entire injury complained of flows from the effect on [a plaintiff's] reputation.'"  *Pusey v. Bank of Am., N.A.*, 2015 U.S. Dist. LEXIS 91083, *9-10 (E.D.N.Y. July 13, 2015) (quoting *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 224 (S.D.N.Y. 2013); *Chao v. Mount Sinai Hosp.*, 2010 U.S. Dist. LEXIS 133686 (S.D.N.Y. Dec. 17, 2010)).  For example, the *Lesesne* court found a tortious interference claim duplicative of a defamation claim because "the gravamen of these claims is that these false statements injured the Plaintiffs by damaging [one plaintiff's] professional reputation," even though the tortious interference claim alleged economic harm.  *Lesesne*, 918 F. Supp. 2d at 224-25.

As with a defamation claim, "it is axiomatic that a claim for commercial disparagement . . . rises and falls on the truth or falsity of a statement that is actually made."  *Imig, Inc. v. Electrolux Home Care Products, Ltd*, 2007 WL 900310, *19 (E.D.N.Y. Mar, 22, 2007).  Plaintiff's trade libel/commercial disparagement claim is premised on the exact same statements as its defamation claim, claims the same type of injury, and is subject to the same defenses.  It is duplicative of the defamation claim and must be dismissed as an improper attempt to circumvent the First Amendment.

### 4.5    Plaintiff Failed to State a Claim Under § 43(a) of the Lanham Act

To prove a claim for false advertising under Section 43(a) of the Lanham Act, a plaintiff must show that:

> (1) The defendant has made a false or misleading statement; (2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 417 (S.D.N.Y. 2013).

The courts "have been careful not to permit overextension of the Lanham Act to intrude on First Amendment values."  *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995).  As with

the commercial disparagement claim, Plaintiff's Lanham Act claim is entirely duplicative of its defamation claim. It premises liability on the exact same statements, and alleges the same sort of reputational injury for this claim as it does for the defamation claim. (*See* Doc. No. 25 at ¶¶107, 123.) It is in every way a defamation claim disguised as false advertising. This is precisely the sort of "claim[] sounding in defamation that ha[s] been disguised as other causes of action." *Lesesne*, 918 F. Supp. 2d at 224. The Court should recognize Plaintiff's attempt to circumvent the First Amendment and dismiss this claim. *See Tobinick v. Novella*, 2015 U.S. Dist. LEXIS 150083 (S.D. Fla. Sept. 30, 2015) (granting summary judgment to defendant in case where plaintiff attempted to shoehorn allegedly defamatory statements into a Lanham Act claim).

### 4.5.1 The Statements Do Not Constitute Commercial Advertising or Promotion

While "the Lanham Act encompasses more than the traditional advertising campaign, the language of the Act cannot be stretched so broadly as to encompass all commercial speech." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Thus, the Second Circuit has said, "the touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Id.* However, Plaintiff pleads no plausible facts in this regard. It only alleges the legal conclusion that the "false and misleading statements . . . are part of an organized campaign by Bleeping to penetrate the mark for anti-malware products."[15] (Doc. No. 25 at ¶106.) But even if these were factual allegations, "[p]roof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action." *Fendi*, 314 F.3d at 57.

---

[15] This allegation is new to the SAC and is a transparent attempt to plead around issues raised in Defendant's prior Motion to Dismiss.

To be "commercial advertising or promotion" under the Lanham Act, there is a three prong test in this Circuit. "The statement must be '(1) commercial speech; (2) for the purpose of influencing consumers to buy defendant's goods or services; and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public.'" *Boule v. Hutton*, 328 F.3d 84, 90-91 (2d Cir. 2003). This District has also established a fourth element, that the Plaintiff and Defendant must be in competition. *Gordon & Breach*, 859 F. Supp. at 1536.

Plaintiff fails to properly plead a Lanham violation since it has not alleged any false statements in commercial advertising or promotion. *See Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004). At best, it alleges a *possible* commercial *benefit* as a result of a post, to a third party, recommending using a product to cure the ills caused by the Plaintiff's product. This is insufficient. But this, by itself, does not make any statement in question commercial speech.

The Supreme Court has fashioned a few different tests for determining whether a statement is commercial speech. The narrowest definition is "speech which does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993). *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 561 (1980) provided a more expansive definition of the term as "expression related solely to the economic interests of the speaker and its audience." The Court then took a more holistic approach in *Bolger v. Young Drug Products Corp.*, 463 U.S. 60 (1983), dealing with pamphlets promoting the defendant's services, when it decided that the combination of (1) the defendant admitting that the pamphlets were advertisements, (2) the pamphlets referring to the defendants' specific products, and (3) the defendant's direct economic motivations, made the pamphlets commercial speech. 463 U.S. at 66-67. Notably, none of these facts, standing alone, would have been sufficient to classify the speech at issue as "commercial." *See id.*

The first two formulations of the "commercial speech" definition obviously do not fit the speech at issue. Quietman7's posts on Defendant's forums provide information as to the safety and trustworthiness of Plaintiff and its products. Despite mentioning a competing product, the posts do

more than merely propose a commercial transaction, and the informational postings are not solely related to the economic interests of Defendant or users of its forums. Even under the more expansive *Bolger* definition, the forum posts are not commercial speech. Quietman7's posts are statements made in a publicly accessible online forum and constitute his opinion as to the reliability of Plaintiff's products. The statements are an attempt to educate members of the general public as to the potential dangers they may face by installing and using SpyHunter. At the time of the earliest of these posts, Plaintiff and SpyHunter had a reputation for dubious business practices and unsafe software over a decade in the making. (*See* Doc. No. 17-5.) The single allegation that Plaintiff makes that has any tendency to show the statements are commercial speech is a recommendation that visitors use some alternative software, and that Defendant receives a commission from the maker of one such piece of software. (*See* Doc. No. 25 at ¶¶75, 77.) The entire commercial speech argument thus rests on the *possible* fact that Defendant derives a *potential* financial benefit from users who view the post.[16] But it is already settled that this incidental benefit, by itself, is insufficient to convert a statement into "commercial speech" for constitutional purposes. *See Bolger*, 463 U.S. at 66-67; Tobinick v. Novella, 2015 U.S. Dist. LEXIS 150083 (S.D. Fla. Oct. 2, 2015); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952) (finding that because "books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment"). Because there are no other possible indications that quietman7's statements constitute commercial speech, the Lanham Act cannot apply to the statements.

Despite any improper motives Plaintiff may allege, the Court should address the question of the nature of the speech in question rather than allowing Plaintiff to burden Defendant with discovery. *See, e.g., Jeweler Magazine, Inc.*, 2006 WL 2254818, *10 (S.D.N.Y. Aug. 7, 2006) (dismissing

---

[16] Plaintiff adds allegations in its SAC that try to characterize this potential monetary benefit as "not insignificant to Bleeping's financial revenues and success" (Doc. No. 25 at ¶10), and even makes the baseless claim that Defendant "functions as a sales arm of Malwarebytes" simply because it receives a commission from the company. These implausible factual assertions and legal conclusion were invented for the sole purpose of pleading around the prior Motion to Dismiss.

Lanham Act claim on ground that the "non-commercial nature of a journalist's article cannot be overcome by plaintiff claiming an improper purpose motivated the publisher to run the article"); *Donini Int'l, S.P.A. v. Satec (USA) LLC*, 2004 WL 1574645, *7 (S.D.N.Y. July 13, 2004) (dismissing Lanham act claim because articles in trade magazine critical of plaintiff's products were not commercial speech despite alleged conspiracy between publisher and competitor); *Gordon and Breach*, 859 F. Supp. 1521 (holding on motion to dismiss that academic articles challenged under Lanham Act were not commercial speech based on allegations in the complaint and review of the articles).

Beyond this, Plaintiff does not allege (nor can it) that Defendant is a competitor. The most it can do is claim that Defendant receives an affiliate commission from one of Plaintiff's competitors. This does not satisfy the "commercial competition" requirement for "advertising in commerce" under *Gordon & Breach*. *See* 859 F. Supp. at 1536. Despite Plaintiff's conclusory allegations in response to Defendant's prior Motion to Dismiss, quietman7's statements on Defendant's forums are "isolated disparaging statements" for which Plaintiff "must seek redress under state-law causes of action," rather than an "organized campaign to penetrate the relevant market." *Fendi*, 314 F.3d at 57. The Court should thus dismiss Plaintiff's false advertising claim.

### 4.5.2   The Statements Are Neither False nor Misleading

Even if the Court finds that quietman7's statements are commercial advertising or promotion, there is no cause of action for false advertising here because the statements are neither false nor misleading. A statement must be false or misleading and *material*, meaning that minor inaccuracies do not give rise to a false advertising claim. And as with defamation claims, "[s]ubjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." *Groden v. Random House, Inc.*, 1994 U.S. Dist. LEXIS 11794, *18 (S.D.N.Y. Aug. 22, 1994) (citing *W.L. Gore & Associates, Inc. v. Totes, Inc.*, 788 F. Supp. 800, 808 (D. Del. 1992)). In other words, "[w]here the alleged misrepresentation is essentially 'a matter of argument, . . . the [consumer] to whom the argument [is] addressed [is] free to make up his own mind as to its validity.'" *Id.* (quoting *Glenn v. Advertising Publications, Inc.*, 251 F. Supp. 889, 904 (S.D.N.Y. 1966)).

As explained in Section 4.3, *supra*, none of the statements are false or misleading. The majority of statements are literally true; SpyHunter was previously placed on the <spywarewarrior.com> Rogue/Suspect Anti-Spyware Products List due to Plaintiff's history of aggressive and deceptive advertising. (*See* Doc. No. 17-5.) There are indeed numerous users of SpyHunter who have complained about the product and Plaintiff's pricing and advertising practices. (*See* Doc. Nos. 17-6, 17-7.) And based on the information disclosed in quietman7's posts on Defendant's forums, there is sufficient information to conclude that Plaintiff takes part in deceptive advertising and did not cooperate with AV-Test in testing SpyHunter. As none of these statements are false or misleading, the Court must dismiss Plaintiff's false advertising claim.

## 5.0    CONCLUSION

Plaintiff has brought an unsupportable claim to try to remove constitutionally protected speech from the Internet. This suit seeks to deprive the consuming public of information that is vital to market decisions in choosing computer software and circumvent Defendant's constitutional and federal statutory protections by shoehorning in a Lanham Act claim that has no place being here. Plaintiff's goal of censoring and silencing protected speech is more transparent in the Second Amended Complaint, which simply invents facts and alleges legal conclusions for the sole purpose of attempting to survive a motion to dismiss. The Court should see this suit for what it is and dismiss all of Plaintiff's claims against Defendant, with prejudice.

Dated April 8, 2016

Respectfully Submitted,

*/s/ Marc J. Randazza*
Marc J. Randazza, Esq.
Admitted *pro hac vice*
RANDAZZA LEGAL GROUP, PLLC
4035 South El Capitan Way
Las Vegas, Nevada 89147
Tele: 702-420-2001
Fax: 305-437-7662
Email: ecf@randazza.com

Gregory W. Herbert, Esq.
New York Bar Registration No. 2502755
GREENBERG TRAURIG, P.A.
450 South Orange Avenue, Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 841-1295
herbertg@gtlaw.com

John J. Elliott, Esq.
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
elliottj@gtlaw.com

# EXHIBIT 8

Existing user? Sign In          Sign Up

Browse        Activity        Malwarebytes.com        Search...

Home    quietman7                                          All Activity



# quietman7
**Experts**

See their activity

**CONTENT COUNT**   **JOINED**
50                  July 19, 2008
**LAST VISITED**
Yesterday at 04:18 PM

About quietman7

quietman7 started following
Introducing the Brand New
Malwarebytes Labs    June 23

**Rank**        Regular Member


Introducing the
Brand New
Malwarebytes
Labs
quietman7 replied to
Edisun's topic in
Malwarebytes News

Contact Methods

**ICQ**          0

Recent Profile Visitors

4,023 profile views

 **DevDream**
October 9

 **Herman_Salim**
August 28

 **axe0**
April 14

 **Khadijah**
April 5

The design looks
great and the pages
load faster for me
than they did
previously.

June 23
23 replies

◀  malwarebytes labs
◀ blog    (and 1 more)

quietman7 started following
Bleeping Computer Sued by
Crapware Vendor    February
1

quietman7 started following
Junkware Removal Tool (JRT)
crashes, just stops    October
13, 2015

 **Malwarebytes
Acquires Junkware
Removal Tool**
quietman7 replied to
RubbeR DuckY's
topic in Malwarebytes
News

Congratulations
thisisu... another
awesome addition to
the Malwarebytes
Team.

June 23, 2015
74 replies

quietman7 started following
Malwarebytes Acquires
Junkware Removal Tool
June 23, 2015



### Cybertris - Stealing content from Malwarebytes website for their own

quietman7 replied to Aura's topic in General Chat

That's fine but you obviously miss the entire point...you cannot conclusively call this proof.

April 26, 2015
15 replies



### Cybertris - Stealing content from Malwarebytes website for their own

quietman7 replied to Aura's topic in General Chat

I by no means am defending this scaware. What I am saying is that it may not be sufficient to prove prima facie convincing evidence of deliberate violation of law. Until that is researched and confirmed by Malwarebytes' legal team, it is not proof positive. Burden of proof is...

April 26, 2015
15 replies

quietman7 started following
Cybertris - Stealing content
from Malwarebytes website for
their own    April 26, 2015



## Cybertris - Stealing content from Malwarebytes website for their own

quietman7 replied to
Aura's topic in
General Chat

As I commented in
the BC topic...while a
lot of that kind of
information is similar
(and used by many
security vendors),
unless I missed
something, I do not
see where there is a
direct copy of the
exact wording used
on Malwarebytes'
website. As such, it
does not appear to...

April 26, 2015
15 replies



## Introducing Malwarebytes Anti-Malware 2.0!

quietman7 replied to
RubbeR DuckY's
topic in Malwarebytes
News

Thank you for the
clarafication. We still
get quite a few folks
who ask that question
so I will make not of
this Official statement

of support for 1.75 for
reference.

February 12,
2015
214 replies



Introducing
Malwarebytes
Anti-Malware 2.0!
quietman7 replied to
RubbeR DuckY's
topic in Malwarebytes
News

There seems to be
some conflicting
information in regards
to support of v1.75
What does
Malwarebytes Anti-
Malware 2.0 mean for
me? AdvancedSetup,
Root Admin
Malwarebytes Forum,
Post #169

February 11,
2015
214 replies



Introducing
Malwarebytes
Anti-Malware 2.0!
quietman7 replied to
RubbeR DuckY's
topic in Malwarebytes
News

Malwarebytes Anti-
Malware 2.0 & 1.75
download

April 17, 2014
214 replies



### Introducing Malwarebytes Anti-Malware 2.0!

quietman7 replied to RubbeR DuckY's topic in Malwarebytes News

Thanks. I thought there was a problem....just wanted to confirm. And knowing the development team is always one step ahead...I figured they were already working to resolve this.

April 7, 2014
214 replies



### Introducing Malwarebytes Anti-Malware 2.0!

quietman7 replied to RubbeR DuckY's topic in Malwarebytes News

Are manually updates still performed the same way...copying mbam-rules, database.conf after an update and transferring them to their respective folders on another computer? I have tried this several times and keep getting a message about the database being corrupt.

April 7, 2014
214 replies



### [SOLVED] Malwarebytes Pro + Anti Exploit +/- Hitman Pro - Alert 2.5 w/ CryptoGuard?

quietman7 replied to JustBoughtMBPro's topic in Malwarebytes Anti-Exploit

HitmanPro.Alert warns when malware has intruded your browser. Alert will not block malware. It is not an antivirus. 1. The Intruder feature is only for web browsers when they are open. Intrusions happening while browser is open, will be detected and an alert will be...

November 28, 2013

11 replies

 malwarebytes pro

anti exploit

(and 4 more)



### [SOLVED] MBAE blocking Firefox and bbEditor preview

quietman7 replied to quietman7's topic in Malwarebytes Anti-Exploit

Issue resolved after performing a clean install of Firefox.

November 13, 2013

3 replies

 [SOLVED] MBAE blocking Firefox and bbEditor preview

quietman7 replied to quietman7's topic in Malwarebytes Anti-Exploit

Sent.

November 11, 2013

3 replies

 [SOLVED] MBAE blocking Firefox and bbEditor preview

quietman7 posted a topic in Malwarebytes Anti-Exploit

I have MBAE on four family computers (three Windows 7, one XP. On the XP machine, MBAE will block Firefox (Exploit attempt) when trying to run it from a taskbar shortcut or the program folder. Running FF from the Desktop shortcut seems to work ok. Since FF is my...

November 10, 2013

3 replies



[SOLVED]
Malwarebytes-anti
exploit 0.09.4.2000
vs Hitmanpro.Alert
2.5 Beta

quietman7 replied to
Avastfun's topic in
Malwarebytes Anti-
Exploit

I have MAE and
HMP.Alert running on
four family computers
without any issues so
apparently doing this
is not affecting all
users.

November 10,
2013

2 replies

◀ Malwarebytes-anti exploit

Home      quietman7                                        All Activity

Privacy Policy    Contact Us

Back to Top

Malwarebytes

Community Software by Invision Power Services, Inc.